# EXHIBIT C

```
 1        IN THE UNITED STATES DISTRICT COURT FOR THE

 2           MIDDLE DISTRICT OF PENNSYLVANIA

 3                      - - -

 4   RIC SZABO,                    :   Civil Action

            Plaintiff             :   No. 21-cv-00468

 5                                 :

        vs.                        :

 6                                 :

     MUNCY INDUSTRIES, LLC         :

 7   D/B/A MUNCY MACHINE &         :

     TOOL CO., INC.,               :

 8           Defendant             :

 9

10                       - - -

11        Wednesday, August 24, 2022

12                       - - -

13        Remote videoconference deposition of JASON

14   FETTER, taken pursuant to notice, at the location of

15   the witness in Houston, Texas, on the above date,

16   beginning at 10:08 a.m. Eastern Standard Time,

17   before Donna A. Bittner, RMR-CRR and Notary Public.

18                       - - -

19

20

21

22        GOLKOW TECHNOLOGIES, INC.

       (877) 370-3377 / fax (917) 591-5672

23           deps@golkow.com

24
```

Jason Fetter

```
 1

    APPEARANCES:  (VIA ZOOM)
 2

            MARY KRAMER, ESQUIRE
 3          Murphy Law Group, LLC
            1628 John F. Kennedy Boulevard
 4          Eight Penn Center, Suite 2000
            Philadelphia, Pennsylvania  19103
 5          (267) 273-1054
            mkramer@phillyemploymentlawyer.com
 6          Counsel for Plaintiff

 7          GREGORY A. STAPP, ESQUIRE
            Stapp Law, LLC
 8          153 West Fourth Street
            Suite 6
 9          Williamsport, Pennsylvania  17701
            (570) 326-1077
10          gstapp@stapplaw.com
            Counsel for Defendant
11

12
                        -  -  -
13

14

15

16

17

18

19

20

21

22

23

24
```

Jason Fetter

1

I N D E X

2    WITNESS:                                    PAGE

3    JASON FETTER

4        By Ms. Kramer                          4, 56

5        By Mr. Stapp                           54

6

                        - - -

7

     EXHIBITS        DESCRIPTION               PAGE

8

9    Fetter-1    Defendant's Answers to

                 Plaintiffs' Interrogatories

10               (8 pages)                      20

11   Fetter-2    Application for Employment

                 and Resume Muncy-000011-000015  46

12

13                       - - -

14

15

16

17

18

19

20

21

22

23

24

Jason Fetter

```
 1              COURT REPORTER:   All

 2         parties to this deposition are

 3         appearing remotely and have agreed

 4         to the witness being sworn in

 5         remotely.  Due to the nature of

 6         remote reporting, please pause

 7         briefly before speaking to ensure

 8         all parties are heard completely.

 9                   - - -

10              ...JASON FETTER, 4804

11         Chaperel Drive, Pearland, Texas

12         77584, having been duly sworn, was

13         examined and deposed as follows...

14                   - - -

15              EXAMINATION

16                   - - -

17    BY MS. KRAMER:

18         Q.   Good morning, Mr. Fetter.

19    My name is Mary Kramer.  I am one of the

20    attorneys representing Mr. Szabo in the

21    matter he has brought against Muncy

22    Industries.  The reason I have asked you

23    here today is just to ask you about what

24    facts you have personal knowledge of and
```

Jason Fetter

1   then after I'm finished your attorney may

2   have some follow-up questions and then we

3   will be finished.

4            All right?

5       A.   Yes.

6       Q.   First, I'd just like to go

7   over a few instructions with you.

8            Have you ever had your

9   deposition taken before?

10      A.   No.

11      Q.   So when I ask you a

12  question, I would just ask that you allow

13  me to finish asking my question before

14  answering, and likewise I will do my best

15  to allow you to finish answering before I

16  ask you my next question.  This way

17  things will be easier for Donna, our

18  court reporter, to get everything and it

19  will make it so we have a clean and clear

20  transcript.

21           Okay?

22      A.   Yes.

23      Q.   I'd also ask you to keep

24  your responses verbal instead of um-hum

```
 1   or uh-uh or nodding or shaking your head,

 2   because Donna will have a difficult time

 3   getting answers like that down on the

 4   record.

 5              And I also want to make it

 6   very clear that I am not asking about any

 7   privileged information, so any

 8   communications or conversations that you

 9   have had with your attorney are not

10   things you need to tell me.  Okay?

11        A.    Yes.

12        Q.    If your attorney has any

13   objections to any of my questions, please

14   allow us to resolve that objection and

15   then you can go ahead and answer the

16   question.  All right?

17        A.    Yes.

18        Q.    If you don't know the answer

19   to something, please don't guess.  You

20   can tell me you don't know or that you're

21   unsure and then we can just move on.  All

22   right?

23        A.    Yes.

24        Q.    And then just remember that
```

Jason Fetter

```
 1   this is under oath the same way it would

 2   be if we were before a judge and jury, so

 3   you are required to tell the truth as

 4   much as you're able to.  All right?

 5        A.   Yes.

 6        Q.   If at any time you need to

 7   take a break, just let me know and I will

 8   be happy to do so.  The only thing I ask

 9   is that if there is a question pending,

10   you answer that question before we can

11   take a break.  Okay?

12        A.   Yes.

13        Q.   With that out of the way,

14   can you please state your name for the

15   record?

16        A.   Jason Fetter.

17        Q.   How old are you?

18        A.   Oh, you're asking easy

19   questions.  Like 44.

20        Q.   Like 44?

21        A.   Yes.

22        Q.   All right.  What is your

23   current mailing address?

24        A.   4804 Chaperel Drive,
```

Jason Fetter

```
 1   Pearland, Texas 77584.

 2         Q.    Is there anyone in the room

 3   with you?

 4         A.    Not in the close proximity,

 5   no.

 6         Q.    Do you have any documents or

 7   notes with you right now?

 8         A.    No.

 9         Q.    How did you prepare for

10   today's deposition?

11         A.    I reviewed some of the

12   pleadings and other depositions.

13         Q.    Okay.  Did you speak with

14   anyone about today's deposition besides

15   your attorney?

16         A.    No.

17         Q.    Did you speak to Megan

18   Delahoussaye about today's deposition?

19         A.    No.

20         Q.    Did you speak to Megan

21   Delahoussaye about her deposition on June

22   15, 2022?

23         A.    No.

24         Q.    Is there anything that would
```

Jason Fetter

```
 1   prevent you from testifying truthfully

 2   today?

 3        A.    No.

 4        Q.    The next question, it may

 5   sound invasive, but I don't mean any

 6   offense by it.  Are you currently taking

 7   any drugs or medications that would

 8   interfere with your ability to understand

 9   my questions or to tell the truth?

10        A.    No.

11        Q.    Are you taking any drugs or

12   medication that would impair your memory?

13        A.    No.

14        Q.    When did you learn about

15   Mr. Szabo's claims against Muncy?

16        A.    I guess when he filed suit.

17        Q.    After you learned about

18   Mr. Szabo's lawsuit, did anyone excluding

19   your attorney give you instructions

20   regarding saving documents that might be

21   related to this matter?

22        A.    No.

23        Q.    To the best of your

24   knowledge, since you first learned of
```

```
1    this lawsuit, have any documents that are
2    related to this matter and Mr. Szabo's
3    employment with Muncy been destroyed?
4         A.    Can you repeat the question?
5         Q.    Sure.  To the best of your
6    knowledge, since you first learned about
7    Mr. Szabo's lawsuit, have any documents
8    that are related to Mr. Szabo's lawsuit
9    and his employment with Muncy been
10   destroyed?
11        A.    No.  I would like to say --
12        Q.    Mr. Fetter --
13        A.    I would like to say that Ric
14   had documents and he might have -- that
15   was prior to the action.  He had a laptop
16   that he wiped, so some documents he could
17   have had there that we do not have access
18   to.
19        Q.    Okay.  What is your highest
20   level of education?
21        A.    I have a juris doctorate and
22   a master of business administration.
23        Q.    Where did you go to law
24   school and then to get your master's?
```

Jason Fetter

```
1          A.    Penn State Dickinson in

2   Carlisle, Pennsylvania for the law

3   school.  My master's in business

4   administration was through Penn State as

5   well.

6          Q.    So you got your JD.  Did you

7   take the bar exam?

8          A.    Yes.

9          Q.    Are you currently

10  admitted --

11         A.    No.

12         Q.    -- to practice?  Okay.

13  Where did you take the bar exam?

14         A.    When?  2003.

15         Q.    What state?

16         A.    Pennsylvania.

17         Q.    Did you practice law after

18  that?

19         A.    Yes.

20         Q.    What was your field of

21  practice?

22         A.    I was kind of like Atticus

23  Finch, so I was a small town attorney,

24  kind of did whatever came in the door.  We
```

Jason Fetter

```
 1    did everything, so I filled in for

 2    different people, so yes.

 3          Q.    When did you start working

 4    for Muncy?

 5          A.    Full time or ever?

 6          Q.    Both.

 7          A.    I worked in college a little

 8    bit in the machines.  I worked 2004 or '5

 9    maybe second shift on the machines while

10    I was an attorney.

11          Q.    Okay.

12          A.    I started full time

13    2006-ish, and then I worked until 2012,

14    and then I moved to Houston, and then I

15    went back to Muncy in 2014, and I have

16    been with Muncy since.

17          Q.    So in 2014 what was your

18    position?

19          A.    At Muncy?

20          Q.    Yes.

21          A.    Vice president.

22          Q.    Were you still an attorney

23    at the time?

24          A.    I'm still an attorney now.
```

Jason Fetter

```
 1   Did I practice in 20 -- in 2014 I did
 2   not, I stopped.  I was not practicing.
 3        Q.    Okay.  What are your job
 4   duties for Muncy as a vice president?
 5             MR. STAPP:   I missed the
 6        question.
 7             THE WITNESS:  I'm sorry.
 8             MR. STAPP:  Yeah, it broke
 9        up.
10             THE WITNESS:  Yeah.
11   BY MS. KRAMER:
12        Q.    What are your job duties for
13   Muncy as a vice president?
14        A.    Fill in the holes.  Small
15   company, small family business, so I'm
16   involved in sales, I'm involved in
17   purchasing, I'm involved in quality, I'm
18   involved in production, I'm involved in
19   shipping, I'm involved in accounting, I'm
20   involved in some engineering, I'm
21   involved in calibration, I'm involved in
22   whatever the holes are.  I mean, it's
23   very eclectic.
24        Q.    Okay.  So in this
```

Jason Fetter

1    fill-in-the-hole position as the vice

2    president, is one of your

3    responsibilities hiring and firing

4    employees?

5         A.    Yes.

6         Q.    And then is this your

7    decision -- or let me ask it a different

8    way.  Who at Muncy decides whether an

9    employee would be classified as an exempt

10   employee and paid a salary or whether

11   they would be paid on an hourly basis and

12   entitled to overtime?

13        A.    It depends on who is hiring

14   the employee.

15        Q.    Okay.  So you're not the

16   only person who does the hiring?

17        A.    Correct.

18        Q.    Who else makes those

19   decisions?

20        A.    The plant managers can make

21   some of the decisions depending on, in

22   terms of hiring and firing.  There is

23   also, I would say Ophelia Fetter also

24   hires and fires, Justin Fetter hires and

Jason Fetter

1    fires, I would say the plant managers

2    hire and fire.

3         Q.    Okay.  Who is Ophelia

4    Fetter?

5         A.    She is the president and

6    owner of some of the entities.

7         Q.    Justin Fetter?

8         A.    He's the vice president of

9    Muncy Machines and a part owner.

10        Q.    Okay.  Are you a part owner?

11        A.    It's complicated, but I'll

12   go with no.

13        Q.    Okay.  Was it your decision

14   to make Mr. Szabo a salary exempt

15   employee?

16        A.    Yes.

17        Q.    How did you make that

18   decision?

19        A.    It was a new division.  It

20   was a new function that Muncy had never

21   done, which was service test beds,

22   service and calibrate and service

23   equipment, so I was learning what type of

24   travel was required because we have never

Jason Fetter

1   done it, what expertise based off of what

2   Ric kind of explained to me as to the

3   travel involved, just having, because you

4   travel to go to do the service.  So based

5   off of the projects that I knew that he

6   was going to work on setting up the

7   entire department, writing all the

8   procedures, it was just not a 40-hour

9   week kind of job, so based off of his

10  experience in the industry, which was

11  very specialized based off of his

12  experience in the military and all of his

13  acclimates along the way, it seemed like

14  it was prudent to, to also ask Ric, you

15  know, how should we do this from an

16  accounting, how do we account for this,

17  how do we figure out the easiest way, the

18  most fair way to do this, and we came up

19  with salary.

20         Q.    Okay.  So then when did you

21  first meet Mr. Szabo?

22         A.    Face to face?

23         Q.    In any capacity.  If you

24  don't remember the date, that's fine.

Jason Fetter

```
 1        A.    I believe it was in November
 2   or December of 2017.  I met him at a
 3   hotel for breakfast to talk about the
 4   position, what he could do.  It was kind
 5   of a job interview trying to -- I had
 6   never met him.  I had never heard of him.
 7   I wasn't in that space.  That would be
 8   when.  Yeah, I think it was in Indiana or
 9   somewhere in the Midwest.
10        Q.    Okay.  So what led to this
11   job interview?
12        A.    I had understood that
13   Mr. Szabo was no longer employed in our
14   industry and was a very, he was the lead
15   calibration tech for another company and
16   was unemployed and looking for a job.
17              I believe he and Joe Roberts
18   had a relationship and Joe had mentioned
19   you might want to consider this guy
20   because he's highly technical, he knows
21   what he's doing, he's done it before,
22   plug and play, kind of he could build the
23   whole department, and so I said okay,
24   let's meet this guy, so that's what we
```

Jason Fetter

1  did.

2      Q.    And then when did you make a

3  decision to hire Mr. Szabo?

4      A.    I believe shortly right

5  after that meeting.  I think within a few

6  days I had sent some type of an offer to

7  him and within a few days after perhaps

8  he accepted it.

9      Q.    And the official title that

10  you hired Mr. Szabo for, what was that?

11      A.    Well, he was the only,

12  presumably the only calibration

13  technician, and I had no -- yeah, so

14  calibration technician.

15      Q.    Do you remember what the job

16  duties of that position were at the time

17  of hiring?

18      A.    At the time of hiring, so we

19  kind of, everything.  I mean he might

20  have even written -- he might have even

21  wrote his job description because I

22  didn't know what a calibration tech did.

23            He defined everything, so he

24  led everything, so he was responsible for

Jason Fetter

```
1   starting everything from scratch, so what
2   equipment do we need, what standards
3   should we comply with, what ISO should we
4   be complying with, what equipment should
5   we use to comply, how high should we go,
6   what should these kits have.
7              I mean, I didn't know
8   anything, so he kind of put a bill of
9   materials together.  He kind of made the
10  certs for, you know, when you calibrate
11  you have certificates.  He put all of
12  that together, all the forms, and that
13  was understood that he was going to start
14  this from scratch and the end result
15  would be the calibration department where
16  we would build it around him because he
17  knew and no one else knew.
18      Q.    Okay.  So I know you're a
19  lawyer.  What is your understanding of
20  the claims Mr. Szabo has brought against
21  Muncy?
22      A.    He wants overtime, back pay
23  for overtime.
24      Q.    Are you familiar with the
```

1    Fair Labor Standards Act?

2         A.    Very generally.

3         Q.    All right.  What about the

4    Pennsylvania Minimum Wage Act?

5         A.    Generally.

6         Q.    I show you, and I know

7    you're on your phone, so this might be

8    difficult for you to see, so just let me

9    know, but I'm going to share my screen

10   and show you what I've marked as

11   Fetter-1.  Those are Defendant's Answers

12   to Plaintiffs' Interrogatories.

13             (Exhibit Fetter-1 was marked

14        for identification.)

15   BY MS. KRAMER:

16        Q.    Just give me one second.  If

17   you need me to make the screen bigger,

18   let me know, but are you familiar with

19   this document?

20        A.    Yes.

21        Q.    Just for the record, when

22   we're discussing this document, please

23   know that when I say "plaintiff" I'm

24   referring only to Ric Szabo.  Okay?

Jason Fetter

```
 1        A.    Yes.
 2        Q.    Did you assist in answering
 3   plaintiff's Interrogatories on behalf of
 4   Muncy?
 5        A.    Yes.
 6        Q.    I'm not going to go through
 7   all of the answers, only a few of them,
 8   but I am going to start with Number 1.
 9   I'm going to read the question for the
10   record and I'll also give you an
11   opportunity to review it for yourself as
12   well as your answer.
13              Interrogatory No. 1 says,
14   "Identify by name, last known address and
15   last known telephone number, all persons
16   with knowledge of the facts and
17   circumstances alleged in Plaintiff's
18   Complaint and in Defendant's Answer to
19   complaint and Affirmative Defenses."
20              Did I read that correctly?
21        A.    Yes.
22        Q.    The answer only provides
23   your name, Jason Fetter, and what I
24   believe is your address and phone number;
```

Jason Fetter

1    is that correct?

2          A.    Yes.

3          Q.    So based on this answer to

4    Interrogatory No. 1, am I correct in

5    stating that you were the only person at

6    Muncy Industries with any knowledge of

7    the facts and circumstances alleged in

8    Mr. Szabo's Complaint and in Muncy's

9    Answer and Affirmative Defenses?  And I

10   can make it bigger if that will help.

11         A.    Yes, I'm the only one that

12   had the conversations for hiring him and

13   yes.

14         Q.    Okay.  So I'm going to move

15   down to Number 2 which is on Page 1 and

16   2, so this says, "Identify in full and

17   complete detail plaintiff's job" -- or

18   "plaintiff's title, job duties and

19   responsibilities."

20               I'll let you take a second

21   to read your complete answer, so just let

22   me know when you're ready.

23         A.    I'm ready.

24         Q.    Okay.  Mr. Szabo's job

Jason Fetter

1    title, you answered that he was a

2    calibration technician lead; is that

3    right?

4         A.    Yes.

5         Q.    Did you prepare this list of

6    his job duties and responsibilities for

7    the position of calibration technician

8    lead?

9         A.    That is certainly a form of

10   an answer, yes.  I mean, you can go into

11   more detail.  The other things he might

12   have also done was he had some sales

13   functions as well.

14        Q.    Okay.  So if we add sales

15   functions to that list, is there anything

16   missing?

17        A.    There is probably a lot

18   missing in many ways in that there is a

19   lot of, this is a general statement, and

20   there is a lot of -- there is other

21   duties.  There is a lot of other things.

22   He did a lot of things, technical, he did

23   a lot of things.

24        Q.    So is that not a full and

 1    complete detailed list of Mr. Szabo's job

 2    duties as a calibration technician lead?

 3         A.    Yeah, I would, I would go a

 4    little further where it says "Support

 5    other calibration technicians and create

 6    and lead the calibration programs

 7    technical aspects," I would kind of add

 8    to that the training of new calibration

 9    technicians, I would add to that

10    statement or to that list because it's

11    kind of in between both because it is

12    supporting calibration techs.  It's also

13    creating and leading program's technical

14    aspects and the training is very

15    technical.

16         Q.    Okay.  How many other

17    technicians did Mr. Szabo train?

18         A.    Five or six.

19         Q.    Five or six?

20         A.    Yes.

21         Q.    Okay.  Do you remember their

22    names?

23         A.    Shandi Crappell, Will Croy.

24    There were a few others that I don't know

1    their names, Miguel, and there is another

2    gentleman which I don't remember his name

3    that was trained under -- I don't think

4    they took.  I don't think they were

5    employed for long per Ric's

6    recommendations.

7         Q.    Okay.  Who else?

8         A.    Jason Fetter, myself, Ric

9    trained me.  I'm trying to think.  That's

10   five.  I feel like there might have been

11   another, but I don't -- those would be

12   the ones I would say that he trained.

13        Q.    All right.  So next I want

14   to look at Number 5.  Let me know when

15   you've had a chance to review and

16   complete.  It starts here and goes to

17   here (indicating).

18        A.    Okay.  What's your question?

19        Q.    In part, Interrogatory No.

20   5, asks defendant to state with

21   particularity the number of hours

22   plaintiff worked in each calendar week

23   during the last three years, and in

24   relevant part defendant answers, "Ric

Jason Fetter

1    Szabo was a salary employee.  See times

2    clocked in as already submitted as they

3    speak for themselves.  During trips no

4    record was taken of his time, as he was a

5    salaried employee as he had agreed in his

6    offer letter and as he was paid for the

7    two or so years he was employed."

8              Based on this answer it

9    seems that there was no method of

10   tracking the calibration technician's

11   time when he was in the field; is that

12   correct?

13        A.    Correct.

14        Q.    So did the calibration

15   technicians work 9:00 to 5:00 when they

16   were in the field?

17        A.    It depends.

18        Q.    What did it depend on?

19        A.    So some calibrations could

20   be in two, three hours.  Some

21   calibrations could take a day or two.

22   Sometimes there is travel, sometimes

23   there is not in between.  Sometimes

24   they're local, sometimes they're -- there

1    is some travel, so sometimes you're done

2    calibrating at 10:00 a.m., 11:00 a.m. in

3    the morning and then you can move on to

4    the next place.  Sometimes you're done at

5    5:00.  It just depends.  And we did not

6    have any mechanism for tracking time on

7    the road like that that was reliable and

8    so we just, we felt this was the easiest

9    and the most fair way to be salary.

10   Because of the travel it made sense for

11   him to be salary as everyone agreed.

12          Q.    Was that the policy for all

13   the calibration technicians?

14          A.    Yes.

15          Q.    Was that the policy if the

16   calibration technician was not a

17   calibration technician lead?

18          A.    Yes.

19          Q.    If the calibration

20   technician finished a job at one site at

21   5:00 p.m., would they be instructed to

22   drive to the next site or would they be

23   instructed to wait until the next day and

24   drive during business hours?

Jason Fetter

1          A.    It's up to the calibration

2    tech.

3          Q.    Do they have set times --

4          A.    There are --

5          Q.    I'm sorry, go ahead.

6          A.    Well, there are factors,

7    too, so, you know, weather can play a

8    role in decisionmaking, how close the

9    other location is.  It's really, you

10   know, when you're on your trip, you know,

11   the calibration tech is the one doing the

12   work and driving or flying or doing

13   whatever so it's...

14         Q.    And this answer, you know,

15   it talks about the times clocked.  As

16   vice president were you also someone who

17   clocked in and clocked out?

18         A.    No.

19         Q.    What was the purpose of

20   having a salaried employee clock in and

21   clock out?

22         A.    So when you're at a facility

23   the concept is you're still supposed to

24   maintain at least regular hours, so we

Jason Fetter

1   wanted to see how many hours people work

2   hourly or salary.  We want to see when

3   they get to work, if they're late, if

4   they're early, if they stay late, if they

5   leave early, you know.  We just need to

6   understand the hours people are putting

7   in if they're at a facility, a Muncy

8   facility.

9        Q.    I'm just going to jump down

10  to Number 9.  Let me know when you've had

11  a chance to read the question and the

12  answer.

13       A.    Okay.

14       Q.    Just for the record, this

15  asks, "Describe in detail the factual

16  basis for defendant's contentions in its

17  answer that plaintiffs were exempt

18  employees within the meaning of the FLSA

19  and the PMWA, including but limited to

20  the professional executive administrative

21  or other professional exemption and

22  corresponding state laws."

23            I haven't been able to

24  figure it out by reading the answer, so

1    I'm going to ask you which exemption

2    Muncy is asserting applies to Mr. Szabo.

3            A.    Is that a legal -- I don't

4    understand.  Can you ask me the question

5    about --

6                MR. STAPP:  I'll just object

7            to the form of the question.  If

8            you can answer the question, you

9            can answer it.  If you don't,

10           because you're not an expert in

11           FLSA, then you don't need to

12           answer the question.

13               THE WITNESS:  Yeah, I'll

14           answer any question that's

15           factual.

16               MS. KRAMER:   Mr. Fetter has

17           said he helped prepare these

18           answers.  I'm not sure based on

19           this answer which exemption Muncy

20           is claiming applies to Mr. Szabo.

21               THE WITNESS:  Can you read

22           to me the FLSA and the PMWA?  I'm

23           not sure what -- maybe I could

24           help you if you read to me the

Jason Fetter

```
 1          section that you're referring to,
 2          but that is still a legal
 3          conclusion.  I'm just trying to
 4          give you facts.
 5  BY MS. KRAMER:
 6          Q.   So you can answer that way
 7  if you're not sure which exemption
 8  applies.
 9          A.   I'm not sure.
10          Q.   What was Mr. Szabo's primary
11  duty as a calibration technician lead?  I
12  know we already discussed his
13  responsibilities a little bit, if you had
14  to narrow it down to a primary duty.
15          A.   I'm sorry.  Can you repeat
16  that question?
17          Q.   What was his primary duty as
18  a calibration technician lead?
19          A.   So at different times there
20  was different roles.  In the very
21  beginning he was, he started from
22  scratch, so write the procedures, write
23  the forms, do the research on what we
24  needed, find vendors for the equipment
```

Jason Fetter

1    that we needed, design the equipment

2    because they're custom, and this is a

3    very niche of a niche market and what we

4    were looking for was very niche.

5              Then once, once we had the

6    basis of what the actual calibration

7    program was, then to get it accredited,

8    so he had to watch that and then add,

9    once it was accredited, once we were

10    essentially competent, then going out and

11    calibrating, and then once we started

12    doing that then we further, he would

13    train people to do so, all the while

14    maintaining and growing our knowledge

15    base and determining how to, you know,

16    there are problems in the field, you

17    know.  He was the resident expert where

18    if you had a question about a hookup on

19    how to calibrate, if you had a question

20    on how low you can go, if you had a

21    question about the instrumentation and

22    how it was reading, he was our go to guy

23    because he had the experience and he

24    taught everybody how to do it.

Jason Fetter

```
 1                   So he was, when he was

 2    traveling he was still on call, he was

 3    still getting questions about how do you

 4    do certain things.  When he was not on

 5    the road, people would still call him

 6    because he was our expert.

 7                   In addition to that, are you

 8    talking about his role as a calibration

 9    tech lead, and while he was on the road

10    he was also looking for opportunities to

11    help kind of consult with our, the test

12    beds we were manufacturing.  I mean, he

13    was constantly being asked for his expert

14    opinion because he's seen so many test

15    beds.  He's seen what's worked and what

16    has not worked well, so he was often a

17    springboard for our mechanical engineers

18    to ask him questions on functionality and

19    also on the practicality.

20                   At the same time when he was

21    in the office he was setting up the lab

22    trying to make it so that we could

23    calibrate at our Lafayette location as

24    well.
```

Jason Fetter

1      Q.    How often was he in the

2  office?

3      A.    I think it really

4  fluctuated, so there were times,

5  especially early on when he first

6  started, he was in the office the whole

7  time.

8           When we were setting up the

9  program, before we had equipment, the

10  first few months he was there

11  exclusively, and then over time as the

12  calibration program took off he was on

13  the road more and more.

14           We tried to limit travel to

15  be palatable for everybody because it's a

16  marathon, not a sprint, but we wanted

17  to -- so oftentimes we would try to have

18  time in between trips, but sometimes it

19  didn't work that way because he was our

20  only calibration tech, and he understood

21  that.  At one -- at some point he was the

22  only calibration tech we had, and then

23  over time he became the lead after we had

24  more.

Jason Fetter

```
 1          Q.    So just to make things a

 2   little more definitive, when did

 3   Mr. Szabo start going out on the road?

 4          A.    I would have to look at that

 5   list we provided.  I'd have to look at

 6   that list we provided, but I would say

 7   April or May of 2018 perhaps, I'm not

 8   sure, but I would defer to that list.

 9          Q.    And then it was probably

10   every week?

11          A.    No, no, no.  There would be,

12   there were some months we were slow and

13   we didn't have much, that much going, so

14   it just depended.  Sometimes he would go

15   just for a few days, sometimes he'd do

16   local stuff, sometimes he would, you

17   know, it just, it really varied because

18   -- it really varied.

19          Q.    When you said Mr. Szabo

20   trained the calibration techs, did he

21   tell them where to go?  Did he give them

22   their assignments, these other employees

23   of Muncy?

24          A.    No.  He trained on the
```

Jason Fetter

```
 1   technical side of calibration because if

 2   you do it wrong people can die, and if

 3   you do it wrong, you can damage

 4   equipment, you can hurt people, so it was

 5   very important that he showed them the

 6   proper way of setting up the equipment,

 7   operating the equipment, calibrating it

 8   properly so it's within the standard.

 9        Q.   All right.  So he never gave

10   out anyone's assignments?

11        A.   No.

12        Q.   Did he have the authority to

13   hire and fire other employees?

14        A.   No.

15        Q.   So did he ever tell you

16   someone deserved a promotion and you

17   would listen to him?

18        A.   He gave me feedback

19   regularly of new calibration techs that

20   were under his supervision and that he

21   was training, so he was, he believed that

22   some of them should have been, were not a

23   good fit, and others were a very good fit

24   and we should invest in them.
```

Jason Fetter

1          Q.     Invest, what do you mean?

2          A.     We should keep them, we

3    should continue to train and invest Ric's

4    time in them.

5          Q.     Okay.  So if he told you to

6    hire someone, fire someone, promote

7    someone, you would listen to him?

8          A.     Absolutely.

9          Q.     Would you always listen to

10   him?

11         A.     Can you repeat the question?

12   I didn't hear you.

13         Q.     Would you always listen to

14   him when he would make a recommendation?

15         A.     I would always listen in

16   terms of personnel issue, of course.  I

17   mean, a manager listens and weighs all

18   the facts they have presented to them.  I

19   don't think I was ever in any really

20   disagreement with him on the personnel

21   that he trained.

22         Q.     Okay.  Did you ever make a

23   decision based on what Mr. Szabo told you

24   about an employee?

Jason Fetter

```
 1        A.    Yes.

 2        Q.    Okay.  As lead calibration

 3   technician, would you describe

 4   Mr. Szabo's work as office work or field

 5   work?

 6        A.    Can you repeat the question?

 7   I apologize.

 8        Q.    So Mr. Szabo --

 9        A.    I can't hear you.

10        Q.    Would you classify

11   Mr. Szabo's work as office work or field

12   work?

13        A.    Both.

14        Q.    All right.  Would you call

15   it manual work or nonmanual work?

16        A.    Both.

17        Q.    Was Mr. Szabo able to

18   exercise discretion and independent

19   judgment?

20        A.    Every day.

21        Q.    Did he need your approval

22   for things first?

23             MR. STAPP:   I couldn't hear

24        the question, Mary.  You're kind
```

Jason Fetter

```
1          of going in and out, but go ahead.
2    BY MS. KRAMER:
3          Q.    Mr. Szabo, did he need to
4    get your approval before he made
5    decisions about buying things, about
6    talking to your clients, about going
7    places?
8          A.    It depends on what it was.
9          Q.    Okay.
10         A.    So when he was calibrating,
11   I was not, so I gave him zero input on
12   how to start the program, the equipment,
13   the -- if he's out in the field, what low
14   you do, you give a customer, how to rig
15   the equipment in the field, how to
16   operate the equipment, what is, you know,
17   in a critical way what is safe, the safe
18   operation of that equipment.
19              Ric was making those
20   decisions every time he calibrated and we
21   trusted him because of his reputation,
22   his training and the results that he was
23   providing, which was consistently good
24   calibrations.
```

Jason Fetter

```
 1                    So from a technical side of

 2    things, you know, Ric on a daily basis

 3    made all those decisions and he also made

 4    them for other people as a calibration

 5    tech lead when they had questions or when

 6    he told them to do it, they did it.

 7                    As it pertains to expenses

 8    and travel, there were certain parameters

 9    that we tried to stay within, but Ric

10    booked the travel, Ric booked the cars,

11    Ric booked the hotels, Ric bought his

12    meals, and he would do that on, you know,

13    as he traveled.

14                    Would I review it after the

15    fact just to make sure that we're

16    following, you know, that everything was

17    reasonable?  Absolutely, but, you know,

18    every situation is different.  You know,

19    there are times when he needed to go buy

20    something in the field, he needed some

21    kind of wire, some kind of something in

22    the field to get the job done, he would

23    take his credit card, go and just get

24    that done, so it just depended on what it
```

Jason Fetter

```
 1   was.

 2              If he wanted to buy capital

 3   expenditures, if he wanted to buy, mostly

 4   capital expenditures, then we have a

 5   process and he would follow that process

 6   in order to achieve that, and he did buy

 7   multiple and fill out multiple capital

 8   expenditures, and we did what he said

 9   because he was the expert.

10        Q.    Okay.  Could he sign up a

11   new client without talking to you about

12   it?

13        A.    What do you mean by sign up?

14        Q.    Honestly, I don't know the

15   calibration field.  Like sign a contract

16   with somebody without discussing it with

17   you?

18        A.    So if he -- there were times

19   where he would be at a calibration and he

20   would say, hey, I can calibrate this

21   other stuff here that is here, or maybe

22   they need another piece of equipment, or

23   while I'm here I can fix this for them,

24   and he would do it and we would charge
```

1    the customer.

2         Q.    Okay.  Did he have to send

3    you every day though a status report?

4         A.    So when he's calibrating in

5    the field, I truly, my involvement was

6    very, very little.  Now, in the back I

7    tried to make sure that we had customers

8    and I tried to be more on the sales side

9    to get the business, but the actual trips

10   and the details, others put those

11   together, I did not, so he was not in

12   communication with me about trips.

13              When you're calibrating

14   there is no daily log.  When you're done

15   calibrating you fill out the certificate

16   showing that we pulled the numbers and

17   verified the numbers to the E4 standard

18   per our ISO 17025.

19              So he would send that on a

20   regular basis to be checked and to be,

21   you know, and there was another form for

22   a work order to make sure that we did the

23   work, and when he got there and when he

24   left, the typical type of paperwork that

Jason Fetter

1    you would do for a calibration.

2              When he was not in the

3    calibration side and when he was in the

4    office, he would work with me among

5    others, but he would work with me on some

6    projects, and I tried to work with him to

7    manage and focus him on what needed to be

8    done in the office.

9              Calibration, you know,

10   traveling around, he really didn't have a

11   lot of contact with me.  When he was in

12   the office he had more contact with me,

13   and that was again setting up the lab

14   early on, setting up the procedure, just

15   trying to make sure that he wrote them

16   within a reasonable amount of time.  The

17   substance, I didn't know what I was

18   looking at.  I mean, this was a Ric

19   thing.  He was the expert.

20        Q.    So when I talk about him

21   giving you a daily goal list, a weekly

22   goal list, are you familiar with what I'm

23   talking about?

24        A.    Yes.

Jason Fetter

1          Q.    All right.  Did everyone

2    have to do that?

3          A.    It depends on people's

4    functions.  For what he was doing he was

5    working on a lot of different projects

6    and I was trying to make sure that he was

7    working on them within the time frames

8    that we had agreed.  So that's what that

9    was, just to keep him, just so I

10   understood what he was doing when he

11   wasn't calibrating.

12         Q.    Okay.  So would you classify

13   being a lead calibration technician as

14   work that is predominantly intellectual

15   in character?

16         A.    Substantially intellectual I

17   would say.

18         Q.    Did you say "substantially

19   intellectual"?

20         A.    Yes, intellectual for sure.

21   Let me rephrase.  Yes, because you have

22   to understand the rules.  You have to

23   walk -- every situation is different for

24   how you're going to approach each

Jason Fetter

```
 1   calibration.  You have to have multiple

 2   disciplines.  You have to be good at

 3   multiple disciplines, which includes the

 4   rotation side, the electrical side.  You

 5   have to be good at the rating side and

 6   the structural side.  You have to be good

 7   at operating heavy equipment.  You have

 8   to be good at following the rules.

 9              So I think, and especially

10   setting up the whole program is extremely

11   intellectual.  You needed to be able to

12   create work instructions and procedures

13   and understand what else is out there and

14   still comply with applicable procedures,

15   and I think he was very technical, so I

16   was very impressed with what Ric did for

17   us when he set up the program.

18        Q.    All right.  So does it

19   require knowledge in a field of science

20   or learning?

21        A.    Absolutely.  You need to

22   know physics.  You need to know D over D

23   ratio.  You need to know safety factors.

24   You need to know hydraulics.  You need to
```

Jason Fetter

 1    know, understand sometimes the electrical

 2    schematics and the hydraulic schematics

 3    of equipment.  I mean, a lot of these

 4    things are above me.  I don't know how to

 5    do a lot of these things that Ric did.

 6         Q.   All right.  So does it

 7    require a prolonged course of specialized

 8    intellectual instruction?

 9         A.   I don't know how you would

10    do it otherwise.  If you don't have that

11    type of background to start a, a program

12    and to understand holistically how

13    everything fits together, it would be a

14    disjointed program if you did not

15    understand all of these things, and we

16    were lucky to find Ric who had all of

17    these things.

18         Q.   All right.  So I'm going to

19    show you what I marked as Fetter-2.

20              (Exhibit Fetter-2 was marked

21         for identification.)

22    BY MS. KRAMER:

23         Q.   This is Mr. Szabo's

24    application for employment with Muncy and

Jason Fetter

```
 1  his resume, so it's a six-page document.

 2  Let me know when you're ready for me to

 3  go to the next page.

 4            Again, if you need me to

 5  make anything bigger, just let me know.

 6       A.    Sorry for my face.

 7            Okay.

 8            Okay.

 9            Okay.

10            Okay.

11            Yes.

12            Okay.

13       Q.    Is there anywhere on

14  Mr. Szabo's application or his resume

15  that says he has spent a significant

16  amount of time in a classroom?

17       A.    Yes.

18       Q.    Where?  And I can go back

19  up.

20       A.    First, I would say the

21  document speaks for itself.  Second, I

22  would say that his training in the

23  military, his training on engines and

24  learning about these engines in a
```

Jason Fetter

```
1   training setting in the military and his,

2   if you scroll back up to the -- right

3   there.  I'm sorry, right there.  Where it

4   says "Key skills and abilities," the fact

5   that he has this type of broad experience

6   that is specialized made him perfect for

7   this role with again the military, AJT,

8   they trained him as well.  Specifically

9   in our industry and before the industry,

10  you know, he did a lot with aircrafts, he

11  did a lot with engines.  You know, these

12  are the things that made him succeed.

13       Q.    So there was nothing to

14  indicate he has received a course of

15  specialized intellectual instruction?

16       A.    I believe he went to, he had

17  some schooling and I believe he went in

18  the military.  Both had substantial

19  schooling.

20       Q.    But Mr. Szabo has not

21  received any academic degrees; correct?

22       A.    Ask Ric.

23       Q.    I am asking you because you

24  are the one who classified him as an
```

Jason Fetter

1    exempt employee.

2         A.    Yeah.  I would say that he

3    had a lot of class time, had a lot in a

4    vo. tech type setting and also in the

5    military.  I think that's the specialized

6    training and then when he trained our

7    people, it was also in a classroom type

8    setting as well.

9         Q.    But the question was an

10   academic degree.  Does he have an

11   academic degree like you have a JD and a

12   master's?  Is there anything on

13   Mr. Szabo's resume?

14        A.    I don't see one.

15        Q.    And I believe on the first

16   page, when he applied or the application,

17   his prior job before coming to you was

18   with AJT; is that right?

19        A.    Yes.

20        Q.    Okay.  So he was salary

21   there or hourly there and Mr. Szabo has

22   been hourly every other job he's worked;

23   is that correct?

24        A.    I cannot speak for -- I

Jason Fetter

```
 1   cannot speak to that.  I can only speak

 2   to what you are showing me on this

 3   screen.

 4        Q.   Okay.  The job Mr. Szabo had

 5   prior to coming to Muncy, as far as you

 6   are aware, was that as a calibration

 7   technician?

 8        A.   Before, yes.

 9        Q.   Okay.  And do you know if he

10   was -- yes, I believe it does say he was

11   an hourly employee.

12        A.   I don't know.  It says

13   17/HR, next to the word "salary."  I

14   don't know.

15        Q.   Fair enough.

16             And I apologize if I already

17   asked this, but which location did

18   Mr. Szabo primarily work out of when he

19   was at Muncy?

20        A.   The Broussard, Louisiana

21   location.

22        Q.   Are you familiar with that

23   location?

24        A.   Could you repeat the
```

Jason Fetter

 1   question?  I couldn't hear you.  I'm

 2   sorry.

 3         Q.    How familiar are you with

 4   that location?

 5         A.    Very.

 6         Q.    That location, did you have

 7   posted a notice explaining the Fair Labor

 8   Standards Act and an employee's rights

 9   under the Fair Labor Standards Act?

10         A.    Yes.

11         Q.    Okay.  Do you remember

12   where?

13         A.    I think there is a bulletin

14   board in the office.  I'm not sure where

15   that is.  It's either by the bulletin --

16   there is two bulletin boards.  It's

17   either the one by the sink in the office

18   or the one in the shop by the office.

19         Q.    Okay.  When we were talking

20   about earlier the travel times for the

21   calibration technicians, you said there

22   wasn't a method of tracking the time for

23   any of the technicians.  Was Mr. Szabo

24   the only technician lead?

Jason Fetter

```
 1         A.    Yes, only technician lead,
 2  only technician at the time.
 3         Q.    Okay.  During the course of
 4  his employment though other technicians
 5  came on?
 6         A.    Yes.
 7         Q.    And again I apologize if I
 8  already asked this.  Were those
 9  technicians salary or hourly?
10         A.    Salary.
11         Q.    Okay.  Why?
12         A.    Because we didn't, again we
13  thought it would be more fair and easy to
14  track.  We didn't have a mechanism to
15  track time well.  Employees understand
16  that travel takes time and that's just
17  part of the job.  It's a technical
18  position and the type of role, it makes
19  sense to be salary, and everybody agrees
20  to that.
21         Q.    Okay.  So the reason
22  Mr. Szabo was paid salary is because it's
23  your position he was exempt, but the
24  other employees, technicians are paid
```

1    salary because it makes sense?

2            A.    Can you repeat the question?

3            Q.    I'm just making sure I

4    understand.  Mr. Szabo was paid a salary

5    because it is your position that he was

6    an exempt employee, but the other

7    technicians were paid a salary because

8    it's your position and their position

9    that it just made sense to pay them a

10   salary?

11           A.    That's what we do.  I don't

12   understand.  Can you rephrase the

13   question again?  I'm sorry.

14           Q.    Well, I'm just trying to

15   understand why there are different

16   reasons to pay people salaries when they

17   are doing arguably the same job.

18           A.    Right.  The type of position

19   makes sense to be salary.

20                 MS. KRAMER:  All right.  So

21           Mr. Fetter, that's all the

22           questions I have.  Attorney Stapp

23           may have some, but thank you for

24           your time today.

Jason Fetter

```
 1                THE WITNESS:  Thank you.

 2                MR. STAPP:   I just have a

 3           couple just to clarify, and I

 4           don't know if you have Muncy-2

 5           there, Mary, to show him.

 6                MS. KRAMER:   Yes.

 7                MR. STAPP:   I think it's

 8           Page 4 is the application for

 9           employment with Mr. Szabo where it

10           shows his degrees from Bradwell

11           Institute and Premier Systems.

12                MS. KRAMER:   This is Page

13           5.  That's the start of the

14           resume.

15                MR. STAPP:  I think it's

16           Page 4.

17                MS. KRAMER:   This is 4.

18                MR. STAPP:  Go to 3 then.

19           All right.  I'm sorry, it's Page

20           2.  Yep, you can stop there.

21                     - - -

22                EXAMINATION

23                     - - -

24     BY MR. STAPP:
```

1          Q.     So, Mr. Fetter, we're

2    looking at Page 2 of what's been marked

3    for your deposition Fetter-2.

4               Does the application that

5    Mr. Szabo filled out for Bradwell

6    Institute, does that say how long he

7    attended the institute?

8          A.     Yes, four years.

9          Q.     And does it, did he say that

10   he graduated that institute?

11         A.     Yes, it says he graduated.

12         Q.     And the Premier Systems and

13   Training, did he also graduate from that

14   program?

15         A.     Yes, it says he graduated.

16         Q.     And just so we're, just so I

17   understand your testimony today, did any

18   of the other technicians that were hired

19   by Muncy Industries around the time of

20   Mr. Szabo's employment, that is 2018,

21   2019, 2020, did any of them do the job

22   that he was doing for you, all the jobs?

23         A.     No.  He set up the whole

24   program.  They went along with the

Jason Fetter

```
 1   program.

 2              MR. STAPP:  That's all the

 3        questions I have.  Thank you.

 4              MS. KRAMER:   I just have a

 5        follow-up.

 6                   - - -

 7              EXAMINATION

 8                   - - -

 9   BY MS. KRAMER:

10        Q.   Mr. Fetter, were you aware

11   that Bradwell Institute is a high school?

12        A.   I don't know what it is.

13              MS. KRAMER:  Okay.  Yeah,

14        that's all the questions I had.

15        Thank you.

16              (Witness excused.)

17                   - - -

18              (Deposition concluded at

19        11:10 a.m.)

20

21

22

23

24
```

```
 1                      CERTIFICATE
 2
 3          I, DONNA A. BITTNER, RMR-CRR and NJ
        CSR License No. 30XI00179000, do hereby
 4      certify that prior to the commencement of the
        examination, JASON FETTER, was duly remotely
 5      sworn by me to testify to the truth, the
        whole truth and nothing but the truth.
 6
            I DO FURTHER CERTIFY that the
 7      foregoing is a verbatim transcript of the
        testimony as taken stenographically by me at
 8      the time, place and on the date hereinbefore
        set forth, to the best of my ability.
 9
            I DO FURTHER CERTIFY that I am neither
10      a relative nor employee nor attorney nor
        counsel of any of the parties to this action,
11      and that I am neither a relative nor employee
        of such attorney or counsel, and that I am
12      not financially interested in this action.
13
14
15
            DONNA A. BITTNER, RMR-CRR
16          NJ CSR No. 30XI00179000
            Notary Public
17          Dated: August 24, 2022
18
19
20
21
22
23
24
```