# EXHIBIT D

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2        MIDDLE DISTRICT OF PENNSYLVANIA

3  RIC SZABO,                   :

        Plaintiff            :

4                               :  Civil Action No.:

            vs.             :  21-cv-00468

5                               :

   MUNCY INDUSTRIES, LLC   :

6  D/B/A MUNCY MACHINE &   :

   TOOL CO., INC.,            :

7        Defendant            :

8                      - - -

9           Wednesday, June 15, 2022

10                      - - -

11        Remote oral deposition of MEGAN

12  DELAHOUSSAYE, via Zoom videoconference,

13  conducted at the location of the witness in

14  New Iberie, Louisiana, taken on the above

15  date, beginning at approximately 1:00 p.m.,

16  before Jessica M. Gericke, RPR, CCR-NJ, and

17  Notary Public in and for Delaware, New Jersey,

18  and Pennsylvania.

19

20

21

22

23

24

Megan Delahoussaye

```
1    APPEARANCES VIA ZOOM VIDEO CONFERENCE:
2       MURPHY LAW GROUP, LLC
        BY:  MARY KRAMER, ESQUIRE
3       1628 John F. Kennedy Boulevard
        Eight Penn Center, Suite 2000
4       Philadelphia, PA  19103
        267-273-1054
5       mkramer@phillyemploymentlawyer.com
6       Counsel for Plaintiff
7

        STAPP LAW, LLC
8       BY:  GREGORY A. STAPP, ESQUIRE
        153 West Fourth Street
9       Suite 6
        Williamsport, PA  17701
10      570-326-1077
        gstapp@stapplaw.net
11
        Counsel for Defendant and Deponent
12
13                     - - -
14
15
16
17
18
19
20
21
22
23
24
```

_
Megan Delahoussaye

```
 1                I N D E X

 2  WITNESS NAME                        PAGE

 3     Megan Delahoussaye

 4          By Ms. Kramer               4

 5                 - - -

 6

 7             E X H I B I T S

 8  NO.          DESCRIPTION            PAGE

 9  Delahoussaye-1                      22

            E-mail Correspondence,
10          Bates-stamp No.
            MUNCY-000231
11

    Delahoussaye-2                      24
12          E-mail Correspondence

13                 - - -

14

15

16

17

18

19

20

21

22

23

24
```

Megan Delahoussaye

```
 1                    - - -
 2              THE COURT REPORTER:  All
 3       parties to this deposition are appearing
 4       remotely and have agreed to the witness
 5       being sworn in remotely.  Due to the
 6       nature of remote reporting, please pause
 7       briefly before speaking to ensure all
 8       parties are heard completely.
 9              Counsel, please state your
10       appearance.
11              MS. KRAMER:  Mary Kramer for
12       the plaintiff, Ric Szabo.
13              MR. STAPP:  Gregory A. Stapp,
14       S-T-A-P-P, for Muncy Industries.
15                    - - -
16              MEGAN DELAHOUSSAYE, after
17       having been first duly sworn, was
18       examined and testified as follows:
19  BY MS. KRAMER:
20     Q.    Good afternoon, Miss Delahoussaye.
21  My name is Mary Kramer and I am one of the
22  attorneys representing Ric Szabo in the matter
23  he brought against Muncy.
24              The reason I have asked you
```

Megan Delahoussaye

1    here today is just to ask you about what facts

2    you have personal knowledge of and it's just

3    going to be like a conversation.  Then after I

4    am finished, your attorney may have some

5    follow-up questions, and then we'll be

6    finished here.  All right?

7         A.    Okay.

8         Q.    So first I would like to just go

9    over a few instructions with you.

10                   Have you ever had a deposition

11   taken before?

12        A.    Yes.

13        Q.    Okay.  What was that for?

14        A.    Previous with Ric.

15        Q.    Okay.  So nothing unrelated to

16   Mr. Szabo or his employment with Muncy?

17        A.    Correct.

18        Q.    Was that other deposition the only

19   time?

20        A.    Yes.

21        Q.    All right.  So as you already know,

22   I would just ask that you allow me to finish

23   asking my questions before you answer and,

24   likewise, I will do my best to allow you to

Megan Delahoussaye

1   finish answering before I ask you the next

2   question.

3              I would also ask that you keep

4   your responses verbal instead of saying uh-huh

5   or unh-unh or nodding or shaking your head.

6   Because the court reporter will have a

7   difficult time getting answers like that down

8   on the record.  All right?

9       A.    Yes, ma'am.

10      Q.    I do want to be very clear that I am

11  not asking about any privileged information.

12  So any communications or conversations that

13  you may have had with an attorney are not

14  things you need to tell me.  Okay?

15      A.    Yes, ma'am.

16      Q.    If your attorney has an objection to

17  my question, please allow us to resolve that

18  objection, and then go ahead and answer the

19  question.

20      A.    Yes.

21      Q.    If at any time you need to take a

22  break, just let me know, and I will be happy

23  to take that break.  The only thing I would

24  ask is if there is a question pending, please

1    just answer that question before we go on a

2    break.   Okay?

3         A.    Yes, ma'am.

4         Q.    So with all of that out of the way,

5    can you, please, state your name for the

6    record?

7         A.    Megan Delahoussaye.

8         Q.    And how old are you?

9         A.    I am 29.

10        Q.    What is your current mailing

11   address?

12        A.    216 Rynella Road, New Iberie,

13   Louisiana 70560.

14        Q.    And where in Louisiana was that?

15        A.    New Iberie.

16        Q.    (Inaudible.)

17        A.    I didn't hear you.

18        Q.    Is anyone in the room with you?

19        A.    No.

20        Q.    Do you have any notes with you?

21        A.    No.

22        Q.    How did you prepare for today's

23   deposition?

24        A.    I didn't.

Megan Delahoussaye

1    Q.    Okay.  So I am just going to be

2    asking some things then that are going to seem

3    unnecessary, but just to be clear about it.

4              Did you review any documents

5    outside the presence of your attorney in

6    preparation of today's deposition?

7    A.    No.

8    Q.    Did you speak with anyone about

9    today's deposition besides your attorney?

10   A.    No.

11   Q.    Is there anything that would prevent

12   you from testifying truthfully today?

13   A.    No.

14   Q.    The next question, it may sound

15   invasive, but I do not mean any offense by it.

16              Are you currently taking any

17   drugs or medications that would interfere with

18   your ability to understand my question or to

19   tell the truth?

20   A.    No, ma'am.

21   Q.    And then are you currently taking

22   any drugs or medications that would impair

23   your memory?

24   A.    No, ma'am.

1    Q.    Okay.  When did you first learn
2    about Mr. Szabo's claims against Muncy?
3    A.    Right after he quit.
4    Q.    And how did you learn about that?
5    A.    Because my boss told me about it.
6    Q.    After you learned about this matter,
7    did anyone, excluding your attorney, give you
8    instructions regarding saving documents that
9    might be related to this matter?
10   A.    No.
11   Q.    To the best of your knowledge, since
12   you first learned of this lawsuit, have any
13   documents that are related to this matter
14   specifically and Mr. Szabo's employment with
15   Muncy generally been destroyed?
16   A.    No.
17   Q.    Have you ever plead guilty or no
18   contest to or been convicted of a felony or
19   misdemeanor?
20   A.    No.
21   Q.    Have you ever been charged or
22   arrested for a crime, regardless of whether or
23   not you were convicted?
24   A.    No.

Megan Delahoussaye

```
1       Q.     (Inaudible.)

2              (Discussion held off the

3       record.)

4   BY MS. KRAMER:

5       Q.     Miss Delahoussaye, what is your

6   highest level of education?

7       A.     I have some college.

8       Q.     Did you graduate, get a degree?

9       A.     I did not.

10      Q.     When did you finish school?

11      A.     High school?

12      Q.     Sorry.  College, the college you

13  attended?

14      A.     2012.

15      Q.     And what school was that, college

16  was that?

17      A.     Louisiana Technical College.

18      Q.     What did you major in there?

19      A.     Nursing.

20      Q.     What was your first job after you

21  left college?  If you remember.  I know it's

22  been about ten years.

23      A.     I believe it was working at the

24  Bayou Companies as a payroll clerk.
```

Megan Delahoussaye

```
1       Q.    Did you say the Bayou Companies?

2       A.    Yes.

3       Q.    All right.  So a payroll clerk.

4   What did you have to do in that position?

5       A.    Log times onto certain jobs, you

6   know, and payroll.

7       Q.    How long were you with the Bayou

8   Company?

9       A.    A year and a half.

10      Q.    Were you terminated from that

11  position or did you resign?

12      A.    No.  I resigned.

13      Q.    What was your next job?

14      A.    I worked at Dynamic Industries.

15      Q.    Okay.  And what did you do there?

16      A.    HR assistant.

17      Q.    How long were you there?

18      A.    Two and a half years.

19      Q.    So what year would that take us to?

20      A.    Oh, God.

21      Q.    That's fine.  We can go over that.

22            Again, were you terminated from

23  that position or did you resign?

24      A.    No.  I resigned.
```

Megan Defahoussaye

1    Q.    Okay.  After Dynamic Industries?

2    A.    I stayed home for a little while and

3    then I started working at Flex Force.

4    Q.    Flex Force, what was your title

5    there?

6    A.    Senior recruiter.

7    Q.    Senior recruiter?

8    A.    Yes.

9    Q.    Were you terminated or did you

10   resign?

11   A.    I resigned.

12   Q.    I apologize if you already said.

13         How long were you with Flex

14   Force?

15   A.    Two and a half years.

16   Q.    Okay.  Was that the last job before

17   Muncy or was there --

18   A.    Correct.  No.  That's the last job.

19   Q.    So then how long have you worked for

20   Muncy?

21   A.    Two and a half years.

22   Q.    Who hired you?

23   A.    Jason.

24   Q.    Jason Fetter?

Megan DeFahoussaye

```
1       A.      Uh-huh.

2       Q.      What was your position at the time

3  of hiring?

4       A.      Plant administrator.

5       Q.      What were your job duties in that

6  position?

7       A.      Ensure the plant was flowing

8  correctly, scheduling jobs, and I was starting

9  to do some inside sales.

10      Q.      Okay.  And who did you report to --

11      A.      Jason.

12      Q.      -- then and now?

13              Did you always only report to

14  Jason?

15      A.      Correct.

16      Q.      Did anyone report to you?

17      A.      Yes.

18      Q.      (Inaudible) people?

19              THE COURT REPORTER:  Please

20   repeat your question.

21  BY MS. KRAMER:

22      Q.      How many people reported to you?

23      A.      At the time of hire?

24      Q.      Yeah.
```

Megan Delahoussaye

1    A.    I would say five or six.

2    Q.    Five or six.  Was Mr. Szabo one of

3    those people?

4    A.    Yes.

5    Q.    Did you have any authority to hire

6    and fire employees?

7    A.    Yes.

8    Q.    Okay.  So then what's your position

9    with Muncy now?

10    A.    I am plant administrator and

11    calibration scheduler.

12    Q.    And --

13    A.    I'm sorry.  I am plant manager.  I

14    don't know if I said that.

15    Q.    That's totally fine.  What are your

16    job duties as a plant manager?

17    A.    I have to turn in time.  I have to

18    ensure my jobs are flowing correctly through

19    the shop.  Oversee shipping.  Oversee

20    production.  Oversee my assistant.

21              Schedule calibration trips.

22    You know, get in contact with the customers,

23    send them quotes.  Receive purchase orders.

24    Input the orders into the system.  Do billing.

Megan DeLahoussaye

1  Things like that.

2      Q.    Okay.  Then when did get, I guess,

3  promoted?  When were you promoted to plant

4  manager?

5      A.    January -- unh-unh.  Probably March

6  of 2022.

7      Q.    Okay.  So you weren't plant manager

8  when Mr. Szabo was there?

9      A.    No.

10      Q.    When you were the calibration -- the

11  plant administrator -- and was it calibration?

12      A.    I am sorry.  I made a mistake.

13              I was promoted to plant manager

14  March of '21.

15      Q.    Twenty-one?

16      A.    Yes, ma'am.

17      Q.    Okay.  Could you repeat what your

18  position for that was, plant administrator and

19  what?

20      A.    I was doing some inside sales.

21      Q.    At the time of your hire until your

22  promotion, were you the only plant

23  administrator?

24      A.    Yes.

Megan Defahoussaye

1    Q.    What is your work schedule like as a

2 plant administrator and then even now as a

3 plant manager?  Do you work 9:00 to 5:00?

4    A.    8:30 to 5:00.

5    Q.    8:30 to 5:00?

6    A.    Yes.

7    Q.    Is that your schedule every day?

8    A.    Yes.

9    Q.    Are you paid hourly or do you

10 receive a salary?

11    A.    Salary.

12    Q.    What is your salary (inaudible)?

13         THE COURT REPORTER:  Please

14    repeat your question.

15 BY MS. KRAMER:

16    Q.    What is your salary as plant

17 administrator?

18    A.    As plant administrator?

19    Q.    Yes.

20    A.    I was making 52,000 per year.

21    Q.    Okay.  And then what is it now?

22    A.    Sixty-one, 62,000 per year.

23    Q.    Okay.  In your role as plant

24 administrator, did you exercise discretion and

Megan Derahoussaye

```
1   independent judgment with respect to matters

2   of significance?

3        A.    Yes.

4        Q.    Were you ever asked to work

5   overtime?

6        A.    No.

7        Q.    So you never worked after 5:00?

8        A.    No, ma'am.

9        Q.    Okay.  And just to confirm, you're

10  still employed by Muncy, correct?

11       A.    Yes, ma'am.

12       Q.    You still only report to Mr. Fetter?

13       A.    Correct.

14       Q.    When he hired you, was that the

15  first time you had ever met him?

16       A.    No.

17       Q.    How did you meet Mr. Fetter?

18       A.    He had previously gotten in touch

19  with my former boss about a staffing relation.

20       Q.    What do you mean by that?

21       A.    He was going to use our staffing

22  company, the previous one I was working for.

23       Q.    Okay.  So he gets in touch with your

24  boss, your former boss.
```

Megan Delahoussaye

1              How did he get pointed in your
2  direction?
3      A.    Because I was a manager, the senior
4  recruiter for that location.  So I went ahead
5  and talked to him.
6      Q.    And then what?  He asked you if you
7  wanted to -- you wanted a new job?
8      A.    No.  We had talked and talked about
9  positions and, you know, I had explained to
10  him that I wasn't happy where I was at, you
11  know, and it went from there.
12      Q.    Okay.  So between the first time you
13  met Mr. Fetter and then your hiring at Muncy,
14  did you speak with Mr. Fetter a lot?
15      A.    Yes.
16      Q.    Was that all about the job, like,
17  the job that he wanted you to do and the job
18  you had been doing before --
19      A.    No.
20      Q.    -- at Flex Force?
21      A.    No.
22      Q.    Okay.  How would you describe your
23  relationship with Mr. Fetter?
24      A.    A normal boss and worker

Megan Delahoussaye

1  relationship.

2      Q.    Okay.  Do you ever interact with him

3  outside of working hours?

4      A.    No.

5      Q.    Okay.  Have you ever traveled to a

6  job site with Mr. Fetter?

7      A.    Yes.

8      Q.    Do you ever travel after 5:00 p.m.

9  on your workday?

10     A.    I don't recall.

11     Q.    You don't recall?  Okay.  How often

12  does that happen, the traveling?

13     A.    I have only traveled twice, I want

14  to say.

15     Q.    Okay.  Are you familiar with Ric

16  Szabo?

17     A.    Yes.

18     Q.    (Inaudible) ever had any

19  conversations with Mr. Szabo or with anyone,

20  excluding your attorney, about Mr. Szabo or

21  about this matter in general?

22     A.    I'm sorry.  Repeat your question.

23     Q.    Let me rephrase.

24              Have you spoken with Mr. Szabo

Megan Delahoussaye

1    since he left Muncy?

2        A.    No, ma'am.

3        Q.    You said already that he reported to

4    you.

5              So did you work with him on a

6    regular basis?

7        A.    Yes.

8        Q.    Are you familiar with Mr. Szabo's

9    position with Muncy?

10       A.    Yes.

11       Q.    What was that position?

12       A.    He was a calibration technician.

13       Q.    Okay.  And do you know when he was

14   hired?

15       A.    I do not.

16       Q.    Do you know when he stopped working

17   for Muncy?

18       A.    I believe it was July of 2020, I

19   think.  I am not sure right offhand.

20       Q.    That's all right if you don't know.

21   You can just say you don't know and we can

22   move on.

23       A.    I'm not sure.

24       Q.    Okay.  Do you know what Mr. Szabo

1   was paid while working as a calibration

2   technician for Muncy?

3        A.    I do not.

4        Q.    What were Mr. Szabo's job duties

5   when he worked for Muncy?

6        A.    He was to calibrate all load cells

7   that came in-house and he was also supposed to

8   travel and calibrate at different customers'

9   locations, their test beds and their

10  dynamometers and chain testers and things like

11  that.

12       Q.    Okay.  You said calibrate load

13  cells?

14       A.    Yes.

15       Q.    What does that mean?  What is a load

16  cell?  How about that?

17       A.    It's a certain amount of -- it's a

18  product that when you press down on it, you

19  can either have tension or compression.  You

20  can use it to measure -- like, when there is a

21  test bed, you have to have a load cell inside

22  of it to be able to show your -- if it's 100 K

23  load cell, then you can only go up to 100 K.

24       Q.    Okay.  Thank you.  And you said

Megan Delahoussaye

1  already that you gave Mr. Szabo assignments

2  when you were plant administrator?

3      A.     I gave him assignments once I

4  started doing calibration, which was in May.

5      Q.     So the inside sales portion of your

6  job was giving him assignments?

7      A.     Inside sales was starting to get --

8  taking over the calibration side.  So getting

9  purchase orders for calibration.

10     Q.     Okay.  Were you the only person who

11  handled getting the purchase orders?

12     A.     Kimberly did before I did and I took

13  over her position.

14     Q.     Would that be Kimberly Bunting?

15     A.     Correct.  Yes, ma'am.

16     Q.     All right.  I am going to share my

17  screen with you and show you an e-mail you

18  sent to Mr. Szabo on July 7, 2020, which I

19  will mark as Delahoussaye-1.  Bear with me.

20     A.     Sure.

21             (Exhibit Delahoussaye-1 marked

22       for identification.)

23  BY MS. KRAMER:

24     Q.     Sorry.  Okay.  I don't know if you

Megan Derahoussaye

1    can see that yet?

2         A.    Yes, ma'am.

3         Q.    You can?

4         A.    Yes.

5         Q.    All right.  So what is that

6    document?

7         A.    So that was for him to do in-house.

8         Q.    When you say in-house, you mean not

9    with one of the job sites?  It was actually

10   within Muncy?

11        A.    Correct.

12        Q.    How often did you send e-mails like

13   this?

14        A.    Almost daily.

15        Q.    Almost daily?

16        A.    (Indicating.)

17        Q.    Dr. Mr. Szabo have to complete

18   everything in this list when you sent the

19   e-mails?

20        A.    Yes.

21        Q.    Did he let you know when he finished

22   these assignments?

23        A.    Correct.

24        Q.    I am going to stop sharing.

Megan Delahoussaye

```
 1       A.    Okay.

 2       Q.    Are you involved with the

 3  scheduling -- you already said you are.

 4             So you are involved with the

 5  scheduling of work travel for the calibration

 6  technicians?

 7       A.    Correct.

 8       Q.    (Inaudible) involved since, what,

 9  May 2020, when you became involved with the

10  sales portion?

11       A.    Repeat your question.  It broke up.

12       Q.    Have you been involved in scheduling

13  ever since you switched to inside sales or

14  started doing inside sales?

15       A.    Correct.

16             (Exhibit Delahoussaye-2 marked

17      for identification.)

18  BY MS. KRAMER:

19       Q.    I'm just going to share one more

20  time.

21             Do you see that?

22       A.    Yes, I see.

23       Q.    Let me know if you need me to make

24  it bigger.
```

Megan Derahoussaye

1    A.    Yep.  I can see it.

2    Q.    So were these the kind of e-mails

3  that you would send when you were giving out

4  the calibration technician's schedule for the

5  week?

6    A.    Yes.

7    Q.    So can you read under May -- under

8  June 1, 2020, the fourth bullet point?

9    A.    The fourth bullet point?

10    Q.    Yes.  I can hover over it.

11    A.    After completing calibration, three

12  hours, then stay the night in Corpus.

13    Q.    Do you know how long a calibration

14  would take?

15    A.    It varies on how fast the technician

16  is.

17    Q.    (Inaudible) if Mr. Szabo or another

18  technician would have needed to travel the

19  three hours that you were saying to travel

20  after 5:00 p.m., when their day ended?

21    A.    Repeat your question.  It broke up.

22    Q.    So are you aware that if a

23  calibration went until 5:00, one of the

24  calibration technicians would then need to

1  travel for the rest of the day, say, three

2  hours to Corpus?

3       A.    It's their choice.

4       Q.    When you say it's their choice, if

5  they said, "I am not going to drive until 8:30

6  the next day," would that have affected their

7  job?

8       A.    No.

9       Q.    There were no set start times for

10  when they needed to begin a job?  It was just

11  a certain day?

12       A.    Correct.

13       Q.    So if a calibration technician,

14  including Mr. Szabo, if they had to work to do

15  this driving after 5:00 p.m., would they have

16  been compensated for that?

17       A.    That's not my expertise.

18       Q.    Okay.  As far as you know, was

19  Mr. Szabo ever involved in hiring or firing

20  employees?

21       A.    No.

22       Q.    Do you know if he was involved in

23  making decisions about hiring and firing

24  employees?

Megan Derahoussaye

```
 1        A.    No.

 2        Q.    When you say no, is that, no, he was

 3   not or, no, you do not know?

 4        A.    As far as calibration goes, he may

 5   have had some sway, you know, when talking

 6   about their resumes and stuff like that, but

 7   ultimately the decision was up to Jason.

 8        Q.    Okay.  So were resumes shared with

 9   him?  Were resumes shared with Mr. Szabo?

10        A.    I can't answer that question.  I am

11   not sure.

12        Q.    As far as you know, did Mr. Szabo

13   supervise any other Muncy employees and direct

14   their work, such as giving them assignments or

15   saying where they would be traveling?

16        A.    No.

17        Q.    No, he did not?

18        A.    No.

19        Q.    As far as you know, did Mr. Szabo,

20   as a calibration technician, exercise

21   discretion and independent judgment with

22   respect to matters of significance?

23        A.    Yes.

24                   MR. STAPP:  I am going to
```

Megan Derahoussaye

1          object to the form of the question.  It

2          calls for a legal conclusion.

3                    I guess she can answer if she

4          wants to, if she understands what you're

5          asking her.

6     BY MS. KRAMER:

7          Q.    You can answer.  Because as you

8     already said, you exercised this kind of

9     discretion.

10                    So in that same measure, did

11    Mr. Szabo?

12         A.    Yes.

13         Q.    And how did he do that?

14         A.    He followed our ISO procedures.  He

15    used his common judgment just like everybody

16    else.

17         Q.    So he used his common judgment?

18         A.    Correct.

19         Q.    (Inaudible) Mr. Fetter's approval?

20         A.    Can you repeat yourself?  You keep

21    breaking up.

22         Q.    I apologize.  As far as you know,

23    when exercising this discretion, did Mr. Szabo

24    need to get approval from Mr. Fetter?

1    A.    Approval on what?

2    Q.    Whether he could do something?

3    A.    That's a very open question.  It

4  depends on what it is.  What is something?

5    Q.    I'm not familiar with calibration

6  technicians' job duties.

7            So could he travel without it

8  being assigned to him?

9    A.    No.

10    Q.    Could he buy something without

11  Mr. Fetter saying okay?

12    A.    He had a credit card.  So he could

13  buy anything he wanted to, but he would need

14  approval.  If it was something frugal, if --

15  you know, because what he was allotted.

16    Q.    Okay.  Could he buy equipment for

17  his job without getting Mr. Fetter's approval?

18    A.    No.

19    Q.    As far as you know, was Mr. Szabo

20  responsible for making sales or obtaining

21  orders or contracts for services?

22    A.    No.

23    Q.    He was not involved in sales at all?

24    A.    I am not aware.

Megan Derahoussaye

1    Q.    Okay.  For calibration technicians,
2  those who worked there while you had been
3  there, did they all have generally the same --
4  you might not know this -- generally the same
5  qualifications?
6    A.    They vary.
7    Q.    Does being a calibration technician
8  require a degree?
9    A.    It does not; however, you have to be
10 certified through us.
11   Q.    Through who?  Through Muncy?
12   A.    Correct.
13   Q.    How long does that certification
14 take?
15   A.    We generally do three to six months
16 of training and then they have to pass an
17 exam.
18   Q.    Is that an ongoing thing?  Do they
19 get tested once a year or something like that?
20   A.    Yes.
21   Q.    Okay.  As far as you know, is a
22 calibration technician -- being a calibration
23 technician, is that a manual job, like, you
24 use your hands?  Like a construction worker is

Megan Delahoussaye

1    a manual job?

2        A.    Yes.

3        Q.    How often, if you know, was

4    Mr. Szabo inside a Muncy office?

5        A.    We generally like to stick with

6    every other week.  It varies.

7        Q.    Every other week.  And the rest of

8    the time they were on job sites, calibration

9    technicians?

10       A.    Correct.

11                   MS. KRAMER:  I think that's all

12       the questions I have.  Thank you.

13                   THE WITNESS:  Sure.

14                   MR. STAPP:  I don't have any

15       questions.

16                   (Witness was excused.)

17                   (Deposition concluded at

18       1:28 p.m.)

19

20

21

22

23

24

Megan Delahoussaye

```
 1              C E R T I F I C A T E
 2          I HEREBY CERTIFY that prior to the
 3   commencement of the examination, MEGAN
 4   DELAHOUSSAYE, was remotely sworn by me to
 5   testify to the truth and that the proceedings,
 6   evidence, and objections are contained fully
 7   and accurately in the stenographic notes taken
 8   by me upon the deposition taken on June 15,
 9   2022, and this is a true and correct
10   transcript of same.
11
12
13                Jessica M. Gericke
14   ____                              _____
15          Jessica M. Gericke, RPR, CCR-NJ,
            and Notary Public
16
17
18          (The foregoing certification of this
19   transcript does not apply to any reproduction
20   of the same by any means, unless under the
21   direct control and/or supervision of the
22   certifying reporter.)
23
24
```