# EXHIBIT E

```
1                    UNITED STATES DISTRICT COURT
                             FOR THE
2                    MIDDLE DISTRICT OF PENNSYLVANIA

3

4

5

6    SHANDI CRAPPELL and     )
     RIC SZABO,              )
7            PLAINTIFFS,     )
                            )
8            VS.            )  NO:  21-CV-00468
                            )
9    MUNCY INDUSTRIES, LLC,  )
     d/b/a MUNCY MACHINE &   )
10   TOOL CO., INC.,         )
             DEFENDANT       )
11

12       ZOOM
         DEPOSITION OF:   RICHARD SZABO
13
         TAKEN BY:        DEFENDANTS
14
         BEFORE:          HEATHER GOSS BORING
15                        NOTARY PUBLIC

16       DATE:            JUNE 30, 2022
                          10:00 A.M.
17
         PLACE:           STAPP LAW
18   `                    153 WEST FOURTH STREET
                          SUITE 6
19                        WILLIAMSPORT, PA  17701

20

21

22

23
                 BORING COURT REPORTING, INC.
24                    121 CHARLES STREET
                  CENTRE HALL, PA  16828
25                     (814) 364-1793
                  boringreporting@gmail.com
```

2

1    A P P E A R A N C E S:

2

3        MURPHY LAW GROUP, LLC
         VIA ZOOM:  MARY KRAMER, ESQUIRE
         Eight Penn Center, Suite 2000
4        1628 John F. Kennedy Boulevard
         Philadelphia, PA  19103
5        (267) 273-1054
         mkramer@phillyemploymentlaw.com
6            APPEARING ON BEHALF OF PLAINTIFFS

7

8        STAPP LAW, INC.
         GREGORY A. STAPP, ESQUIRE
9        153 West Fourth Street
         Williamsport, PA  17701
10       (570) 326-1077
         gstapp@stapplaw.net
11           APPEARING ON BEHALF OF THE DEFENDANT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          I N D E X

2    TESTIMONY OF                          EXAMINATION

3                      RICHARD SZABO

4       By Mr. Stapp:                         4, 89
        By Ms. Kramer:                        85
5

6                        E X H I B I T S

7                                          PRODUCED AND
     DEPOSITION EXHIBITS                      MARKED
8
     Exhibit 1  -  1-Page Employment          30
9                  Warning Report
                   Bates MUNCY-000131
10
     Exhibit 2  -  1-Page Undated             35
11                 Offer Letter
                   Bates MUNCY-000079
12
     Exhibit 3  -  2-Page Company             40
13                 Vehicle Agreement
                   Bates MUNCY-000076
14
     Exhibit 4  -  2 Pages of U-Haul          42
15                 Receipts
                   Bates MUNCY-121 & 122
16
     Exhibit 5  -  1-Page Expense Statement   45
17                 Bates MUNCY-001117

18   Exhibit 6  -  2 Pages of Receipts        47
                   Bates MUNCY-118 & 120
19

20

21               REQUEST MADE ON RECORD

22             STAPP - PAGES 74, 77, 78

23

24

25

RICHARD SZABO

4

```
 1                        STIPULATION

 2

 3         It is hereby stipulated by and between

 4    counsel for the respective parties that reading,

 5    signing, sealing, certification, and filing are

 6    waived, and that all objections except as to the form

 7    of the question are reserved to the time of trial.

 8

 9         RICHARD SZABO, called as a witness, being

10    sworn, testified as follows:

11

12                        EXAMINATION

13

14    BY MR. STAPP:

15         Q    Okay.  Mr. Szabo, you know my name is

16    Greg Stapp and we've taken your deposition before in

17    another case, so I just want to ask you, do you

18    recall the rules that we went over with regard to

19    your deposition from that previous deposition?

20         A    Yes, I do.

21         Q    And the primary thing is just to make sure

22    you answers are verbal and not a shrug, especially

23    since we are doing this via Zoom, it is going to be

24    important that we know what your answer is to the

25    question, so.
```

RICHARD SZABO

**5**

| | | |
|---|---|---|
| 13:06:31 | 1 | So let me start by asking you, did you talk |
| 13:06:35 | 2 | to anyone, other than your attorney, please don't |
| 13:06:39 | 3 | talk to me about what you discussed with Ms. Kramer |
| 13:06:42 | 4 | or any counsel you have, but did you speak to anyone |
| 13:06:45 | 5 | who is not your attorney prior to today's deposition |
| 13:06:48 | 6 | about this deposition? |
| 13:06:49 | 7 | A    No, sir. |
| 13:06:50 | 8 | Q    Okay.  Did you review any documents of any |
| 13:06:55 | 9 | kind prior to today's deposition? |
| 13:06:57 | 10 | A    Yes, I have. |
| 13:06:59 | 11 | Q    What documents did you review? |
| 13:07:01 | 12 | A    The documents that your team sent over to |
| 13:07:09 | 13 | Miss Mary about my travel.  It was a travel history, |
| 13:07:14 | 14 | I think it was a couple pages -- |
| 13:07:15 | 15 | Q    Okay. |
| 13:07:16 | 16 | A    -- of when I was involved with Muncy. |
| 13:07:19 | 17 | Q    Okay.  Anything else you reviewed besides |
| 13:07:24 | 18 | the discovery information we gave to you? |
| 13:07:26 | 19 | A    The interrogatories and such, but nothing |
| 13:07:30 | 20 | else. |
| 13:07:30 | 21 | Q    Okay.  Mr. Szabo, have you ever been |
| 13:07:36 | 22 | convicted for a crimen falsi crime, and let me |
| 13:07:40 | 23 | explain to you what that means, when we say |
| 13:07:42 | 24 | crimen falsi it means a crime involving some kind of |
| 13:07:49 | 25 | dishonesty like a theft, a theft by deception.  Ever |

*RICHARD SZABO*

**6**

| | | |
|---|---|---|
| 13:07:51 | 1 | been charged with any kind of crimen falsi crime that |
| 13:07:54 | 2 | you are aware of? |
| 13:07:55 | 3 | A    No, sir. |
| 13:07:56 | 4 | Q    So I want to talk to you about some of the |
| 13:08:04 | 5 | documents that you reviewed today, so I'll try to do |
| 13:08:08 | 6 | this by sharing screen.  But let me first begin by |
| 13:08:12 | 7 | asking you a question with regard to your employment |
| 13:08:16 | 8 | at Muncy.  You were a salaried employee; is that |
| 13:08:20 | 9 | correct? |
| 13:08:20 | 10 | A    Yes. |
| 13:08:22 | 11 | Q    And how were you paid?  Did you get paid |
| 13:08:28 | 12 | weekly, biweekly? |
| 13:08:29 | 13 | A    It was weekly. |
| 13:08:32 | 14 | Q    And what was your understanding of the days |
| 13:08:37 | 15 | and the hours that you were going to be working as a |
| 13:08:40 | 16 | salaried employee? |
| 13:08:41 | 17 | A    The understanding was that I would work |
| 13:08:51 | 18 | whatever was needed of me, but I would only get paid |
| 13:08:55 | 19 | for a salary of 40 hours a week, regardless of how |
| 13:09:03 | 20 | much I worked pretty much. |
| 13:09:03 | 21 | (Court reporter clarification.) |
| 13:09:05 | 22 | BY MR. STAPP: |
| 13:09:05 | 23 | Q    You said regardless of how much you worked, |
| 13:09:08 | 24 | is that what you said? |
| 13:09:10 | 25 | A    That was, yes, I'm sorry, yes. |

RICHARD SZABO

**7**

13:09:13  1      Q      So help me understand what you mean you

13:09:19  2  were going -- who told you you would be paid 40 hours

13:09:22  3  a week?

13:09:22  4      A      I was told such -- I was told by

13:09:38  5  Jason Fetter when I was hired I would be paid a

13:09:42  6  salary.  I would be paid a salary of X amount of

13:09:46  7  dollars and that that salary would total a 40-hour

13:09:50  8  work week.  Also it is in the employee handbook that

13:09:58  9  salaried employees are paid at a 40-hour work week.

13:10:04  10  So.

13:10:08  11      Q      Okay.  And you believe that language of

13:10:11  12  40-hour work week is in the handbook; is that

13:10:16  13  correct?

13:10:16  14      A      I believe to the best of my knowledge, I

13:10:21  15  don't have the handbook anymore, but I could see if I

13:10:27  16  could locate it, but just -- I don't -- yeah.

13:10:31  17      Q      So getting back to my earlier question,

13:10:33  18  which may have been compound, what was your

13:10:36  19  understanding when you were hired in 2018 of what

13:10:40  20  days of the week you would work and what hours?

13:10:43  21      A      My understanding would be a Monday through

13:10:49  22  Friday type of situation with an occasional Saturday

13:10:57  23  if something happened.  That was the understanding.

13:11:01  24      Q      And what hours of the days Monday through

13:11:04  25  Friday was your understanding you would be working?

RICHARD SZABO

**8**

13:11:06   1       A     Oh, when I first started, it was from eight

13:11:11   2    to five if I was in the office.  But if I traveled

13:11:18   3    that could vary, you know, I would try to stick by

13:11:26   4    eight to five to travel but sometimes that changes.

13:11:29   5       Q     And Megan, I'm going to try to pronounce it

13:11:34   6    correctly and then I'll give the spelling to the

13:11:39   7    court reporter, Delahoussaye said that you were

13:11:41   8    allowed, you and other employees were allowed to

13:11:44   9    travel Monday through Friday if you wanted to.  Do

13:11:47   10   you agree or disagree with that statement?

13:11:49   11      A     I'm not sure I understand the question.

13:11:58   12   Well, of course we would travel during the week.

13:12:00   13   That was our work hours.  I'm not sure what the

13:12:03   14   "allowed" comment means.  To me that's a key word.

13:12:07   15      Q     Well, you were allowed to travel Monday

13:12:10   16   through Friday if you wanted to, correct?

13:12:12   17      A     I disagree.  Not correct.

13:12:18   18      Q     Why do you believe you weren't --

13:12:21   19      A     Because there's -- because if Jason wanted

13:12:24   20   me to travel on a Saturday or a Sunday, I couldn't, I

13:12:27   21   couldn't argue with that.  I had to.  So I disagree

13:12:31   22   with the "allowed" comment.

13:12:33   23      Q     Okay.  And why do you believe Jason wanted

13:12:35   24   you to you travel on a Saturday or a Sunday?

13:12:38   25      A     Because number one, he's [Zoom inaudible]

*RICHARD SZABO*

**9**

13:12:48  1    that he didn't have to pay me.  And number two, the

13:12:55  2    logic behind it would mean me being at a customer's

13:12:58  3    location on a Monday or a Friday, rather than using

13:13:03  4    the Monday, like to Friday, to travel and not be at

13:13:09  5    the customers.  So I understand the logic behind it,

13:13:11  6    but it's not fair that I have to use my weekends and

13:13:15  7    not being paid for any travel time and my whole

13:13:17  8    weekend is gone.

13:13:18  9         Q    Okay.  Well, Megan Delahoussaye testified

13:13:22  10   that you if you wanted to travel from Monday to

13:13:25  11   Friday from eight to five p.m. you could have done

13:13:28  12   that.  Do you agree with that statement?

13:13:29  13        A    I disagree with that 100 percent.

13:13:33  14        Q    Okay.  Why do you believe you couldn't

13:13:35  15   travel Monday through Friday eight to five?

13:13:37  16        A    Because there was there were several

13:13:40  17   instances, I can't give you dates and times, that I

13:13:45  18   requested this with Jason and I was told absolutely

13:13:49  19   not, to quote Jason, absolutely not.

13:13:53  20        Q    "Absolutely not" what?

13:13:54  21        A    Absolutely not.

13:13:59  22        Q    That you couldn't --

13:14:00  23        A    The answer was can I leave on a Monday

13:14:02  24   instead of a Sunday so the question would be can I

13:14:06  25   leave on a Monday instead of Sunday, his answer would

RICHARD SZABO

**10**

13:14:10  1    be absolutely not.  You need to go Sunday.

13:14:12  2        Q    Okay, well, sir, it's your litigation,

13:14:14  3    right, so I don't have the burden of proof here, you

13:14:16  4    do.  So my question to you is are you saying this is

13:14:19  5    a verbal conversation you had?

13:14:23  6        A    Well, of course it would be a verbal

13:14:25  7    conversation.

13:14:25  8        Q    Okay.  Do you have any kind of e-mails,

13:14:29  9    text messages, anything like this where Mr. Fetter

13:14:33  10   asked you to travel on a weekend?

13:14:35  11       A    I could probably find something.  I don't

13:14:44  12   have anything up here right now to show the court or

13:14:47  13   show you, no, but I could dig deep probably and

13:14:50  14   produce something.

13:14:51  15       Q    Okay.  Well, you need to get that to me as

13:14:54  16   soon as possible because the question here, sir, is

13:14:59  17   when you would work outside of the eight to five

13:15:02  18   hours, it was your decision to work after eight to

13:15:06  19   five Monday through Friday, correct?

13:15:07  20       A    That's not true, no.

13:15:11  21       Q    Okay.  Who's making the decision that you

13:15:14  22   had to work outside Monday to Friday eight to five?

13:15:16  23       A    My supervisor, Jason Fetter.

13:15:19  24       Q    And how did he can require you to do that?

13:15:22  25       A    Through delegation of authority.

RICHARD SZABO

**11**

```
13:15:29    1        Q        How would he delegate the authority?
13:15:35    2        A        By saying, Ric, I need you to travel on
13:15:38    3    these dates or call me up on the phone and discuss
13:15:42    4    the plan throughout the week, saying for the
13:15:46    5    future -- say for a future trip, upcoming trip, and
13:15:51    6    he would be like I need you to do this and this and
13:15:54    7    this and this is how it's going to be, what do you
13:15:59    8    think.  And sometimes I would disagree with it
13:16:02    9    because he would be wanting me to come home on a
13:16:05   10    Saturday and leave again on a Sunday for another week
13:16:09   11    and that would be where we would disagree, where we
13:16:11   12    would butt heads because he would absolutely require
13:16:14   13    me to travel on weekends.
13:16:18   14        Q        And again --
13:16:19   15        A        And since --
13:16:20   16        Q        -- how was this communicated to you?  Are
13:16:22   17    you saying these are verbal conversations you're
13:16:23   18    having?
13:16:24   19        A        Verbally over the phone, yep, or in person
13:16:27   20    if he would be in the office.
13:16:28   21        Q        Okay.  Anytime was that put in any kind of
13:16:31   22    e-mail or text message or written correspondence to
13:16:36   23    you?
13:16:36   24        A        Sometimes through Ms. Bunting in e-mails
13:16:41   25    basically typing, you know, telling me my itinerary,
```

*RICHARD SZABO*

**12**

13:16:46  1    when I would travel, when I would leave, when I would

13:16:49  2    return home, you know, it was just make up the entire

13:16:54  3    trip.

13:16:54  4         Q    Hang on one second, the court reporter is

13:16:54  5    asking what you said.  You said sometimes through

13:16:54  6    Ms. Bunting; is that correct?  B-U-N-T-I-N-G?

13:16:54  7         A    Yes.

13:17:03  8         Q    Again, the testimony that was given by

13:17:07  9    Ms. Bunting, Megan, was if you had asked to travel

13:17:11  10   from Monday through Friday eight to five, you could

13:17:14  11   have done that?  Do you agree or disagree with that

13:17:17  12   testimony?

13:17:17  13        A    I disagree.

13:17:20  14        Q    Okay.  And why do you believe you couldn't

13:17:22  15   have asked to travel Monday to Friday, eight to five?

13:17:25  16        A    Because I asked several times because I had

13:17:28  17   plans on the weekends and I was told that I could not

13:17:32  18   do that.

13:17:33  19        Q    When you say you had asked several times,

13:17:35  20   again are these conversations being held verbally?

13:17:38  21        A    Yes.

13:17:39  22        Q    And who was it that was telling you

13:17:45  23   weren't allowed to travel Monday through Friday eight

13:17:47  24   to five?  Was it Ms. Bunting, Ms. Delahoussaye,

13:17:55  25   somebody else, who was it?

RICHARD SZABO

**13**

13:17:56   1       A    No, it would be Mr. Jason Fetter.

13:17:58   2       Q    Did anybody else other than Jason Fetter

13:18:02   3   ever tell you you had to travel outside of Monday to

13:18:05   4   Friday eight to five o'clock?

13:18:06   5       A    No.  There was -- they didn't have any

13:18:11   6   authority to do so; only Jason.

13:18:13   7       Q    When you were traveling outside of the

13:18:29   8   Monday through Friday, eight to five, did you ever

13:18:32   9   ask to be paid for that time while you were working

13:18:35  10   at Muncy Industries?

13:18:36  11       A    I did not, because the understanding I'm

13:18:43  12   unpaid.

13:18:44  13       Q    Why are you asking for it now?

13:18:46  14       A    Because I found out that I was paid

13:18:54  15   improperly after the fact and that Jason Fetter

13:19:01  16   broke the law.

13:19:01  17            (Court reporter clarification.)

13:19:01  18   BY MR. STAPP:

13:19:07  19       Q    How did you find that out, sir?

13:19:08  20       A    Through my new employer and the proper, you

13:19:14  21   know, talking with other people, several people about

13:19:17  22   my past and -- excuse me -- they all said you should

13:19:27  23   look into it, so I did.

13:19:28  24       Q    Who was the first person that told you got

13:19:30  25   paid -- that they believed you were getting paid in

*RICHARD SZABO*

**14**

13:19:34  1   violation of federal law?

13:19:39  2         THE WITNESS:  Do I have to answer that,

13:19:40  3   Mary?  I think that's a privacy thing.

13:19:44  4         MS. KRAMER:  Ric, unless it's conversations

13:19:45  5   between you and myself, you do have to answer about

13:19:49  6   those.

13:19:50  7         THE WITNESS:  Of who told me?

13:19:50  8   BY MR. STAPP:

13:19:50  9      Q    Yeah, who was --

13:19:52  10         MS. KRAMER:  Unless it's anyone from my

13:19:53  11   office, it would be.  You don't have to disclose

13:19:56  12   anything you talked about or were told by anyone from

13:20:00  13   my office, but otherwise, yes, you need to answer.

13:20:05  14         THE WITNESS:  Okay.

13:20:07  15      A    So it would have been my new employer,

13:20:07  16   Phil Chant.

13:20:14  17   BY MR. STAPP:

13:20:14  18      Q    So Phil Chant was the first person to tell

13:20:17  19   you you were being paid, in what he believed, was a

13:20:20  20   violation of federal law?

13:20:21  21      A    Yes.

13:20:22  22      Q    How close in time was that comment to you

13:20:27  23   in relation to his request to you to send the e-mail

13:20:31  24   that you sent to some of the Muncy Industries

13:20:35  25   customers?

*RICHARD SZABO*

**15**

| | | |
|---|---|---|
| 13:20:37 | 1 | MS. KRAMER:  I'm going to -- I would object |
| 13:20:40 | 2 | to that, Greg, because I don't believe he e-mailed |
| 13:20:45 | 3 | anything that may be part of the other claims. |
| 13:20:48 | 4 | MR. STAPP:  I think it's relevant for his |
| 13:20:50 | 5 | motivation as to why he's here and the jury is |
| 13:20:54 | 6 | certainly allowed to hear that. |
| 13:20:54 | 7 | BY MR. STAPP: |
| 13:20:55 | 8 | Q    So I just want to know if it was during |
| 13:20:56 | 9 | that same conversation that you were asked to send an |
| 13:20:58 | 10 | e-mail to Muncy customers or not? |
| 13:21:00 | 11 | A    It was not during the same conversation |
| 13:21:00 | 12 | whatsoever. |
| 13:21:04 | 13 | Q    Was it before you were asked to send |
| 13:21:05 | 14 | e-mails to the customers or after? |
| 13:21:07 | 15 | A    Oh, it was way before. |
| 13:21:09 | 16 | Q    Okay.  So before you were asked to send an |
| 13:21:14 | 17 | e-mail, Phil Chant told you that you could sue |
| 13:21:17 | 18 | Muncy Industries for what he believed was a violation |
| 13:21:21 | 19 | of federal law? |
| 13:21:22 | 20 | A    Yes, it was before that conversation about |
| 13:21:27 | 21 | the e-mail, yes. |
| 13:21:28 | 22 | Q    How close, was it during your interview or |
| 13:21:31 | 23 | was it after you were hired that you were told this? |
| 13:21:34 | 24 | A    (No response.) |
| 13:21:34 | 25 | (Court reporter clarification.) |

*RICHARD SZABO*

**16**

| | | |
|---|---|---|
| 13:21:34 | 1 | BY MR. STAPP: |
| 13:21:34 | 2 | Q    I didn't hear.  Did you answer the |
| 13:21:34 | 3 | question? |
| 13:21:48 | 4 | A    I'm sorry.  There were -- there were |
| 13:21:48 | 5 | multiple conversations probably repeated, so it would |
| 13:21:51 | 6 | have been after, it would have been before.  It was |
| 13:21:56 | 7 | talked about multiple times. |
| 13:21:58 | 8 | Q    Did he talk to you about it when he first |
| 13:22:00 | 9 | reached out to you, that is Phil Chant, to come work |
| 13:22:03 | 10 | for him? |
| 13:22:08 | 11 | A    No.  It was not. |
| 13:22:10 | 12 | Q    Was it when you first came up to |
| 13:22:14 | 13 | Pennsylvania to interview with them for the job that |
| 13:22:16 | 14 | he talked to you about it? |
| 13:22:17 | 15 | A    Yeah, maybe during that time frame, yes, |
| 13:22:22 | 16 | sir. |
| 13:22:22 | 17 | Q    And did Mr. Chant actively encourage you to |
| 13:22:28 | 18 | file a federal lawsuit against Muncy Industries? |
| 13:22:30 | 19 | A    It was a mutual partaking, I guess you |
| 13:22:37 | 20 | could say.  At first I said, well, I'll think about |
| 13:22:43 | 21 | it.  I'll think about it, you know, and the more I |
| 13:22:45 | 22 | thought about it then I decided to do it.  But there |
| 13:22:52 | 23 | were multiple conversations that proceeded forward. |
| 13:22:57 | 24 | Q    How many, when you say "multiple," how many |
| 13:22:59 | 25 | times did you guys talk about it? |

RICHARD SZABO

**17**

13:23:00  1    A    Oh, gosh, this is bad.  I don't count these

13:23:04  2  things.  There were multiple conversations.

13:23:06  3    Q    More than two?

13:23:07  4    A    Yes.

13:23:08  5    Q    How about more than five conversations?

13:23:11  6    A    Maybe.

13:23:16  7    Q    Less than ten or more than ten?

13:23:18  8    A    Less than ten.

13:23:20  9    Q    Okay.  So somewhere between five and ten

13:23:22  10  conversations before you decided to pursue a federal

13:23:25  11  lawsuit?

13:23:27  12    A    Yes, sir.

13:23:28  13    Q    And during that time was Mr. Chant

13:23:32  14  encouraging you to file a lawsuit against

13:23:34  15  Muncy Industries?

13:23:34  16    A    I wouldn't say "encouraging," I would more

13:23:41  17  or less say checking on me to see how things are

13:23:45  18  going and if I reached out to Murphy Law Group.

13:23:51  19    Q    Did he give you the name of Murphy Law Firm

13:23:54  20  to call?

13:23:54  21    A    He did not.  He didn't even know Murphy.

13:24:00  22  It was actually his employment lawyer, his employment

13:24:03  23  law firm.  And I don't even know who they are -- if

13:24:14  24  they --

13:24:14  25    Q    So just so I understand, Mr. Chant gave you

RICHARD SZABO

**18**

| | | |
|---|---|---|
| 13:24:18 | 1 | the name of his employment lawyer to call about this? |
| 13:24:20 | 2 | A    No.  They reached out to me via e-mail. |
| 13:24:23 | 3 | Q    An attorney reached out to you via e-mail |
| 13:24:27 | 4 | that works with Phil Chant? |
| 13:24:29 | 5 | A    It may be -- may have been a paralegal of |
| 13:24:33 | 6 | some sort that gave me Murphy Law Group's |
| 13:24:37 | 7 | information, actually gave me a specific person's |
| 13:24:40 | 8 | e-mail from Murphy, who had initially started this |
| 13:24:44 | 9 | claim with.  Mary Kramer was not the initial person. |
| 13:24:48 | 10 | Q    Okay.  So if I understand you correctly, |
| 13:24:53 | 11 | I'm not asking what your communications said.  An |
| 13:24:58 | 12 | attorney or somebody who works for an attorney what |
| 13:25:01 | 13 | works for Phil Chant reached out to you to help you |
| 13:25:04 | 14 | locate an attorney to file a federal lawsuit; is that |
| 13:25:06 | 15 | a correct statement? |
| 13:25:07 | 16 | A    That would be a correct statement. |
| 13:25:08 | 17 | Q    Before you met Phil Chant, did you have any |
| 13:25:14 | 18 | designs about filing a federal lawsuit for a Fair |
| 13:25:19 | 19 | Labor Standards Act against Muncy Industries? |
| 13:25:20 | 20 | A    No, sir, I did not. |
| 13:25:29 | 21 | Q    So it's correct to say that if you hadn't |
| 13:25:32 | 22 | met with Mr. Chant that you probably would have never |
| 13:25:33 | 23 | even filed this lawsuit? |
| 13:25:35 | 24 | A    Probably correct, yes. |
| 13:25:39 | 25 | Q    Let me ask you this, going back to how this |

RICHARD SZABO

**19**

13:25:50    1    dynamic worked, at least the way you are describing

13:25:52    2    it, did you ever try to say to Mr. Fetter or anyone

13:25:56    3    else at Muncy Industries like Kimberly Bunting or

13:26:00    4    Megan Delahoussaye, that I don't want to travel this

13:26:03    5    weekend on Saturday or Sunday, can we move it to

13:26:06    6    Monday morning, did you ever have a time when you

13:26:08    7    tried to do that?

13:26:09    8        A    No, sir.

13:26:10    9        Q    Why didn't you ever ask to travel during

13:26:14   10    Monday through Friday if you didn't want to travel on

13:26:18   11    the weekends?

13:26:18   12        A    Because I already knew the answer, which

13:26:20   13    would be no.

13:26:21   14        Q    How did you know the answer already without

13:26:23   15    asking the question?

13:26:24   16        A    Because I know Jason Fetter.

13:26:29   17        Q    You'll have to explain to me what that

13:26:33   18    means?

13:26:33   19        A    Well, I know his attitude towards me and

13:26:35   20    his attitude towards the trips and there was no room

13:26:39   21    for error.  There was no room for moving things or

13:26:45   22    adjusting things, whatever he said goes and anyone in

13:26:52   23    that company will tell you the same answer.  Whatever

13:26:55   24    he says goes.  He's not a very flexible person.

13:27:00   25        Q    Okay.  Well, again there were other

*RICHARD SZABO*

**20**

13:27:03   1   employees that have testified in this case and they

13:27:07   2   indicated that they sometimes would work past five

13:27:11   3   or work through a lunch hour.  Have you worked

13:27:15   4   through a lunch hour before when you worked for

13:27:17   5   Muncy Industries?

13:27:18   6        A    Yes, numerous occasions.

13:27:21   7        Q    And their testimony was that when they

13:27:24   8   worked through a lunch hour they didn't expect to be

13:27:27   9   paid because they assumed that was their choice to

13:27:29   10  decide to work through the lunch hour to get the work

13:27:32   11  done.  How would you characterize your decision to

13:27:35   12  work through the lunch hour?

13:27:36   13       A    It was because, just like you said, you had

13:27:44   14  to get, sometimes you needed to just buckle up and

13:27:47   15  get things done.  I mean that's what a dedicated

13:27:51   16  employee does.  You push through and get the job

13:27:54   17  done.

13:27:55   18       Q    Right.  Like in your situation, sir, just

13:27:59   19  as an example, you're a calibration technician,

13:28:03   20  correct, for Muncy Industries?

13:28:04   21       A    Yes, sir.

13:28:05   22       Q    And if you're at an employer's site and

13:28:09   23  you're working on a test bed as lunch approaches,

13:28:14   24  were there many times that you would just go ahead

13:28:16   25  and finish that work to make sure it got done?

RICHARD SZABO

21

13:28:19  1        A    Oh yes.

13:28:20  2        Q    When you did that, that was your decision

13:28:22  3   to keep working through the lunch hour, correct?

13:28:24  4        A    It was, yes, sir.

13:28:26  5        Q    If you had a test bed when you worked at

13:28:33  6   Muncy Industries where you were approaching

13:28:36  7   5:00 and you were close to getting the job done, were

13:28:38  8   there many times when you would just keeping working

13:28:40  9   past five to get that job finished?

13:28:42  10       A    Many times.

13:28:44  11       Q    Again that choice to go ahead and finish

13:28:48  12  it, whether it's 5:30 or 6:00, that was your choice

13:28:50  13  to keep working to get that job done, correct?

13:28:53  14       A    I would like to state for the record

13:28:56  15  because I was salaried paid, I knew that that's what

13:29:03  16  -- that that's what was expected of me from my

13:29:08  17  employer.  But let me tell you, if I was hourly paid,

13:29:10  18  there would have been phone calls, there would have

13:29:13  19  been I'm getting paid for this extra time, right?

13:29:16  20  You know, I would have made sure I was getting paid

13:29:22  21  by the hour for the hour.  Please let me be clear at

13:29:24  22  that.  I mean --

13:29:27  23       Q    Yeah.  Can you restate that answer, we just

13:29:29  24  didn't catch part of it.  I'm sorry.

13:29:32  25       A    That's okay.  Just know that because I was

RICHARD SZABO

**22**

13:29:34   1   salaried, that's what was expected of me and I knew

13:29:38   2   that.  But if I would have been hourly paid, they

13:29:41   3   would have been making sure I got paid by the hour

13:29:44   4   for every hour that I stayed after five o'clock.

13:29:48   5   Whether it be a phone call or making sure that he

13:29:51   6   knew I was still on the job after five.

13:29:55   7        Q    So when you were hired you understand

13:30:00   8   because you were a salaried employee, you were not

13:30:04   9   going to get paid extra time if you worked past five

13:30:07   10  or worked through the lunch hour?

13:30:08   11       A    I understood that.

13:30:09   12       Q    And, in fact, my earlier question to you

13:30:12   13  was that you were asked to be paid for overtime while

13:30:17   14  you were at Muncy Industries.  Did you ever ask to

13:30:19   15  get paid for travel time if you traveled for Muncy

13:30:22   16  outside of Monday through Friday eight to five?

13:30:24   17       A    No, I did not.

13:30:26   18       Q    Okay.  And when you worked at Muncy

13:30:33   19  Industries, and I know we covered this in other

13:30:35   20  depos, I'm going to try really hard, Mr. Szabo, not

13:30:37   21  to repeat questions, but you basically created their

13:30:40   22  calibration program at Muncy Industries, correct?

13:30:43   23       A    I would say, yes, yes.

13:30:48   24       Q    And you taught several individuals at

13:30:52   25  Muncy Industries how to do calibration, correct?

*RICHARD SZABO*

**23**

13:30:55  1      A      I attempted to.  There were a total of

13:31:02  2   three that I can recall.

13:31:04  3      Q      Okay.  And one of those --

13:31:05  4      A      Two of them ended up not actually working

13:31:08  5   there.

13:31:08  6      Q      Okay.  And one of those people was

13:31:10  7   Mr. Fetter himself, correct, didn't you teach

13:31:12  8   Mr. Fetter how you do your job?

13:31:15  9      A      Sorry.  I'm sorry.  Sure, yes.

13:31:26  10      Q      And you taught Shandi Crappell or tried to

13:31:31  11   teach her some of the calibration techniques; is that

13:31:34  12   correct?

13:31:34  13      A      Yes, I did.

13:31:35  14      Q      What other individuals besides those two

13:31:37  15   I've just named, did you actually teach some of the

13:31:39  16   calibration techniques?

13:31:42  17      A      There was another gentlemen, William Croy.

13:31:42  18              (Court reporter clarification.)

13:31:42  19   BY MR. STAPP:

13:31:47  20      Q      What was the last name, sir?

13:31:50  21      A      I'm pretty sure the last name was Croy or

13:31:54  22   Roy.  I can't spell it.

13:31:55  23      Q      C-R-O-Y?

13:31:57  24      A      C-R-O-Y.

13:32:00  25      Q      And did Mr. Croy go on job assignments with

RICHARD SZABO

**24**

13:32:05   1    you to calibrate?

13:32:07   2         A    He did.  There was a few, yeah.

13:32:11   3         Q    And Ms. Crappell went on some jobs with

13:32:13   4    you, too, to employers or to customer sites to

13:32:18   5    calibrate, correct?

13:32:19   6         A    I think there was one time, yes, sir.

13:32:21   7         Q    When you would have Shandi Crappell or

13:32:25   8    William Croy with you, would you supervise them while

13:32:30   9    they were on the customer site?

13:32:32  10         A    No, sir.  I was not given any authority to

13:32:39  11    supervise.

13:32:40  12         Q    Did you help them perform the calibrations

13:32:43  13    when you were there with them?

13:32:44  14         A    Yeah, I would, it was a team effort for

13:32:48  15    sure.

13:32:49  16         Q    And if they were doing something wrong,

13:32:50  17    would you tell them how to fix that so they weren't

13:32:53  18    doing it incorrectly?

13:32:55  19         A    Yeah, that's, I mean that goes with

13:33:00  20    training someone, yes, sir, you want to make sure

13:33:03  21    they do the job and learn it correctly.

13:33:06  22         Q    Were there times with either Ms. Crappell

13:33:08  23    or Mr. Croy where they would ask for your assistance

13:33:10  24    with a calibration technique or something they were

13:33:13  25    doing to perform the work?

*RICHARD SZABO*

**25**

| | | |
|---|---|---|
| 13:33:14 | 1 | A    Yes.  Sure.  There were always questions |
| 13:33:21 | 2 | about doing things. |
| 13:33:21 | 3 | Q    Okay.  And when they, those questions, they |
| 13:33:24 | 4 | were directed to you? |
| 13:33:25 | 5 | A    Well, yes, sir, I was the only one there. |
| 13:33:31 | 6 | Q    And did you then help them perform the |
| 13:33:34 | 7 | task? |
| 13:33:34 | 8 | A    Well, yes, sir. |
| 13:33:36 | 9 | Q    Okay.  So and it's correct to say that when |
| 13:33:39 | 10 | these people, William Croy and Shandi Crappell would |
| 13:33:43 | 11 | go on a job assignment with you, you were trying to |
| 13:33:45 | 12 | make sure they were doing the work correctly; is that |
| 13:33:49 | 13 | right? |
| 13:33:49 | 14 | A    Well, yes, sir, you don't want to teach |
| 13:33:56 | 15 | them to do it wrong. |
| 13:33:57 | 16 | Q    So in essence, I mean isn't that what |
| 13:34:05 | 17 | supervision is, is everything you just described: |
| 13:34:08 | 18 | Answering questions, giving them directions, helping |
| 13:34:12 | 19 | them do the job correctly, wouldn't you agree that's |
| 13:34:14 | 20 | what supervision is? |
| 13:34:16 | 21 | A    No, sir.  I was a trainer.  I was not |
| 13:34:18 | 22 | supervisor.  Let's be clear. |
| 13:34:19 | 23 | Q    And, well, help me understand the |
| 13:34:22 | 24 | difference in your perspective between what you did |
| 13:34:24 | 25 | and what supervision is? |

RICHARD SZABO

**26**

13:34:27    1    A    Okay.  Well, for example, my brother-in-law

13:34:29    2    works for the government, he is a trainer.  He's

13:34:33    3    clearly someone that trains people to do a certain

13:34:35    4    job, but he's not a supervisor.  He doesn't have any

13:34:39    5    supervisory capabilities hiring people, firing

13:34:42    6    people, do this, do that, do what I say or, you know,

13:34:47    7    that's what a supervisor is.

13:34:50    8         But to train someone, you're just training

13:34:52    9    someone.  You're teaching them how to do a job and

13:34:55   10    that's all I did was teach people how to do a job.

13:34:58   11    Q    Okay.  So, again, let's try to make sure I

13:35:03   12    understand, it sounds to me like your definition,

13:35:07   13    okay, and definitions are very important in the law,

13:35:10   14    of someone who supervises means that they have to

13:35:14   15    have the ability to hire or fire that employee; is

13:35:18   16    that correct?

13:35:18   17    A    Let's not twist that around.  I'm not

13:35:25   18    saying that.  I'm just saying that I didn't have any

13:35:29   19    delegation authorities.  I was just there to make

13:35:33   20    sure someone did the job correctly, to understand the

13:35:37   21    process and how Muncy does things.  I was not any

13:35:41   22    type of supervisor.

13:35:42   23    Q    Okay.  Well, let's talk about an individual

13:35:45   24    site where you would have gone with somebody like

13:35:47   25    William Croy, right, so you arrive at the customer's

13:35:51  1   location.  Who was the person who decides who is

13:35:54  2   going to do what part of the job that day when you

13:35:57  3   would arrive?

13:35:57  4        A    I don't know.  We just did it.  We just

13:36:05  5   tackled it and did things, I mean it wasn't --

13:36:08  6        Q    Okay.  Well, was it you that told Mr. Croy,

13:36:11  7   I'm going to go do this --

13:36:11  8        A    I didn't delegate.

13:36:11  9        Q    -- and you're going to go do that?

13:36:14  10       A    No, I didn't delegate.  No, I didn't do

13:36:16  11  that.

13:36:17  12       Q    How did you decide with Mr. Croy and

13:36:18  13  Ms. Crappell who was going to do what part of the

13:36:23  14  job?

13:36:23  15       A    We just would open up the stuff and just

13:36:26  16  start tackling.  Sometimes they would say, okay, I'll

13:36:29  17  do this or do that and you do this and do that, okay,

13:36:33  18  that's fine.  You know, however you all want to do

13:36:36  19  it, let's do it, you know.

13:36:38  20       Q    Okay.  Well, I believe the testimony from

13:36:46  21  Megan and/or Kimberly Bunting both was that when you

13:36:48  22  were on the job site you were allowed to supervise

13:36:50  23  individuals like Shandi Crappell or William Croy.  Do

13:36:53  24  you agree or disagree with that statement?

13:36:56  25       A    I was training them.

RICHARD SZABO

**28**

13:37:00  1    Q    Okay.  So were you training them the entire

13:37:02  2    time that they worked with you?

13:37:04  3    A    No, once they learned the job, we would

13:37:09  4    just be teammates at that point.

13:37:10  5    Q    Okay.  So after they were trained, didn't

13:37:13  6    you have the authority to supervise them on the job

13:37:16  7    site at that point to tell them what they could do

13:37:18  8    and you would do something different, correct?

13:37:20  9    A    Oh, absolutely not.  I did not have the

13:37:25  10   authority to say you do this or I'll do that or

13:37:29  11   whatever.  We were just equals at that point.  I was

13:37:33  12   not a team leader or a -- you know, once they were

13:37:39  13   calibration technicians, they were just a technician

13:37:42  14   like me.

13:37:44  15   Q    Okay.  Just so I understand your testimony,

13:37:46  16   after you trained either Mr. Croy or Ms. Crappell,

13:37:51  17   it's your testimony today that you never went to a

13:37:54  18   job site for Muncy Industries and told either one of

13:37:56  19   them what they should do at the job site that day,

13:37:59  20   correct?

13:37:59  21   A    That's correct.  I mean, there was possible

13:38:11  22   -- never mind.  I'm going to be quiet.

13:38:13  23   Q    Let me go into, I'm going to try and do

13:38:16  24   this if I can and Share the screen.  I just want to

13:38:19  25   go over the salary stuff.  Before I do that, let me

RICHARD SZABO

**29**

13:38:22  1    just cover this issue quickly and then we'll move

13:38:25  2    back to salary.  So I'm going to try to Share my

13:38:28  3    screen here with you guys.  Okay.

13:38:40  4            So let me go to the top here.  So this is

13:38:47  5    on Page 131 of the Bate Stamped documents.  This is

13:38:54  6    entitled an Employee Warning Report.  Do you

13:38:56  7    recognize this document, sir?

13:38:58  8        A    What's this have to do with salary?

13:39:02  9            MS. KRAMER:  Greg, I think this is

13:39:04  10   e-mail --

13:39:05  11       A    This is bullshit.

13:39:06  12           MS. KRAMER:  -- whether Mr. Szabo was paid

13:39:10  13   correctly or classified correctly.

13:39:11  14       A    Every time, in the other case you did this.

13:39:16  15           MS. KRAMER:  Ric.

13:39:16  16           THE WITNESS:  I'm sorry.

13:39:19  17       A    This has nothing to do with that.  He's

13:39:19  18   going to make me out to be a bad guy, man.

13:39:19  19   BY MR. STAPP:

13:39:23  20       Q    This is directly related to your employment

13:39:25  21   with Muncy Industries and you're making a claim for

13:39:27  22   wages as a result of your employment, so I just want

13:39:29  23   to verify that this is your signature on this

13:39:32  24   document that I'm trying to confirm here.  So I just

13:39:35  25   want to ask you the simple question --

*RICHARD SZABO*

**30**

13:39:37  1      A      There are plenty of documents with my

13:39:37  2  signature on it that you didn't have to pull this one

13:39:39  3  up in front of people.  I apologize, but that's --

13:39:46  4  plenty of documents, Greg.

13:39:48  5      Q      Okay.  My --

13:39:49  6          MS. KRAMER:  I just want to object.

13:39:51  7  BY MR. STAPP:

13:39:51  8      Q      My question is, Mr. Szabo, is this your

13:39:54  9  signature here on this document?

13:39:55  10     A      Yes, sir.

13:40:01  11         MR. STAPP:  Did we lose him?

13:40:03  12         MS. KRAMER:  Greg, is he still there?

13:40:06  13         MR. STAPP:  I don't even see him on the

13:40:07  14  screen.  Let me go out of Share screen.  Let me go

13:40:10  15  back to the salary stuff because it's all the way up

13:40:12  16  at the top so whatever happens here.  I don't see him

13:40:19  17  on here.  I'm going to try to go to some other

13:40:23  18  documents.

13:40:24  19         MS. KRAMER:  I'm asking my assistant to

13:40:26  20  help.

13:40:27  21         MR. STAPP:  Okay.  I'll scroll to the top

13:40:29  22  of this one so we can get back to the salary stuff.

13:40:29  23         (1-page Employment Warning Report marked as

13:41:12  24  Exhibit 1.)

13:41:12  25         MS. KRAMER:  Greg, I'm going to need to

RICHARD SZABO

**31**

13:41:15  1    give him a call.  Can we just go -- is this off the

13:41:17  2    record?

13:41:17  3             (Discussion held off the record.)

13:41:18  4             MR. STAPP:  All I'm doing is giving her

13:41:21  5    that document so he has that.

13:41:23  6             MS. KRAMER:  Okay.  Thanks.

13:45:13  7             He said he was coming back.  There he is.

13:45:30  8             (Recess.)

13:45:30  9    BY MR. STAPP:

13:45:33  10        Q    Mr. Szabo, can you hear me?

13:45:34  11        A    Yes.

13:45:35  12        Q    Okay.  I'm showing you now some documents

13:45:42  13   that were in the discovery that was produced and this

13:45:47  14   is just what appears to be some type of record that

13:45:51  15   was being kept by Muncy Machine and Tool.  I just

13:45:55  16   want to understand from your perspective, have you

13:45:57  17   seen this before when you were working there?

13:45:59  18        A    No, sir.

13:46:02  19        Q    Okay.  Do you know, were you keeping this

13:46:07  20   or is this -- did you have to clock in and clock out?

13:46:10  21        A    We did have to clock in on a time clock and

13:46:16  22   clock out.

13:46:17  23        Q    When you were at the facility, correct?

13:46:19  24        A    When we were at the facility, correct.

13:46:22  25        Q    So, and again if you can't answer this

*RICHARD SZABO*

**32**

13:46:25  1  question, sir, that's fine.  I'm really just trying

13:46:27  2  to make sure I understand from both sides, your side

13:46:30  3  and my client's side.  Are these what appear to you

13:46:34  4  to be days that you would have been working at

13:46:37  5  Muncy Industries' location in Louisiana, where you're

13:46:41  6  clocking in and clocking out?

13:46:43  7       A    It looks correct.  I mean it looks, it

13:46:48  8  appears to be that, yes.  I apologize.

13:46:50  9       Q    So the record can reflect, I'm referring to

13:46:54  10  what's Bate stamped Page 17 and 18 and goes on for

13:46:58  11  some time what appear to be clock records, so I just

13:47:02  12  want to make sure I know what these are.  Despite

13:47:05  13  your clocking and clocking out, you were paid a

13:47:08  14  salary with a bonus structure, correct?

13:47:10  15       A    That's correct.

13:47:14  16       Q    And, for instance, I have an e-mail where

13:47:19  17  you were paid a $200 bonus on August 23rd, 2018, and

13:47:24  18  I'm not going to mark this as an exhibit, I'll see if

13:47:29  19  I can just show you that so you see what I'm talking

13:47:32  20  about.  And then if you just tell me how that was

13:47:36  21  paid, what your understanding of how that was paid

13:47:39  22  was (scrolling).  Okay.

13:47:42  23       A    Are you ready for me to answer that or are

13:47:48  24  you --

13:47:48  25       Q    Yeah, let me just get to that, I'm sorry, I

*RICHARD SZABO*

33

13:47:50   1   thought there was a faster way to scroll on this I

13:47:52   2   would.  I think I put this wrong.  Let me show you

13:47:54   3   this one first because this is older.

13:47:55   4            Here is one from Mr. Fetter to someone at

13:47:58   5   Muncy Industries about a $200 bonus in August of

13:48:02   6   2018.  Do you recall getting a bonus back in

13:48:05   7   August of 2018?

13:48:06   8        A    I would say that's accurate, yes, sir.

13:48:09   9        Q    And what was the bonus for?

13:48:11   10       A    That I can't remember.

13:48:15   11       Q    Okay.

13:48:16   12       A    I wish I could.

13:48:18   13       Q    And here's another one, right above, on

13:48:20   14   January 31st of 2019, where it looked like you were

13:48:24   15   given a bonus of $400.  Do you recall that bonus?

13:48:27   16       A    I'll just answer you for the future ones, I

13:48:33   17   do remember getting every bonus that he gave me.  I

13:48:36   18   do remember it.

13:48:37   19       Q    Now, one of the bonus structures, at least

13:48:39   20   from what I have seen and again I just want to

13:48:41   21   confirm this with you, appears to be based on how

13:48:44   22   many calibrations you did; is that correct?

13:48:48   23       A    That is true.

13:48:50   24       Q    Okay.  And is that the only thing you got

13:48:56   25   paid a bonus for was how many calibrations you did?

RICHARD SZABO

**34**

13:48:59  1      A     Well, let's clarify the statement.  I would

13:49:06  2   get a raise, as you show here, a raise, not a bonus,

13:49:11  3   performing calibrations.  The bonuses were just for,

13:49:15  4   I guess, for doing a good job or added to my customer

13:49:21  5   satisfaction, things like that.

13:49:23  6      Q     Okay.

13:49:23  7      A     So I just want to clarify, you're using

13:49:25  8   this bonus versus raises.

13:49:27  9      Q     Okay.  All right.  Well, I appreciate that.

13:49:29  10  That's the whole purpose of my question.  So here's

13:49:32  11  an e-mail on the same date as the earlier one where

13:49:35  12  you were given a bonus, where it also says you're

13:49:37  13  getting a raise of $2,000 on August 18th of 2018.

13:49:42  14  Did you get a raise at that time?

13:49:43  15     A     Yes, sir, I did.

13:49:46  16     Q     Okay.  And looks like there's even one --

13:49:50  17  and I apologize of getting it out of order -- on

13:49:53  18  July of 2018 it looks like you got one for another

13:49:59  19  $2,000.  Let me see if I can get to that page

13:50:04  20  (scrolling).  See, here's one for July 2018, one

13:50:07  21  month, approximately one month before the one we just

13:50:10  22  looked at where you got an annual raise of $2,000 as

13:50:13  23  well; is that correct?

13:50:14  24     A     Yeah, I can't remember and I'll just --  I

13:50:23  25  can't remember.  I don't think I got two raises

RICHARD SZABO

35

13:50:26   1    within a month of each other.  I think maybe what

13:50:29   2    happened was he sent the notification and I let him

13:50:34   3    know that I never got it and I think that he had to

13:50:38   4    resend it because somehow it got missed in the loop.

13:50:41   5    That's my memory, sir.

13:50:43   6         Q    Okay.  So I think you and I are saying

13:50:47   7    together that you got a $2000 raise in August of '18,

13:50:51   8    but you did get a bonus as well around that time of

13:50:54   9    $200; is that correct?

13:50:56   10        A    That is, yes, sir.

13:50:58   11        Q    Okay.  Now, let me show you this page,

13:51:01   12   because this seems to lay out some -- something

13:51:04   13   between you and Mr. Fetter about your pay.  So I'm

13:51:10   14   showing you what's been marked Bates document 79, and

13:51:13   15   you know, this one I think I will mark as an exhibit,

13:51:17   16   this would be Exhibit Number 2 to the deposition and

13:51:22   17   I'll get you a clean copy.  But do you recognize this

13:51:27   18   document, Mr. Szabo?

13:51:27   19             (1-Page Undated Typewritten Offer Letter

13:51:28   20   marked as Exhibit 2.)

13:51:28   21        A    I think that was on my offer letter when I

13:51:34   22   got employed.

13:51:35   23   BY MR. STAPP:

13:51:35   24        Q    So this is the -- this is giving to you

13:51:38   25   when you were hired on January of 2018?

RICHARD SZABO

**36**

13:51:40  1      A      That's correct.

13:51:41  2      Q      And it looks like you're going to receive a

13:51:46  3  salary increase of $2,000 for "every 30 E4

13:51:52  4  calibrations you successfully perform;" is that

13:51:56  5  correct?

13:51:56  6      A      That is correct.

13:51:58  7      Q      So does that mean that when you got the

13:52:02  8  salary increase by July of 2018, that you had

13:52:05  9  completed 30 calibrations by that point?

13:52:08  10      A      Yes, that's true.

13:52:10  11      Q      This also seems to indicate that even after

13:52:16  12  your salary is over $50,000, they are going to

13:52:20  13  provide you a bonus for $500 for every 20 E4

13:52:24  14  calibrations you perform; am I reading that

13:52:26  15  correctly?

13:52:27  16      A      That is correct.

13:52:28  17      Q      Did you ever take advantage of that when

13:52:30  18  you got to a point where your salary was at at

13:52:33  19  $50,000 or over?

13:52:35  20      A      No, sir.

13:52:35  21      Q      Okay.

13:52:37  22      A      I didn't quite make it on that.

13:52:40  23      Q      And that's going to bring me to this next

13:52:44  24  one we have, which is it looks like by April 1st of

13:52:49  25  2019, and starting effective May 1st of 2019, your

RICHARD SZABO

37

13:52:55   1   salary was going to be a total of $45,000; is that

13:52:58   2   correct?

13:52:58   3        A    Sure.

13:53:03   4        Q    Is that --

13:53:04   5        A    I can't -- I can't even remember that time

13:53:09   6   frame what I was making, but I'm just going to have

13:53:12   7   to assume that this is correct.  I don't know if

13:53:14   8   that's the right thing.

13:53:18   9        Q    So you don't have any reason to disagree

13:53:20   10   with the fact you were getting $45,000?

13:53:23   11        A    I don't disagree with it, that's correct.

13:53:26   12   I don't disagree with it.

13:53:27   13        Q    Just so, and I apologize, I did it at least

13:53:29   14   once myself, but just wait until I finish my question

13:53:32   15   to answer.  That's one of the rules we didn't go over

13:53:35   16   today, but just so the court reporter can get down my

13:53:37   17   question and your answers, so we're not talking over

13:53:39   18   each other.

13:53:45   19             Now is that, the $45,000, not including

13:53:49   20   bonuses mind you, is that the salary you were at when

13:53:52   21   you left Muncy Industries?

13:53:56   22        A    I do not think that is correct.

13:54:02   23        Q    Okay.  You had --

13:54:03   24        A    That is not correct.

13:54:05   25        Q    You had another increase.  Okay.  What was

RICHARD SZABO

**38**

13:54:05  1    your salary?

13:54:06  2         A    Close to 50, like I think I was right at

13:54:13  3    that 49 mark, 48, 49, to be honest.

13:54:17  4         Q    Okay.  And you got other bonuses, too,

13:54:21  5    while you were there, other than the two I showed you

13:54:26  6    today; is that right?

13:54:26  7         A    So to be honest, I believe I got one more.

13:54:32  8    And that was, yeah, I believe I got one more.

13:54:35  9         Q    Okay.  I'm going to show you --

13:54:38  10        A    There was an $800 bonus one time, I just.

13:54:43  11        Q    I don't have any official documentation

13:54:45  12   other than this handwritten note, but it looked like

13:54:48  13   someone wrote a note on April 28 of 2019, to increase

13:54:53  14   your salary to $47,000.  Did you get an increase to

13:54:58  15   $47,000, based on the calibrations in April of 2018?

13:55:02  16        A    I did do that.  That is actually my

13:55:06  17   handwriting and my note that I sent to Jason.

13:55:10  18        Q    Okay.  And did they honor it?

13:55:13  19             THE WITNESS:  There is something on my

13:55:14  20   screen.  I apologize, something is going on.  Give me

13:55:17  21   just a second.  Some background program is

13:55:21  22   interrupting.  All right.  Go ahead.

13:55:25  23   BY MR. STAPP:

13:55:25  24        Q    And is it your recollection that this

13:55:29  25   request by you was honored to increase it to the next

*RICHARD SZABO*

**39**

13:55:32  1   $2,000 level?

13:55:34  2       A    It was honored, yes, sir.

13:55:38  3       Q    So if I understand the testimony so far at

13:55:44  4   least it looks like that Muncy Industries honored

13:55:47  5   that deal that we just showed you that has been

13:55:51  6   marked <u>Exhibit Number 2</u> regarding your salary and

13:55:53  7   your pay rate with them; is that correct?

13:55:55  8       A    That is correct.

13:55:58  9       Q    And as you and I discussed before, you had

13:56:07  10  requested that to help you out, that Muncy provide a

13:56:11  11  vehicle which really in essence was then purchasing

13:56:14  12  the vehicle that you already were driving; is that

13:56:16  13  right?

13:56:16  14      A    They did purchase my car, correct.

13:56:21  15      Q    So I'm going to show you this, do you

13:56:25  16  recognize this document, the Company Vehicle

13:56:30  17  Agreement?

13:56:30  18      A    I'm pretty sure that it's familiar, yes.

13:56:37  19  Yeah, I think we had to sign it.

13:56:41  20      Q    And this is a 2016 Toyota Scion, S-C-I-O-N;

13:56:44  21  is that correct?

13:56:46  22      A    That is correct.

13:56:46  23      Q    And this is your signature here; is that

13:56:49  24  right?

13:56:49  25      A    I can't see it.  Oh, there it is.

*RICHARD SZABO*

**40**

13:56:55  1      Q      Right here, is that your signature?

13:56:57  2      A      That is correct, yeah.

13:56:58  3      Q      So just so, so for purposes of

13:57:00  4  completeness today, I'll mark that Deposition

13:57:00  5  Exhibit 3.

13:57:00  6             (2-Page Company Vehicle Agreement marked as

13:57:10  7  Exhibit 3.)

13:57:10  8  BY MR. STAPP:

13:57:11  9      Q      Okay.  In addition to the car, there was a

13:57:14  10  reimbursement for some moving expenses, too; is that

13:57:17  11  right?

13:57:17  12      A      Yes, they provided partial moving cost when

13:57:25  13  I moved to join the company.

13:57:28  14      Q      And I'm showing you a document that they

13:57:33  15  titled, Muncy Industries did, Moving Expense, re

13:57:39  16  hyphen payment promissory note.  Do you recognize

13:57:40  17  this document?

13:57:40  18      A      Yes, I do.  I do remember that.

13:57:43  19      Q      Okay.  So what, help me understand what

13:57:47  20  this is.  Were they just offering to loan you the

13:57:50  21  company or were they giving you the $1500?

13:57:52  22      A      It was a loan to be paid back by time

13:57:58  23  served, if that makes sense.

13:58:01  24      Q      Okay.

13:58:01  25      A      Meaning that if I stayed with them for two

*RICHARD SZABO*

**41**

13:58:03  1    years, that I no longer had to pay that money back.

13:58:07  2        Q    Okay.  And did you ever have to pay back

13:58:09  3    the moving expenses that they gave to you?

13:58:11  4        A    No, I did not have to pay them back.  That

13:58:20  5    was clean.

13:58:20  6        Q    Okay.

13:58:20  7             (Court reporter clarification.)

13:58:20  8    BY MR. STAPP:

13:58:21  9        Q    You said "clean"; is that right?

13:58:23  10       A    Yeah, I guess, the slate was clean, wiped

13:58:26  11   clean.  I apologize.

13:58:27  12       Q    So now I'm just going to show you, and this

13:58:30  13   one I think I'll mark these two because they are

13:58:32  14   actual, what appear to be payments related to the

13:58:36  15   moving.  It looks like there was a U-Haul payment of

13:58:42  16   it looks to me to be 892.20, that was paid to U-Haul.

13:58:49  17   Does that sound about right for your moving expense

13:58:52  18   with U-Haul?

13:58:53  19       A    Yes, that's about right, yeah.

13:58:55  20       Q    And then --

13:58:56  21       A    That's actually my handwriting.  Sorry.

13:58:59  22       Q    Okay, okay.  So this was a form you

13:59:02  23   submitted to Muncy Industries for payment?

13:59:03  24       A    That's what I had to do, yes.

13:59:05  25       Q    Okay.  And this looks like maybe a receipt

*RICHARD SZABO*

**42**

| | | |
|---|---|---|
| 13:59:07 | 1 | from your U-Haul order reservation; is that what -- |
| 13:59:12 | 2 | is that what this is? |
| 13:59:12 | 3 | A    Yes, sir. |
| 13:59:14 | 4 | Q    And do you recognize this is a true and |
| 13:59:17 | 5 | authentic copy of your reservation receipt for |
| 13:59:21 | 6 | confirmation? |
| 13:59:21 | 7 | A    Yes, it is. |
| 13:59:22 | 8 | Q    Okay.  So, what, you were moving from |
| 13:59:28 | 9 | Savannah, Georgia, I guess, to Lafayette, Louisiana; |
| 13:59:31 | 10 | is that right? |
| 13:59:31 | 11 | A    That's correct. |
| 13:59:32 | 12 | Q    Okay.  So we'll just mark that 4 so we have |
| 13:59:36 | 13 | it. |
| 13:59:36 | 14 | (Two Pages of U-Haul Receipts marked |
| 13:59:37 | 15 | Exhibit 4.) |
| 13:59:37 | 16 | BY MR. STAPP: |
| 13:59:40 | 17 | Q    In addition to the car that they bought for |
| 13:59:44 | 18 | you and the moving expenses they paid, you were also, |
| 13:59:48 | 19 | because of the traveling, you were given a credit |
| 13:59:50 | 20 | card to use as well; is that right? |
| 13:59:51 | 21 | A    Yes, that's correct. |
| 13:59:54 | 22 | Q    And you did use that credit card for travel |
| 13:59:59 | 23 | expenses; is that right? |
| 14:00:01 | 24 | A    Yes, I did. |
| 14:00:03 | 25 | Q    Help me understand from your perspective |

*RICHARD SZABO*

**43**

14:00:06    1    what kinds of things were you allowed to purchase

14:00:08    2    with the company card?

14:00:10    3        A    Food, hotel purchases, an occasional

14:00:18    4    airline ticket if I needed to, anything -- anything

14:00:27    5    work related.  So I had to put tires on the car, I

14:00:31    6    would use it for that.  It was specifically work

14:00:33    7    related.

14:00:33    8        Q    Okay.  So they, so Muncy was paying, when

14:00:38    9    you were on the road, they were paying for your food

14:00:40    10    and hotel, correct?

14:00:41    11        A    That is correct.

14:00:43    12        Q    And did you have to reimburse them for

14:00:53    13    those items or the company paid for them completely?

14:00:55    14        A    No, I didn't have to pay them.

14:01:00    15        Q    Anything else that you can recall that you

14:01:08    16    were given or that Muncy paid for for you, other than

14:01:12    17    what we've discussed here today, which are so far

14:01:15    18    salary with bonuses, salary increases, the purchase

14:01:21    19    of a vehicle for you to use with the company, as well

14:01:23    20    as your moving expenses and all of your travel

14:01:26    21    expenses.  Is there anything else that Muncy paid for

14:01:28    22    you besides those items?

14:01:29    23        A    Yes.

14:01:35    24        Q    Okay.  What else did they pay?

14:01:36    25        A    I don't know if it applies to this

RICHARD SZABO

**44**

14:01:40  1    category, but I had a company paid cell phone as

14:01:43  2    well.

14:01:43  3         Q    Okay.  Were you allowed to use that

14:01:47  4    personally or you didn't have to pay for a cell phone

14:01:50  5    or no?

14:01:51  6         A    I was.

14:01:53  7         Q    And did you use it for your personal cell

14:01:57  8    phone as well or did you have a separate cell phone?

14:02:00  9         A    I had a separate.

14:02:02  10        Q    But you could have saved the expense of a

14:02:05  11   separate cell phone if you wanted to by just using

14:02:07  12   theirs for personal use as well?

14:02:09  13        A    There were -- there were times, yes, that I

14:02:14  14   actually did use theirs, yes, to save the expense.

14:02:18  15        Q    So there were some months where you didn't

14:02:20  16   have another cell phone, you would just use

14:02:22  17   Muncy Industries'?

14:02:23  18        A    Yes, sir.

14:02:24  19        Q    Okay.  So a couple more documents that I

14:02:47  20   want to just cover since I am trying to figure out

14:02:49  21   what these are too and then we'll go back to other

14:02:52  22   questions.  I think this may be related to the moving

14:02:55  23   expenses, but I'm not sure, so I'm really just

14:02:57  24   looking for your eyes only to see what these are.

14:03:02  25             This is a document that's a Bates 117 and

*RICHARD SZABO*

**45**

14:03:07  1    it looks like it's moving expenses.  Do you recognize

14:03:10  2    the handwriting and/or what this document is?

14:03:13  3        A    Actually, yes.  This is the -- this is

14:03:22  4    another submitted document from me to Jason about

14:03:26  5    getting paid for the moving expenses.

14:03:29  6        Q    Okay.  So did you get paid this 990.97 by

14:03:33  7    Muncy Industries as well?

14:03:37  8        A    I'm pretty sure I did.  I think they may

14:03:40  9    have given me a different amount, but I did get paid

14:03:43  10   something for that.

14:03:44  11       Q    Do you know whether you got paid all of

14:03:47  12   this or just some of it?

14:03:48  13       A    I'm pretty sure they gave me all of it.

14:03:51  14   They may have.  I don't know.  I can't remember.

14:03:56  15   It's so long ago.  But they did pay me, yes.

14:03:59  16       Q    Okay.  I'm going to mark that one as

14:04:05  17   Exhibit 5, just so we don't lose track of these.

14:04:07  18            (1-Page Expense Statement marked

14:04:08  19   Exhibit 5.)

14:04:08  20   BY MR. STAPP:

14:04:09  21       Q    Here is another one, next one is Bates

14:04:12  22   stamped 118.  It appears to be some kind of a receipt

14:04:16  23   and it is, I can't read it, it looks like 425, maybe,

14:04:21  24   and some change.  Do you recognize this document?  I

14:04:24  25   apologize for it being turned.  I would turn it if I

*RICHARD SZABO*

**46**

14:04:28  1   could.

14:04:33  2        A     Yeah, I don't.  I'm not sure what it is

14:04:35  3   for.

14:04:37  4        Q     It's saying Apartment 1521.  Do you know

14:04:39  5   what Apartment 1521 is?

14:04:41  6        A     Oh.  (Reviewing.)

14:04:48  7        Q     And it says assistant manager.

14:04:53  8        A     Wait, that's a receipt from my apartment to

14:04:57  9   me for -- for it looks like a prorated rent, yeah,

14:05:03  10  prorated rent for the first month when I moved in.

14:05:06  11  I'm pretty sure that's what that is, but I don't know

14:05:10  12  why Jason would have that in his possession.

14:05:13  13       Q     Well, you guessed my question.  So do you

14:05:16  14  know why this is in discovery?  Did Muncy Industries

14:05:19  15  pay this amount for you possibly or no?

14:05:22  16       A     I don't know why he has that.  It could be

14:05:28  17  related as part of the payment.  I just can't

14:05:31  18  remember.

14:05:33  19       Q     Okay.  Here is another one at Bates

14:05:38  20  stamp 120, do you know what this document is, the

14:05:52  21  Emberwood Apartments?

14:05:52  22       A     (Reviewing.)  No, it looks like all my --

14:05:57  23  that looks like the move-in expenses --

14:05:59  24       Q     Okay.

14:05:59  25       A     -- that I needed to provide payment for

*RICHARD SZABO*

47

14:06:02  1   before I could move in.

14:06:03  2       Q    Okay.  It looks like this is your signature

14:06:05  3   on the document, here is the number again 425.97, is

14:06:10  4   it possible that 425.97 was for you to pay to the

14:06:13  5   apartment to move into the area?

14:06:18  6       A    It sounds like it, yes.  I would agree with

14:06:21  7   that.

14:06:22  8       Q    So did you request reimbursement from

14:06:25  9   Muncy Industries for that 425.97?

14:06:34  10      A    No.  This, I believe, is all part of the

14:06:36  11  moving expenses.  That $1500 loan that we reviewed a

14:06:42  12  moment ago, this was all inclusive with that.

14:06:45  13      Q    So what I'm going to do is mark the receipt

14:06:48  14  form and this "Emberwood Welcome Home" together,

14:06:52  15  that's Bates stamp 118 and 120 as Exhibit Number 6,

14:06:55  16  just so we have a little bit better explanation of

14:06:58  17  what that is.  So that's part of the moving expenses

14:07:01  18  they paid you; is that correct?

14:07:01  19           (Two Pages of Receipts marked as

14:07:03  20  Exhibit 6.)

14:07:03  21      A    Yes.

14:07:07  22  BY MR. STAPP:

14:07:07  23      Q    And Mr. -- so let me shift gears a little

14:07:21  24  bit.  When you worked for Muncy Industries, you

14:07:25  25  actively tried to obtain new customers for them; is

*RICHARD SZABO*

**48**

14:07:28  1   that right?

14:07:28  2        A    Sorry, repeat the question.

14:07:36  3        Q    When you worked for Muncy Industries, you

14:07:38  4   actively tried to recruit new customers for them; is

14:07:42  5   that right?

14:07:42  6        A    I would say yes, yes.

14:07:49  7        Q    In fact, you had suggested at one point

14:07:52  8   that they consider a -- I'm going to try and pull

14:07:57  9   this document up too, if I can, so let me do this,

14:07:59  10  I'll stop Sharing the screen for a second and then

14:08:04  11  I'm going to go over here and pull this up.

14:08:09  12       At one point you had, it looks like,

14:08:11  13  suggested a Mailchimp campaign be tried by Muncy

14:08:18  14  Industries.  Do you recall talking to Mr. Fetter

14:08:21  15  about that idea?

14:08:25  16       A    I do remember something about Mailchimp,

14:08:27  17  yes, sir.

14:08:28  18       Q    Let me go back to, so I'm going to show you

14:08:35  19  what is Bate Stamped 259 through 261 or 62, this

14:08:41  20  appears to be an e-mail from you to Mr. Fetter on

14:08:44  21  August 15th of 2019.  Do you recognize this e-mail?

14:08:52  22       A    Sure.

14:08:55  23       Q    And was that your e-mail address when you

14:08:57  24  worked there, ric@muncyindustries.com?

14:08:59  25       A    Yes.

RICHARD SZABO

**49**

14:09:03  1      Q    It looks like you are sending him basically

14:09:06  2  what is an advertisement for how to do a Mailchimp

14:09:10  3  campaign; is that a fair statement?

14:09:12  4      A    Yes, I believe, yes.

14:09:17  5      Q    And am I correct, Mailchimp is a way to

14:09:21  6  send out solicitations to potential customers to get

14:09:26  7  their business; is that what you were giving it to

14:09:29  8  him for?

14:09:30  9      A    He wanted me to, if I remember correctly,

14:09:36  10  it wasn't specifically for that, but it was along

14:09:39  11  those lines.  I think he wanted us to make a campaign

14:09:42  12  page to put into a magazine is what it was.  And it

14:09:45  13  was a magazine that, yes, Muncy customers had

14:09:48  14  subscribed to.

14:09:50  15      Q    Okay.  And was that your idea or

14:09:52  16  Mr. Fetter's idea to try and solicit customers?

14:09:56  17      A    Oh, it was clearly his idea.  I'd just do

14:10:00  18  what he said.

14:10:01  19      Q    Okay.  And then there was another exchange

14:10:09  20  that looked like it occurred between you and

14:10:12  21  Mr. Fetter regarding some individuals you were

14:10:16  22  reaching out to try to obtain their business.  So let

14:10:20  23  me see if I can get that up here.  Okay.  So this is

14:10:26  24  I hope this is the correct one.  Hang on a second.

14:10:31  25      It looked like there was part of an e-mail

RICHARD SZABO

**50**

14:10:34   1   that was sent where you wrote to Mr. Fetter -- hang

14:10:40   2   on a second -- this is on Page 300 of the Bate stamp,

14:10:44   3   about potential customers.

14:10:49   4          Okay.  So here is what, back in March of

14:10:52   5   2018, it looks like you are writing to Mr. Fetter

14:10:56   6   about local customers in here and you state at the

14:11:02   7   end of it, if I'm reading this correctly, they are

14:11:05   8   both extremely interested in our calibration services

14:11:09   9   and I have verbally requested quotes.  Do you recall

14:11:11  10   this e-mail you sent to Mr. Fetter about two

14:11:16  11   customers which appear to be Bishop Lifting and Core

14:11:21  12   Lifting, do you recall those individuals?

14:11:22  13      A    I recall the customers, because I -- yeah,

14:11:32  14   I recall the customers, yes, sir.

14:11:33  15      Q    And were you trying to get their business

14:11:36  16   to come into Muncy Industries at that point?

14:11:44  17      A    They may have already been.  I think I

14:11:49  18   remember calibrating for Core Lifting already.  I

14:11:55  19   think they were already a customer, but --

14:11:55  20      Q    Well, it looks like they're a customer, but

14:11:57  21   they're not calibration services customers; is that a

14:12:01  22   fair statement at this point?

14:12:01  23      A    No, I believe I actually calibrated their

14:12:07  24   test bed.

14:12:11  25      Q    Well, if you look at this e-mail, it says

RICHARD SZABO

**51**

14:12:14  1    quote They are both extremely interested in our

14:12:17  2    calibration services and have verbally requested

14:12:22  3    quotes, end quote.  Am I reading that statement

14:12:24  4    correctly?

14:12:24  5        A    Sure.

14:12:25  6        Q    And did you -- did you start calibrating

14:12:28  7    for these people after you gave them the quotes, that

14:12:33  8    is Core Lifting and Bishop Lifting?

14:12:35  9        A    After Muncy gave them quotes.  I didn't

14:12:41  10   myself.  But, yeah, it's possible that's the time

14:12:44  11   frame that I calibrated after this.

14:12:48  12       Q    Okay.  And it looks like did you -- did you

14:12:51  13   solicit them while you were there with them for the

14:12:53  14   calibration services?

14:12:54  15       A    I could have, yes, sir.

14:13:01  16       Q    Okay.  So, I mean --

14:13:06  17       A    It's so long ago, I don't remember any

14:13:07  18   specific instances.

14:13:08  19       Q    It's correct to say, Mr. Szabo, that when

14:13:11  20   you worked for Muncy Industries you got some new

14:13:13  21   customers for them, correct, for calibration

14:13:17  22   services?

14:13:17  23       A    Yes, that's correct.

14:13:18  24       Q    And at one point did you offer to

14:13:22  25   Jason Fetter or Muncy Industries to reach out to

RICHARD SZABO

**52**

14:13:25  1  Roberts customers, your former employer?

14:13:28  2       A    I'm thinking, there may have been some talk

14:13:40  3  through me and Mr. Fetter throughout my employment

14:13:41  4  about reaching out to Roberts customers, that's

14:13:44  5  correct.  I would say so.

14:13:46  6       Q    Did you ever reach out to Roberts customers

14:13:48  7  on behalf of Muncy Industries to try and get their

14:13:51  8  business?

14:13:51  9       A    It's possible.

14:13:56  10      Q    So if I understood your question, you're

14:13:59  11  saying that you may have done that?

14:14:02  12      A    I may have.

14:14:03  13      Q    By the way, when you were working at

14:14:06  14  Roberts, were you salaried there or were you an

14:14:09  15  hourly employee?

14:14:09  16      A    I was hourly.

14:14:11  17      Q    Okay.

14:14:16  18      A    Hourly with overtime.

14:14:18  19      Q    Okay.  Did you get paid any travel time

14:14:20  20  when you worked at Roberts?

14:14:21  21      A    Sometimes.

14:14:26  22      Q    When you say "sometimes," when would you

14:14:30  23  get paid and when would you not get paid?

14:14:33  24      A    Usually if I had -- [Zoom unintelligible],

14:14:43  25  Sunday [Zoom unintelligible] -- kind.

RICHARD SZABO

**53**

14:14:47   1        Q    Yeah, you're breaking up, so we're not
14:14:49   2   getting your answer to that one.
14:14:50   3        A    I'll have to do it.
14:14:52   4        Q    Hang on a second, Mr. Szabo, you're
14:14:54   5   breaking up, so let's go -- I want to get out of
14:14:57   6   Share screen.  Let's go back to the question.  The
14:14:59   7   question was you said sometimes for travel time you
14:15:01   8   got paid and I asked you when did you get paid and
14:15:04   9   when did you not get paid and when you tried to
14:15:07  10   answer you broke up, so if you could answer that
14:15:09  11   again.
14:15:10  12        A    Oh, I just said sometimes that I would
14:15:14  13   travel maybe on a Sunday and -- [Zoom freezes up] --
14:15:23  14   it was maybe once still.
14:15:27  15        Q    Yeah, well, you broke up again, we'll have
14:15:29  16   to do that again.
14:15:44  17             (Answer read back by stenographer.)
14:15:45  18        A    Yes, that's it.  That's exactly how I said
14:15:48  19   it.
14:15:48  20   BY MR. STAPP:
14:15:48  21        Q    So you only got paid one time for travel?
14:15:51  22        A    Yeah, and that may, that's just a very
14:15:54  23   cloudy memory.
14:15:55  24        Q    Okay.  So Megan Delahoussaye had testified
14:16:04  25   at her deposition that it was your choice to travel

RICHARD SZABO

**54**

14:16:08   1   when you did and then that you could have traveled

14:16:11   2   during work hours if you wanted to.  Do you agree or

14:16:13   3   disagree with her statement?

14:16:15   4        A    I disagree.  That's a repeat question.

14:16:26   5             (Court reporter clarification.)

14:16:28   6   BY MR. STAPP:

14:16:29   7        Q    Megan had also testified that you exercised

14:16:32   8   judgment -- or exercised discretion and sound

14:16:36   9   judgment in your position at Muncy Industries as a

14:16:39   10  calibration technician.  Do you agree or disagree

14:16:42   11  with that statement?

14:16:43   12       A    I agree.  I just don't understand.  I don't

14:16:55   13  know.  Can you rephrase it somehow?  I'm not sure I

14:16:57   14  understand what the question means and I do

14:16:59   15  apologize.

14:17:00   16       Q    Well, the question is did you exercise

14:17:03   17  discretion and sound judgment in your employment at

14:17:05   18  Muncy Industries as a calibration technician?

14:17:08   19       A    Sure.

14:17:10   20       Q    Megan had also said that to do the

14:17:17   21  calibrations you had to be certified; is that right?

14:17:19   22       A    Yes.

14:17:22   23       Q    And she said that, I guess, you were part

14:17:26   24  of that, helping people get certified to do the

14:17:29   25  calibrations; is that right?

**55**

```
14:17:31   1        A     Yes.

14:17:33   2        Q     And was Mr. Fetter one of those people you

14:17:38   3   helped get certified?

14:17:39   4        A     I'm not certain.

14:17:40   5        Q     How about William Croy?

14:17:44   6        A     Yes, sir.

14:17:44   7        Q     Okay.  So Megan had testified that in her

14:17:48   8   recollection it took about three to six months of

14:17:51   9   training to pass the exam.  Can you just help me

14:17:55  10   understand what she meant when she said that; do you

14:17:57  11   know what she's talking about?

14:17:58  12        A     Yeah, there's a written test that I created

14:18:05  13   as part of the program that to finally you had to do

14:18:08  14   two parts.  You had to do a hands-on test and you had

14:18:11  15   to do a written exam.  And yes, it -- the time that

14:18:17  16   it took to do such, it was just definitely up to the

14:18:21  17   person being trained and how well they, you know, you

14:18:26  18   how well they adapted and learned it.

14:18:29  19        Q     And did it take the individuals three to

14:18:31  20   six months of training to be able to pass the exam?

14:18:34  21        A     Maybe three.  I don't know that I've had

14:18:42  22   anyone ever go longer than that.  Ms. Crappell

14:18:46  23   actually did it in a couple weeks.

14:18:47  24        Q     You, if I understand you correctly, the

14:18:49  25   certification process, you created the test and the
```

RICHARD SZABO

**56**

14:18:52  1   hands-on exam for them to take?

14:18:55  2        A    I did.

14:18:56  3        Q    And how did you know how to do that, how to

14:19:00  4   create the test and the hands-on examination?

14:19:02  5        A    I didn't, actually.  I just, intuition, I

14:19:12  6   guess, you know, no one had to tell me, I just knew

14:19:16  7   what had to be done.  That's the best way I can

14:19:20  8   answer.

14:19:20  9        Q    Well, who issues the certification, you did

14:19:22  10  or the state or the government; who does that?

14:19:25  11       A    We did at Muncy, but Muncy has to be

14:19:32  12  certified as an accredited laboratory before we can

14:19:38  13  say, yadda, yadda is certified to do calibration.  We

14:19:44  14  have to be accredited and we have to follow ISO.  So

14:19:47  15  the company itself, Muncy, has to be sound with two

14:19:59  16  agencies, I guess, or two -- they have to be ISO

14:20:03  17  certified and they have to be HOLA accredited before

14:20:07  18  me or someone could certify someone.

14:20:10  19       Q    And who is the one -- I'm sorry, I didn't

14:20:13  20  mean to interrupt you.  Who is the one responsible

14:20:14  21  for the ISO certification, who issues that

14:20:17  22  certification?

14:20:17  23       A    If you just get registered with I think

14:20:27  24  it's with NIST, National Institute Standards in

14:20:32  25  Testing, yeah, NIST.

*RICHARD SZABO*

**57**

14:20:34  1    Q    Okay.  And is that just a private

14:20:36  2  organization or is that part of the federal

14:20:38  3  government; do you know?

14:20:39  4    A    That's a federal, to the best of my

14:20:42  5  knowledge.  It's, yeah, I don't know the actual

14:20:46  6  answer to that.

14:20:47  7    Q    Okay.  And when you were doing the training

14:20:51  8  of Ms. Crappell and Mr. Croy to prepare them to do

14:20:55  9  your test and exam, I assume you were supervising

14:21:00  10  them during that training process, correct?

14:21:01  11    A    Was I a supervisor during the training

14:21:11  12  process of Shandi and William?

14:21:14  13    Q    That's not my question, sir.  My question

14:21:17  14  was did you supervise Shandi Crappell and

14:21:20  15  William Croy when you were training them for the

14:21:23  16  written test and the hands-on exam?

14:21:25  17    A    I really don't know how to answer that.

14:21:37  18  No.  I would say no.

14:21:38  19    Q    Okay.  Who was supervising Ms. Crappell and

14:21:43  20  Mr. Croy while they were learning how to do the tasks

14:21:46  21  to take the written test and hands-on exam?

14:21:48  22    A    Well, they were directly under

14:21:51  23  Jason Fetter.

14:21:51  24    Q    Okay.  And was Mr. Fetter there doing the

14:21:56  25  supervision while they were learning tasks to take

RICHARD SZABO

**58**

14:21:58   1   the written test and hands-on exam?

14:22:00   2        A    No, sir, he wasn't.  Well, it was different

14:22:05   3   for each employee.  So may I address that?

14:22:10   4        Q    Well, yeah, I need to understand how he's

14:22:11   5   supervising when he wasn't there, so if you can

14:22:15   6   explain that to me, that would helpful.

14:22:17   7        A    Well, we had a supervisor above me that was

14:22:20   8   there.  My name is John Lisonring, he was the plant

14:22:24   9   manager and he was our supervisor when Jason was not

14:22:26  10   there.

14:22:27  11        Q    Okay.  And did Mr. Lisonring supervise

14:22:31  12   Shandi Crappell and William Croy while they were

14:22:33  13   learning how to take the written test and the

14:22:36  14   hands-on exam?

14:22:36  15        A    I'm pretty sure that William Croy was there

14:22:43  16   for John, but John left us.  John quit and went on to

14:22:48  17   do other things, so I think when Shandi came he was

14:22:51  18   not there.

14:22:52  19        Q    Okay.  So who was supervising Shandi?

14:22:56  20        A    That was Shandi.  Shandi would have been --

14:22:56  21             (Court reporter clarification.)

14:23:05  22        A    Can you please ask the question?  I

14:23:06  23   apologize.

14:23:06  24        Q    Who was supervising Shandi then?

14:23:09  25        A    Oh, that would have been Megan.  Even

*RICHARD SZABO*

**59**

14:23:13  1   myself was under Megan.

14:23:15  2       Q    Okay.  So if I understand you correctly,

14:23:17  3   Megan Delahoussaye was the one supervising

14:23:22  4   Shandi Crappell while she was learning how to do the

14:23:25  5   written test and hands-on exam you created; is that

14:23:27  6   right?

14:23:27  7       A    That is absolutely true.

14:23:29  8       Q    Okay.  So Megan was the one teaching them

14:23:33  9   how to do to get prepared for the hands-on exam and

14:23:37  10  the written test; is that right?

14:23:38  11      A    That is not true.  That was me.

14:23:42  12      Q    Okay.  So if you're the one telling them

14:23:45  13  how to do it, aren't you the one supervising them?

14:23:48  14      A    Nope.

14:23:50  15      Q    Okay.  So just so I understand your

14:23:52  16  answer --

14:23:53  17      A    You got -- you have to understand how it

14:23:55  18  was with Muncy.  You couldn't do anything without

14:24:00  19  Jason telling Megan and then Megan coming to tell you

14:24:05  20  or control whatever it is you're doing.  I had no,

14:24:10  21  zero, supervisory capabilities.

14:24:12  22      Q    Okay.

14:24:12  23      A    Yeah, I stood there and watched her, yes, I

14:24:15  24  stood there and made sure that she did the job

14:24:18  25  correct.  But I was not a supervisor in any shape or

RICHARD SZABO

**60**

14:24:22  1    form.

14:24:22  2        Q    Okay.  But, sir, if you are teaching the

14:24:26  3    employee how to do the task and you're watching them

14:24:29  4    while they are doing it to make sure they're doing it

14:24:32  5    correctly, isn't that the very definition of

14:24:34  6    supervision?

14:24:36  7        A    I'm not sure what the definition of

14:24:39  8    supervision is.

14:24:40  9        Q    Okay.  Let's talk about it, right.  So if I

14:24:43  10   have a cookie factory tonight and I'm going teach the

14:24:47  11   kids at home how to make chocolate chip cookies,

14:24:52  12   right?  And I said tonight you guys we're going to

14:24:55  13   learn how to make chocolate chip cookies.  If I'm

14:24:59  14   there in the kitchen with the kids while we're

14:25:02  15   teaching them chocolate chip cookies and I'm showing

14:25:03  16   them how to make the dough, how to put the chocolate

14:25:06  17   chips in the cookie and then how to get them on the

14:25:07  18   pan and bake those cookies until they're done

14:25:10  19   properly, would you agree in that scenario, I'm

14:25:14  20   supervising them making chocolate chip cookies?

14:25:16  21       A    You are teaching them.  I don't agree.

14:25:18  22       Q    Okay.  So --

14:25:20  23       A    You're teaching them how to do this

14:25:22  24   properly.  You're a teacher.

14:25:24  25       Q    Okay.  Well, let's change it, right, now

RICHARD SZABO

**61**

14:25:26   1   let's --

14:25:27   2        A    You're not a supervisor.

14:25:28   3        Q    -- let's say a kid starts to put his hand

14:25:30   4   in the 400 degree oven while I'm there doing the

14:25:36   5   cookies.  Do you believe that I should tell that

14:25:39   6   child before they put their hand in the hot oven,

14:25:41   7   don't touch the oven or not at that point?  What

14:25:43   8   would you suggest that I do?

14:25:45   9        A    Well absolutely, you should.  What does

14:25:48  10   that have to do with the --

14:25:50  11        Q    Well, if I'm helping somebody avoid getting

14:25:52  12   hurt and watching them while they perform a task to

14:25:55  13   make sure they do it correctly, isn't that what the

14:25:58  14   definition of supervision is?

14:26:01  15        A    You are teaching them right from wrong.

14:26:05  16   Again, that's not the definition.  No, I disagree.

14:26:08  17   That's not the definition of supervisory.

14:26:11  18        Q    Okay.  Well, let me ask you this, if

14:26:13  19   Shandi Crappell had started to do something as a

14:26:17  20   calibration technician that was going put herself or

14:26:20  21   others in danger while she was performing the task

14:26:23  22   and you were watching her, did you tell her please

14:26:26  23   don't do that?

14:26:30  24        A    No.  It never happened.

14:26:32  25        Q    If it had happened, where she was putting

RICHARD SZABO

**62**

14:26:34  1   herself at risk of something breaking or dropping a

14:26:37  2   heavy weight, would you have told her, please don't

14:26:39  3   do that?

14:26:43  4        A    If that had happened.

14:26:45  5        Q    Okay.  You wouldn't have let her just have

14:26:46  6   the machine break or drop a heavy weight, correct?

14:26:50  7        A    Oh gosh, no.

14:26:52  8        Q    Okay.  And you're doing that because you're

14:26:56  9   supervising, watching over to make sure that she does

14:26:58  10  it correctly, right?

14:26:59  11       A    I wouldn't call it supervision.

14:27:05  12       Q    What would you call it?

14:27:07  13       A    I'm just not going to agree with you.

14:27:09  14       Q    What would you call it?

14:27:10  15       A    We can stop this right now.  I was not a

14:27:11  16  supervisor.  I know where this is leading.

14:27:14  17       Q    Well, let's be clear, because --

14:27:15  18       A    I'm not a supervisor.

14:27:16  19       Q    Because if Shandi Crappell had done

14:27:19  20  something where she was putting herself and others at

14:27:22  21  risk and you would have stepped in to stop it, you

14:27:25  22  would agree with me that's not part of the training

14:27:27  23  process, right?

14:27:30  24            MS. KRAMER:  Greg, I think we've already

14:27:31  25  went over all this.

RICHARD SZABO

**63**

14:27:32  1      A      Anybody can step in.

14:27:34  2             MS. KRAMER:  Ric, let's me talk.  If

14:27:38  3      someone wants, I was going to say put yourself out

14:27:39  4      there, that's not supervising.  I think we've covered

14:27:41  5      the whole supervisor risk training issue here.

14:27:45  6      BY MR. STAPP:

14:27:48  7      Q      Megan Delahoussaye had said that she tried

14:27:49  8      to schedule you at Muncy in a way that you were in

14:27:54  9      the office every other week.  Do you agree or

14:27:58  10     disagree with that testimony?

14:28:00  11     A      I disagree.  I've never even heard that.

14:28:09  12     This is the first time I've ever heard anything like

14:28:11  13     that.

14:28:11  14     Q      Okay.  But it looks like from the earlier

14:28:16  15     documents you reviewed that whenever the time card

14:28:18  16     was punched, that was you at Muncy Industries in

14:28:22  17     Louisiana, correct?

14:28:23  18     A      That is correct.

14:28:28  19     Q      And, Mr. Szabo, you agree that you quit

14:28:44  20     your employment with Muncy Industries, correct?

14:28:47  21     A      That's correct.

14:28:51  22     Q      And when you quit your employment with

14:28:53  23     Muncy and you turned in that laptop, you had deleted

14:28:59  24     information from that laptop, correct?

14:29:00  25     A      That has nothing do with this case.  I'm

RICHARD SZABO

**64**

14:29:05    1    sorry I answered it in that manner.

14:29:08    2         Q    When you quit Muncy Industries and you

14:29:11    3    turned in your laptop, you had deleted information

14:29:14    4    from the laptop before you turned it in, correct?

14:29:17    5         A    (No response.)

14:29:24    6              MS. KRAMER:  Ric, you got to answer.

14:29:28    7         A    Okay.  I turned in a laptop, whereas I

14:29:35    8    removed my e-mails from that laptop.  There was

14:29:40    9    information removed, yes.  I don't understand what

14:29:43   10    that has to do with this case.

14:29:46   11    BY MR. STAPP:

14:29:47   12         Q    And I don't want to go over the document

14:29:50   13    again because you and I talked about it before, so

14:29:52   14    I'm just going to show you what was previously marked

14:29:57   15    Szabo 1 exhibit from the deposition in the state

14:30:00   16    court action, that is the July 22nd, 2020, e-mail

14:30:05   17    from the e-mail address rckid1973@gmail.com.  So

14:30:11   18    you've seen this before.  Do you recall that e-mail

14:30:13   19    that you sent, Mr. Szabo?

14:30:20   20         A    Yes, I recall that e-mail.  That's a

14:30:23   21    different case.  What does that have to do with this

14:30:26   22    case?  I think I have the right to ask that question.

14:30:29   23         Q    And when you left Muncy Industries, you

14:30:32   24    went to work for one of their competitors,

14:30:36   25    Chant Engineering within a week or two, correct?

RICHARD SZABO

**65**

14:30:38    1          MS. KRAMER:  All right, Greg, I think where

14:30:41    2    he went work after, I'm not sure that's relevant

14:30:42    3    because we're talking about how he's classified while

14:30:46    4    living and working in Muncy, not after another

14:30:48    5    employer.

14:30:49    6          MR. STAPP:  Okay.

14:30:49    7    BY MR. STAPP:

14:30:49    8       Q    I mean, I'm just asking a simple question,

14:30:50    9    you went to work for a competitor shortly after

14:30:53   10    leaving Muncy Industries?

14:30:55   11       A    That's a state case.  Man, that's a

14:30:57   12    different case.  It has nothing to do with my

14:30:59   13    overtime time and lost wages.  Zero.

14:31:04   14       Q    Sir, if I understand the e-mail in the

14:31:08   15    other case, you sent that e-mail shortly after

14:31:11   16    leaving Muncy Industries to Muncy Industries'

14:31:13   17    customers, correct?

14:31:24   18          MS. KRAMER:  If you want to disclose this

14:31:26   19    on the record and let me know where you're going with

14:31:30   20    these.  Can you do that?

14:31:31   21          MR. STAPP:  Yeah, I've only got one or two

14:31:32   22    more questions.

14:31:32   23    BY MR. STAPP:

14:31:33   24       Q    I'm just asking the question related after

14:31:35   25    you left Muncy Industries, you sent the e-mail that

*RICHARD SZABO*

**66**

14:31:36    1    was previously marked Szabo <u>Exhibit Number 1</u> to Muncy

14:31:39    2    customers, correct?

14:31:41    3        A    I sent an e-mail to possibly previous Muncy

14:31:51    4    customers.  That was a different thing.

14:31:57    5        Q    Okay.  Just so I understand what you're

14:32:01    6    asking for today, my question to you is after

14:32:05    7    quitting Muncy Industries and returning a laptop with

14:32:10    8    deleted information and working for a competitor and

14:32:14    9    then sending e-mails to Muncy customers in which you

14:32:17    10    advised them about concerns about their calibration

14:32:20    11    program, do you still believe that Muncy Industries

14:32:24    12    owes you money?

14:32:24    13        A    Yes, I believe.  I believe I deserve simple

14:32:36    14    lost wages from the time I worked outside of the

14:32:40    15    40 hours.

14:32:41    16        Q    What is it you believe you are owed, sir?

14:32:43    17        A    At least 15,000 per year that I was

14:32:52    18    employed.

14:32:53    19        Q    Why do you believe you are owed an

14:32:55    20    additional $15,000, besides the moving expenses and

14:33:00    21    the laptop and the cell phone and the car and the

14:33:03    22    salaries and the bonuses?

14:33:08    23        A    Because none of that stuff that you

14:33:13    24    mention, regardless of my situation, other employees

14:33:20    25    had company cell phones, okay, number one.

RICHARD SZABO

**67**

14:33:23  1  Number two, there wasn't any favor for me.

14:33:26  2  Number three, the pay was all policy.  That's just

14:33:35  3  company policy, the credit card and all that.  There

14:33:36  4  were others employees with company credit cards that

14:33:39  5  traveled.  You make it look like they were doing me

14:33:41  6  favors, but that was company policy to be given a

14:33:43  7  credit card if you traveled, to have a cell phone,

14:33:47  8  and to be given a computer, all that.  That had

14:33:52  9  nothing to do with providing me with anything extra

14:33:55  10  than what I was paid, other than the bonuses.  The

14:33:59  11  bonuses I was grateful for.

14:34:01  12          The car, that was an agreement.  He told me

14:34:04  13  he was going to get me a car when I got hired.  There

14:34:09  14  was another engineer and William Croy, they both got

14:34:13  15  cars.  They both got cars.  They got brand-new cars.

14:34:16  16  So don't try to make it as they did me a favor by

14:34:20  17  buying me a car.  They didn't.

14:34:22  18      Q    And, sir, I mean, even after sending the

14:34:28  19  e-mail at the request of Mr. Chant and his other

14:34:30  20  staff members, do you still feel like Muncy

14:34:33  21  Industries owes you money?

14:34:36  22      A    Yes, I do.  It's just the law, man.  If I

14:34:42  23  am miscategorized as an employee, which I feel I was,

14:34:47  24  I was mislabeled and paid improperly.  That's the

14:34:53  25  law.  That's the labor law, man.  I can't recite it,

*RICHARD SZABO*

**68**

14:34:56  1   but I should be getting what I should have been paid.

14:34:56  2       Q     And all --

14:35:00  3       A     That's just it.

14:35:01  4       Q     And all of that you just said about being

14:35:05  5   mischaracterized or that you're owed money, you

14:35:08  6   didn't know any of that until you spoke with

14:35:09  7   Mr. Chant, correct?

14:35:10  8       A     That's irrelevant, whether I do or not.

14:35:15  9   I'm grateful that I know it now.  I'm grateful that

14:35:19  10  someone stepped up and told me.  Otherwise, I would

14:35:22  11  have been completely taken advantage of.

14:35:24  12      Q     And the person that stepped up and told you

14:35:25  13  that was Philip Chant, correct?

14:35:28  14      A     That's how it initiated, yes.

14:35:30  15      Q     And, sir, as you are working now at Chant,

14:35:36  16  you're doing work for former Muncy Industry

14:35:40  17  customers, correct?

14:35:40  18      A     Repeat the question.

14:35:44  19      Q     You're doing --

14:35:45  20          MS. KRAMER:  You don't need to repeat it.

14:35:47  21  Greg, I don't think that's relevant and I don't want

14:35:50  22  any indications on any other cases that may be out

14:35:53  23  there if someone happens to be associated.  So I just

14:35:56  24  don't think he needs to talk about his current work.

14:35:59  25          MR. STAPP:  I think it's relevant because

*RICHARD SZABO*

**69**

| | | |
|---|---|---|
| 14:36:00 | 1 | he's testified today that the only reason he even |
| 14:36:02 | 2 | filed this lawsuit is because of Mr. Chant, so if |
| 14:36:04 | 3 | he's doing work for former Muncy customers for |
| 14:36:07 | 4 | Mr. Chant too I think that's relevant, so -- |
| 14:36:07 | 5 | MS. KRAMER:  I -- |
| 14:36:11 | 6 | MR. STAPP:  Because of his testimony. |
| 14:36:13 | 7 | (Court reporter clarification.) |
| 14:36:16 | 8 | A    I'd actually like to answer that. |
| 14:36:19 | 9 | THE WITNESS:  May I answer that, Miss Mary? |
| 14:36:23 | 10 | MS. KRAMER:  I don't think you should.  I |
| 14:36:26 | 11 | don't think you need to answer that. |
| 14:36:27 | 12 | THE WITNESS:  All right, all right. |
| 14:36:28 | 13 | MR. STAPP:  Well, I mean we can ask the |
| 14:36:30 | 14 | judge to weigh in on it, but I mean, I think he's |
| 14:36:33 | 15 | already said the only reason he's filed the lawsuit |
| 14:36:36 | 16 | is because of Philip Chant, so I want to know is he |
| 14:36:37 | 17 | also doing work for Muncy customers while working for |
| 14:36:41 | 18 | Philip Chant.  I think that's relevant to the case. |
| 14:36:43 | 19 | MS. KRAMER:  Greg, all right. |
| 14:36:45 | 20 | BY MR. STAPP: |
| 14:36:46 | 21 | Q    Are you, since you been at Chant |
| 14:36:48 | 22 | Engineering, are you doing work for Muncy Industries' |
| 14:36:50 | 23 | customers? |
| 14:36:51 | 24 | A    I don't know if I am or not.  They're not |
| 14:36:58 | 25 | Muncy Industries customers.  They are Chant |

*RICHARD SZABO*

**70**

| | | |
|---|---|---|
| 14:37:01 | 1 | customers.  We don't calibrate any Muncy.  I don't -- |
| 14:37:05 | 2 | that question doesn't make any sense. |
| 14:37:07 | 3 | Q    Are you familiar with the company called |
| 14:37:10 | 4 | Golf America? |
| 14:37:13 | 5 | A    Golf America? |
| 14:37:15 | 6 | Q    Yes. |
| 14:37:16 | 7 | A    Yeah, I know who they are. |
| 14:37:17 | 8 | Q    Okay.  And are you aware that someone from |
| 14:37:20 | 9 | the Chant Engineering did work at Golf America on |
| 14:37:23 | 10 | December 20th of 2021? |
| 14:37:30 | 11 | A    Yeah, I am aware of that actually. |
| 14:37:32 | 12 | Q    I'll just show you a picture if I can, |
| 14:37:35 | 13 | we'll see if I Share the screen here. |
| 14:37:42 | 14 | A    Again, this, I'm sorry, this should be |
| 14:37:45 | 15 | going into the state case.  That is not relevant to |
| 14:37:47 | 16 | this case. |
| 14:37:48 | 17 | Q    Well, I asked the question about the |
| 14:37:49 | 18 | customers.  I'm just trying to get clarification. |
| 14:37:52 | 19 | This is a picture from -- |
| 14:37:53 | 20 | MS. KRAMER:  Greg, I think we'll need to |
| 14:37:57 | 21 | revisit if -- |
| 14:37:57 | 22 | THE WITNESS:  We have to do all this? |
| 14:37:57 | 23 | MS. KRAMER:  -- if we're going to just keep |
| 14:37:58 | 24 | talking about customers for now, about the customers, |
| 14:38:00 | 25 | the customers can't come up. |

RICHARD SZABO

**71**

14:38:04  1       MR. STAPP:  Well, I'm just asking -- well,

14:38:05  2  let me ask this question and you don't have to

14:38:07  3  comment on the picture.

14:38:07  4  BY MR. STAPP:

14:38:08  5       Q    Was Golf America a customer of Muncy

14:38:11  6  Industries when you worked for them?

14:38:15  7       A    Well, I can't recall.  I can't recall who

14:38:19  8  was customers and who wasn't.  We talked about this

14:38:26  9  in the other case.  Same answer then, same answer

14:38:30  10  now:  I can't recall.

14:38:37  11       Q    Are you aware that Chant Engineering

14:38:39  12  is doing work for some of the customers that

14:38:42  13  you did work for while you were employed with

14:38:43  14  Muncy Industries?

14:38:48  15       A    Can you repeat it one more time, please?

14:38:52  16       Q    Are you aware that Chant Engineering is

14:38:55  17  doing work for customers that you did work for while

14:38:57  18  you were employed with Muncy Industries?

14:39:03  19       A    We could be.  I mean maybe.

14:39:09  20       Q    When you were working for Muncy Industries

14:39:18  21  as an employee, did you have to get approval from

14:39:21  22  Jason or Kimberly Bunting to stay longer at a

14:39:24  23  customer's site?

14:39:25  24       A    Yes.

14:39:31  25       Q    Did other calibrations -- did other

*RICHARD SZABO*

72

14:39:41  1    calibrations [sic] at Muncy Industries travel on

14:39:44  2    weekends other than yourself?

14:39:46  3         A    Did other calibration technicians?

14:39:54  4         Q    Yeah, of Muncy Industries travel on the

14:39:57  5    weekends?

14:39:57  6         A    You broke up right there.  I do apologize.

14:40:00  7              Yes.

14:40:02  8         Q    And did other calibration technicians at

14:40:06  9    Muncy's work overtime?

14:40:07  10        A    They did not.  Well, could I rephrase it.

14:40:14  11   Can I answer that differently?

14:40:16  12        Q    Go ahead.

14:40:17  13        A    What do you mean?  What do you mean, were

14:40:20  14   they paid overtime or did they just work overtime?

14:40:22  15        Q    My question was did other calibration

14:40:25  16   technicians at Muncy work overtime?

14:40:27  17        A    Yes.

14:40:29  18        Q    And who were those individuals that worked

14:40:32  19   overtime and traveled on the weekend as calibration

14:40:34  20   technicians?

14:40:35  21        A    Shandi Crappell, William Croy.  I don't

14:40:45  22   remember the last name of the guy, but he was one of

14:40:47  23   the engineers, his name was Alex.  You may refer to

14:40:53  24   Mr. Fetter on the last name for that.

14:40:56  25        Q    Okay.  And do you know whether anybody

RICHARD SZABO

**73**

14:41:05   1   other than Ms. Crappell has filed any type of

14:41:09   2   lawsuit for wages, Mr. Croy or Alex, anyone of that

14:41:14   3   nature?

14:41:14   4        A     I'm not aware of anyone else.

14:41:17   5        Q     Okay.

14:41:32   6             MR. STAPP:  Is it -- let's take a -- and

14:41:33   7   I'm almost done, can I take a short break?  I just

14:41:36   8   want to look through one other or two other documents

14:41:38   9   and then if we take like five or ten minutes just to

14:41:41   10  come back and I don't know if I'll have any other

14:41:42   11  questions or not, but let me just look at those

14:41:44   12  documents really quickly and then I'll come back, if

14:41:48   13  that's okay with everybody.  Just a short break.

14:41:49   14             MS. KRAMER:  That is fine, Greg.

14:41:52   15             MR. STAPP:  All right.  We'll take a quick

14:41:54   16  break here, thanks.

14:47:08   17             (Recess.)

14:47:08   18             MS. KRAMER:  Greg, I don't know where he

14:47:11   19  went.  I thought he would be back by now, so I'll

14:47:14   20  give him a call.

14:47:21   21             (Discussion held off record.)

14:47:21   22  BY MR. STAPP:

14:50:33   23        Q     Can you hear me, Mr. Szabo?

14:50:35   24        A     Yes, sir.

14:50:36   25        Q     All right.  We'll go back on the record.

RICHARD SZABO

**74**

14:50:39  1  So I'm looking at the Complaint and some of the

14:50:41  2  discovery we sent I just want to understand about

14:50:44  3  what you're asking for here.

14:50:47  4       Your Complaint indicates in Paragraphs 20

14:50:53  5  and 21, that you would work sometimes 60 to 80 hours

14:50:57  6  a week and/or 87 hours and 45 minutes, I'm looking at

14:51:08  7  Paragraph 22.  Do you have any documentation that

14:51:10  8  establishes that you worked over 40 hours a week for

14:51:13  9  Muncy Industries?

14:51:14  10      A    I have some documentation that I've

14:51:21  11  provided to Ms. Kramer.

14:51:22  12      Q    Okay.

14:51:23  13      MR. STAPP:  Because we had sent a request

14:51:25  14  for production, I'm not sure that we ever got that.

14:51:28  15  We asked for Request Number 2, any and all wage

14:51:31  16  records or documentation and we got an objection and

14:51:34  17  I don't know that I've ever gotten that.  So if you

14:51:36  18  can get me that, Mary, if you have anything from him

14:51:39  19  at all, I would like to see it.

14:51:41  20      (Request made on record by Attorney Stapp.)

14:51:41  21      MS. KRAMER:  Yeah, I think I didn't provide

14:51:43  22  what he sent because it was something he created

14:51:45  23  himself for me to review.  But was that what you were

14:51:50  24  talking about, Ric?

14:51:52  25      THE WITNESS:  Yeah, it was something that I

RICHARD SZABO

**75**

14:51:55  1  provided to you.  It wasn't asked, that I know of, to

14:51:58  2  provide to Mr. Stapp.  I apologize.  Maybe I

14:52:01  3  misunderstood the question.

14:52:01  4  BY MR. STAPP:

14:52:03  5      Q    Well, so what I'm asking you for is if you

14:52:05  6  hear the question it's any and all wage records or

14:52:08  7  documentation.  Now that would include if you were

14:52:10  8  keeping a handwritten note.  Were you keeping a diary

14:52:13  9  or note of the hours that you worked for Muncy

14:52:16  10 Industries while you worked for them?

14:52:18  11     A    There were sometimes, I do admit that I did

14:52:23  12 keep notes, but I don't -- I couldn't produce them at

14:52:27  13 this time.

14:52:27  14     Q    So do you have those, is my question?  You

14:52:29  15 don't have them anymore?

14:52:31  16     A    I do not.  I'm sorry.

14:52:32  17     Q    So I mean I'm not -- I don't want to get

14:52:35  18 into an evidentiary debate if you were asked to

14:52:38  19 create some kind of a formula for Ms. Kramer, as your

14:52:40  20 counsel.  My question to you is, sir, first, let's

14:52:44  21 break them down.  Do you have any wage records from

14:52:46  22 Muncy Industries?  Any kind of pay stubs, anything

14:52:49  23 that you have that shows your work hours or what you

14:52:52  24 were paid?

14:52:53  25     A    I do not.  At the time I worked, I guess I

RICHARD SZABO

**76**

14:52:59  1    was pretty negligent about paying attention to it.

14:53:02  2    I've never produced -- it was all online, so I never

14:53:07  3    even got a check stub.  I mean we were given online

14:53:10  4    access to that stuff, but I never.  I apologize.

14:53:13  5         Q    But you don't have any of that, correct?

14:53:15  6         A    I do not.

14:53:17  7         Q    And then Request Number 4 talks about what

14:53:20  8    I'm kind of asking you, which is did you keep a

14:53:24  9    handbook, like a notepad, a memoranda, a diary of any

14:53:28  10   kind while you worked for Muncy Industries about your

14:53:30  11   work there?

14:53:34  12        A    There was a handbook that we -- I kept a

14:53:38  13   fair amount of time, yes.

14:53:40  14        Q    And what would you make notes of in that?

14:53:44  15        A    Well, I didn't make any notes.  I'm sorry,

14:53:49  16   maybe I misunderstood.  I thought your question was

14:53:51  17   did I have -- did I have any of these documents, yes,

14:53:55  18   I had a handbook.

14:53:56  19        Q    Okay.  That handbook is something you

14:53:57  20   created or you mean the one that Muncy gave you?

14:54:00  21        A    Oh, no that's the Muncy handbook.

14:54:03  22        Q    Do you have any handbook or note that you

14:54:04  23   made of any kind while you worked there about your

14:54:07  24   employment with Muncy Industries?

14:54:09  25        A    Oh, no, sir.

RICHARD SZABO

77

14:54:11   1        Q     Okay.  Do you have any kind of

14:54:15   2   communications between yourself and anyone at

14:54:18   3   Muncy Industries, whether it's Mr. Fetter,

14:54:23   4   Ms. Bunting, Megan about your employment or the hours

14:54:24   5   you worked or your scheduling that you have in your

14:54:28   6   possession now, anything like that?

14:54:30   7        A     I do have some e-mails between me and

14:54:36   8   Ms. Bunting in my possession.

14:54:38   9        Q     Okay.  Can you give those to your counsel

14:54:40   10  so she can provide those to me?

14:54:44   11       A     I will certainly do that for her.

14:54:46   12       Q     Okay.

14:54:48   13             (Request made on record by Attorney Stapp.)

14:54:48   14  BY MR. STAPP:

14:54:49   15       Q     Anybody else other than Ms. Bunting or

14:54:51   16  yourself that you had e-mails between about your work

14:54:51   17  or your schedule?

14:54:55   18       A     None that I can recall.

14:54:56   19       Q     Okay.

14:54:57   20       A     Sorry.

14:54:57   21       Q     That's okay.  Are there any other documents

14:55:05   22  that you have in your possession other than those

14:55:08   23  e-mails you just described to Ms. Bunting that would

14:55:10   24  establish your claim that you are trying to make here

14:55:12   25  that you believe you're owed wages, any documents?

RICHARD SZABO

**78**

14:55:19  1    A    No, sir.

14:55:27  2    Q    Okay.  You don't have any time cards, time

14:55:30  3  sheets, time records of any kind; is that right?

14:55:32  4    A    Not at this time.

14:55:35  5    Q    How about any kind of W-2s?  You mentioned

14:55:39  6  you had no pay stubs, do you have any of those tax

14:55:42  7  documentations?

14:55:42  8    A    I could find them.  I was pretty good about

14:55:46  9  keeping my tax stuff, yes.

14:55:48  10   Q    Yeah, if you could get me the tax stuff for

14:55:50  11 the years that you worked Muncy Industries and get

14:55:52  12 those to your counsel that would be very good.

14:55:54  13        (Request made on record by Attorney Stapp.)

14:55:57  14   A    Okay.

14:55:59  15 BY MR. STAPP:

14:56:18  16   Q    So just so I understand, I mean when you

14:56:21  17 have in Paragraph 22 of your Complaint, and I'll read

14:56:24  18 it for you because I know you may not have it in

14:56:27  19 front of you.  It says, Plaintiff Ric Szabo worked

14:56:31  20 approximately 87 hours and 45 minutes, but was not

14:56:35  21 compensated for all hours worked for over 40 hours or

14:56:40  22 at 1.5 times his regular rate of pay for all hours

14:56:42  23 worked over 40 hours, period closed quote.

14:56:45  24        So my question to you, sir, is where did

14:56:47  25 you come up with the "87 hours and 45 minutes?"

RICHARD SZABO

**79**

14:56:53  1        A     Okay.  I think I remember this, this was --
14:56:57  2    that Complaint and all was done by the previous
14:57:04  3    attorney.  Her name was Pria and I gave her
14:57:09  4    documentations -- well, me and Shandi both gave her
14:57:12  5    documentation and trip information on a trip we took.
14:57:18  6    That was from a Sunday to a Saturday or a Sunday to a
14:57:22  7    Sunday, back in 2020, I can't remember the dates,
14:57:31  8    where we gave her the documentation and    Ms. Pria
14:57:37  9    actually came up with the amount of hours based on
14:57:41  10   the documentation and the time that we traveled and
14:57:44  11   that is a true statement.
14:57:46  12       Q     Okay.  And that was your former attorney,
14:57:49  13   correct?
14:57:49  14       A     That was the former attorney.
14:57:51  15       Q     Okay, yeah.
14:57:52  16       A     Before Ms. Kramer.
14:57:53  17       Q     Okay.  So this amount in Paragraph 22 came
14:58:00  18   from one trip you took.  Do you remember where that
14:58:02  19   trip was to?
14:58:03  20       A     Oh, I cannot recall.  I went away up north
14:58:13  21   somewhere.  We drove.  We drove in a pickup truck, I
14:58:18  22   do remember that.  It was me, Mr. Fetter,
14:58:20  23   Shandi Crappell, and William Croy, all four of us
14:58:24  24   together.  Gosh, I don't remember where we went.  It
14:58:29  25   was up north somewhere, Michigan or somewhere.  We

RICHARD SZABO

**80**

14:58:34  1   split ways with him.

14:58:37  2       Q    That does say at the beginning part of that

14:58:39  3   paragraph that was an example of a particular week.

14:58:42  4   But you're not saying today, sir, that you worked

14:58:45  5   87 hours and 45 minutes every week when you worked at

14:58:47  6   Muncy, correct?

14:58:48  7       A    I'm not saying that.

14:58:51  8       Q    Okay.

14:58:51  9       A    Not every week.

14:58:52  10      Q    Okay.  And, I mean, how many hours you said

14:58:55  11  earlier today, $15,000 a year that you think you are

14:58:59  12  owed.  Now you're basing that on what?  I mean, what

14:59:02  13  records do you have that you're saying I worked this

14:59:04  14  many extra hours?

14:59:05  15      A    So I went back and I created my own chart

14:59:09  16  and I used what's called Google Timeline.  I don't

14:59:14  17  know if you're familiar with it.  But Google Maps

14:59:17  18  keeps a timeline if you choose to do so.  I do.  And

14:59:21  19  I could back go back to eight years if I wanted and

14:59:25  20  see exactly where I was, what date, what time, what

14:59:28  21  airport I went to, how long it took me to get there,

14:59:32  22  and I could do that for every single one of these

14:59:36  23  trips if I have to.

14:59:38  24           If I have to, then believe me, it's going

14:59:42  25  to come out to more than $15,000.  But I did one

RICHARD SZABO

**81**

14:59:46  1   month, I did one month using my Google Timeline for

14:59:49  2   trips with Jason, and based on that one month, I

14:59:54  3   calculated if I did that same routine for 12 months

14:59:59  4   of that year, it would have came up to about 19,000.

15:00:04  5   I'm only asking for 15, and that was only nine months

15:00:07  6   of charting.

15:00:08  7        Q    What month and year was that, sir, if you

15:00:10  8   recall?

15:00:10  9        A    It was my first year, 2018, and would have

15:00:18  10  been through end of March through April, I believe

15:00:22  11  was the month I did.  It was the first month we

15:00:25  12  started traveling.

15:00:27  13       Q    Okay.  And you believe that the Google

15:00:31  14  Timeline will establish where you were for the whole

15:00:35  15  time you were employed at Muncy Industries?

15:00:38  16       A    Absolutely.

15:00:39  17       Q    Okay.

15:00:40  18       A    One hundred percent.

15:00:41  19       Q    And is it your contention that every trip

15:00:45  20  you took during the time you were employed from

15:00:48  21  January of '18 until 2020, was related to your

15:00:52  22  employment at Muncy Industries?

15:00:57  23       A    Not every trip.  There were trips where I

15:00:59  24  went to vacation with my sister and stuff like that.

15:01:04  25  But maybe once a year.

RICHARD SZABO

**82**

| | | |
|---|---|---|
| 15:01:05 | 1 | Q    Okay.  With regard to your Complaint that |
| 15:01:13 | 2 | you filed in this matter in federal court, did you |
| 15:01:16 | 3 | review that Complaint before it was filed by your |
| 15:01:18 | 4 | counsel? |
| 15:01:22 | 5 | A    I did not review it in its entirety.  It |
| 15:01:31 | 6 | was verbally and we're talking about Ms. Pria, right, |
| 15:01:36 | 7 | before Mary? |
| 15:01:37 | 8 | Q    So I don't know who drafted it.  I'm just |
| 15:01:40 | 9 | asking if the complaint that was filed in court on |
| 15:01:42 | 10 | March 16th of 2021, if you reviewed that Complaint |
| 15:01:45 | 11 | before it was filed? |
| 15:01:46 | 12 | A    I would say yes. |
| 15:01:57 | 13 | Q    Okay. |
| 15:01:59 | 14 | A    It was sent to me.  I believe I -- |
| 15:02:02 | 15 | Q    Did you review Paragraph 17, which reads as |
| 15:02:05 | 16 | follows quote, Throughout their employment, |
| 15:02:10 | 17 | Plaintiffs performed their jobs well, receiving |
| 15:02:12 | 18 | positive feedback and no justifiable discipline, |
| 15:02:18 | 19 | period end quote. |
| 15:02:19 | 20 | Did you review at that paragraph when you |
| 15:02:20 | 21 | reviewed your Complaint? |
| 15:02:24 | 22 | A    I don't recall that paragraph, no, sir. |
| 15:02:27 | 23 | Q    Okay.  So you would agree with me that the |
| 15:02:33 | 24 | statement in Paragraph 17 is not correct, right? |
| 15:02:36 | 25 | A    I didn't review it, so I don't know if it's |

RICHARD SZABO

**83**

15:02:44  1    correct or not.

15:02:45  2        Q    Well, question is this statement says you

15:02:47  3    received, it says "both Plaintiffs" that would be

15:02:49  4    referring to yourself, received no justifiable

15:02:51  5    discipline, but we've already covered today, I think,

15:02:54  6    in Exhibit Number 1, an Employee Warning Report where

15:02:57  7    you were disciplined at Muncy Industries, correct?

15:02:59  8        A    Yes, that's correct.

15:03:06  9        Q    And you would agree that that discipline,

15:03:09  10   that Warning Report you received that's marked

15:03:10  11   Exhibit Number 1, that was justifiable, correct?

15:03:12  12       A    Yes.

15:03:14  13       Q    And that exhibit we marked as Exhibit

15:03:26  14   Number 1 that was just a month or two before you left

15:03:29  15   employment with Muncy Industries, correct?

15:03:30  16       A    Could have been, yes.

15:03:34  17       Q    Okay.  Give me one second, I apologize.

15:04:09  18   (Reviewing.)

15:04:15  19            I know you already testified, Mr. Szabo,

15:04:17  20   today about how this lawsuit came about, but I just

15:04:20  21   want to make sure that I'm asking all the questions I

15:04:23  22   need to.  Have you ever filed, related to your

15:04:27  23   employment at Muncy Industries, any type of action or

15:04:30  24   complaint with the state, either the Commonwealth of

15:04:33  25   Pennsylvania or the Louisiana about your wages?

*RICHARD SZABO*

**84**

15:04:37  1    A    I had not other than this.

15:04:39  2    Q    Did you ever file any type of Complaint

15:04:44  3  against Muncy Industries in any type of state or

15:04:48  4  federal government, and I'm not talking about your

15:04:50  5  federal court case, I'm talking about some kind of,

15:04:52  6  you know, business action or if there's a consumer

15:04:57  7  protection agency, anything like that.  Did you ever

15:04:59  8  file anything like that against Muncy Industries?

15:05:01  9    A    No, sir.

15:05:02  10   Q    Have you ever filed a Fair Labor Standards

15:05:11  11  Act Complaint before this one?

15:05:12  12   A    No, sir.

15:05:14  13   Q    Do you know -- and if you don't, that's

15:05:28  14  fine, sir, I'm just asking the question -- do you

15:05:31  15  know of any witnesses that you would intend to call

15:05:33  16  at trial in this matter at this point?  Do you know

15:05:36  17  who you would like to call?

15:05:40  18   A    Sure, yes.

15:05:46  19   Q    Who would you like to call?

15:05:49  20   A    I would like to call both Megan and

15:05:52  21  Kimberly.

15:05:53  22   Q    That is Megan Delahoussaye and

15:05:53  23  Kimberly Bunting?

15:05:57  24   A    Megan Delahoussaye and Kimberly Bunting.

15:05:59  25   Q    Anybody else?

*RICHARD SZABO*

**85**

| | | |
|---|---|---|
| 15:06:09 | 1 | MS. KRAMER: Greg, I think it's more of |
| 15:06:11 | 2 | my -- |
| 15:06:13 | 3 | MR. STAPP: That's fine. Yeah, I mean, I |
| 15:06:15 | 4 | was just curious who he wanted to call. |
| 15:06:17 | 5 | A    Yeah. |
| 15:06:18 | 6 | BY MR. STAPP: |
| 15:06:23 | 7 | Q    Okay. Give me one last parse through my |
| 15:06:32 | 8 | notes, guys, and just make sure I didn't miss |
| 15:06:34 | 9 | anything. |
| 15:06:37 | 10 | A    Yes, sir. |
| 15:07:19 | 11 | MR. STAPP: Okay. I think that's all the |
| 15:07:21 | 12 | questions I have, Mr. Szabo. We got you out in time, |
| 15:07:24 | 13 | Mary, for your court hearing, so. |
| 15:07:26 | 14 | MS. KRAMER: There's just a few things I |
| 15:07:27 | 15 | want to follow up and then we'll be almost finished. |
| 15:07:29 | 16 | MR. STAPP: Sure, I don't have any |
| 15:07:30 | 17 | questions. Go ahead. |
| 15:07:30 | 18 | |
| 15:07:30 | 19 | EXAMINATION |
| 15:07:30 | 20 | |
| 15:07:30 | 21 | BY MS. KRAMER: |
| 15:07:32 | 22 | Q    So, Ric, if you didn't work through lunch |
| 15:07:35 | 23 | occasionally, what would have happened to those |
| 15:07:37 | 24 | assignments to what you needed to get done? |
| 15:07:40 | 25 | A    Well, if we didn't work through lunch, I |

*RICHARD SZABO*

**86**

15:07:49  1   mean it could have -- it could have -- it would have

15:07:54  2   just made Mr. Fetter angry pretty much.  He was such

15:07:59  3   a stickler and no one likes to be making him angry.

15:08:03  4   So literally it was just the fear of making the

15:08:06  5   employee -- or excuse me, fear of making him mad and

15:08:09  6   getting yelled at was the reason most of us did it.

15:08:15  7       Q    So did you ever take a lunch when you had

15:08:18  8   work to do or did you --

15:08:23  9       A    Yes, we did.

15:08:24  10      Q    Did you ever take a lunch while work piled

15:08:26  11  up and you had to do it?

15:08:27  12      A    No.  Only when Mr. Fetter would come to the

15:08:35  13  office and he would take some people out to lunch,

15:08:38  14  but most of the time, I never took a lunch at the

15:08:42  15  office or when I traveled.

15:08:44  16      Q    Okay.

15:08:45  17      A    And it was just because the work demand was

15:08:47  18  so much.

15:08:48  19      Q    Okay.  And then I may be misremembering

15:08:52  20  something you said earlier, but did you say that you

15:08:54  21  taught Jason Fetter how to do some calibrations?

15:08:57  22      A    He was -- I know this should be yes or no

15:09:03  23  question, but these aren't yes or no questions and

15:09:06  24  it's because of the person we're talking about.

15:09:09  25      Q    Well, let's not go -- let's not worry about

RICHARD SZABO

**87**

| | | |
|---|---|---|
| 15:09:12 | 1 | that.  Did you teach him how to do the calibrations? |
| 15:09:16 | 2 | A    Yes. |
| 15:09:16 | 3 | Q    While you were teaching him, did you have |
| 15:09:18 | 4 | authority over him? |
| 15:09:19 | 5 | A    No. |
| 15:09:20 | 6 | Q    Did you say you messed that up and -- |
| 15:09:23 | 7 | A    Yeah, no, no.  There was no authority over |
| 15:09:25 | 8 | him.  It's just simply teaching somebody. |
| 15:09:31 | 9 | Q    All right.  So prior to working at Muncy, |
| 15:09:35 | 10 | did you have jobs where you were paid hourly? |
| 15:09:38 | 11 | A    Yes, I did. |
| 15:09:39 | 12 | Q    And in those hourly jobs, did you ever |
| 15:09:42 | 13 | receive bonuses for whatever reason? |
| 15:09:44 | 14 | A    No. |
| 15:09:48 | 15 | Q    With Muncy what was your main job duty? |
| 15:09:53 | 16 | A    To be a calibration technician and be out |
| 15:09:59 | 17 | in the field. |
| 15:10:00 | 18 | Q    Okay. |
| 15:10:02 | 19 | A    I mean that was 80 percent of my time was |
| 15:10:07 | 20 | out on the road and calibrating machines. |
| 15:10:12 | 21 | Q    From your perspective was one of your main |
| 15:10:16 | 22 | responsibilities making sales or signing up clients? |
| 15:10:20 | 23 | A    No. |
| 15:10:21 | 24 | Q    Making use of the cost of the cell phone |
| 15:10:28 | 25 | and credit card, at any point did anyone at Muncy |

**88**

15:10:30  1   indicate that you receiving those items instead of

15:10:33  2   compensation for the time you worked over 40 hours

15:10:35  3   per week?

15:10:36  4        A     Only the beginning before I was hired, you

15:10:43  5   know, there was talk about the moving costs and there

15:10:47  6   talk was about and I quote during your employment you

15:10:50  7   will be issued a company cell phone, you will be

15:10:53  8   issued a laptop and you will get issued a company

15:10:58  9   credit card.

15:10:59  10        Q     I think I need to rephrase the question.

15:11:01  11        A     Yes.

15:11:01  12        Q     When they gave you one of those items, did

15:11:04  13   they say this is for the hours you worked last week

15:11:08  14   that were over 40 hours or anything to that effect?

15:11:13  15        A     No.

15:11:16  16        Q     Then just last question, when you left

15:11:20  17   Muncy, did that have anything to do with any

15:11:23  18   discipline you may or may not have received for any

15:11:25  19   reason at any point?

15:11:30  20        A     No.

15:11:30  21        Q     What was that?

15:11:32  22        A     Wait.  What's the question again?  I'm

15:11:35  23   thinking of the cell phone.  Repeat, please.

15:11:38  24        Q     So there was mention that you had a

15:11:40  25   write-up about a month or so I think before you left

*RICHARD SZABO*

**89**

15:11:43  1    Muncy; is that right?

15:11:45  2         A    Yeah, okay.

15:11:48  3         Q    So then was you leaving Muncy in any way

15:11:51  4    related to that?

15:11:53  5         A    No.  It was a much bigger picture than

15:11:58  6    that, yeah, no.

15:12:00  7         Q    Okay.  When you were disciplined for

15:12:03  8    something, did you have -- I don't actually, I don't

15:12:10  9    have any more questions.  Thanks, Ric.

15:12:11 10

15:12:11 11                   FURTHER EXAMINATION

15:12:11 12

15:12:11 13    BY MR. STAPP:

15:12:13 14         Q    Just a couple here in follow-ups to that,

15:12:16 15    Mr. Szabo.  When you were leaving Muncy Industries,

15:12:18 16    was your mother sick?

15:12:21 17         A    She was.

15:12:22 18         Q    And did you talk to Mr. Fetter about the

15:12:26 19    fact that your mother as ill when you were

15:12:30 20    contemplating leaving Muncy Industries?

15:12:31 21         A    I believe I mentioned after the fact.

15:12:31 22              (Court reporter clarification.)

15:12:31 23    BY MR. STAPP:

15:12:40 24         Q    We're not hearing you as well, go ahead.

15:12:41 25         A    I'm sorry.  I'm just going to answer you

*RICHARD SZABO*

**90**

15:12:43  1   straight up.  I think I mentioned it after the fact.

15:12:49  2        Q    Sir, didn't you tell Mr. Fetter that you

15:12:52  3   were leaving because your mom was ill and you needed

15:12:56  4   to take care of her?

15:12:57  5        A    That was part of the reason, yeah.

15:13:01  6        Q    Okay.  And I thought the reason that you

15:13:04  7   were leaving was because your mom lives in Louisiana;

15:13:06  8   is that correct?

15:13:08  9        A    No, she lives in Savannah, Georgia.

15:13:11  10       Q    So you were going to move back to be closer

15:13:14  11   to her, was that the goal?

15:13:15  12       A    I was going -- the goal was to go [Zoom

15:13:15  13   unintelligible.]

15:13:15  14            (Court reporter clarification.)

15:13:23  15   BY MR. STAPP:

15:13:23  16       Q    The goal was to do what, sir?  I'm sorry,

15:13:24  17   you broke up.

15:13:24  18       A    It was to go back, yeah, to go back home,

15:13:29  19   but things changed.

15:13:29  20       Q    But you didn't actually do that, correct?

15:13:31  21   You didn't go back and live with your mom?

15:13:37  22       A    I did not go back.  I did not.

15:13:41  23       Q    And, in fact, what you did was you took a

15:13:46  24   job with Chant Engineering within a couple weeks

15:13:47  25   after leaving Muncy, right?

RICHARD SZABO

**91**

| | | |
|---|---|---|
| 15:13:48 | 1 | A     Yes, sir. |
| 15:13:51 | 2 | Q     You have to just lean forward a little bit, |
| 15:13:54 | 3 | Mr. Szabo, because of your mic. |
| 15:14:00 | 4 | MS. KRAMER:  He looks frozen. |
| 15:14:02 | 5 | MR. STAPP:  Yeah.  Are you still there, |
| 15:14:03 | 6 | Mr. Szabo? |
| 15:14:04 | 7 | (Mr. Szabo's Zoom screen frozen.) |
| 15:14:15 | 8 | MR. STAPP:  Yeah, I'm not -- he's totally |
| 15:14:18 | 9 | frozen up here. |
| 15:14:23 | 10 | (Discussion held off record.) |
| 15:14:23 | 11 | MR. STAPP:  Can you hear us, Mr. Szabo? |
| 15:14:25 | 12 | You are still frozen.  Nope, now he's gone |
| 15:14:41 | 13 | altogether. |
| 15:14:41 | 14 | MS. KRAMER:  You want me to just call him |
| 15:14:44 | 15 | since we're finishing it up? |
| 15:14:47 | 16 | MR. STAPP:  Yeah, I don't -- however you |
| 15:14:48 | 17 | can do it, is fine.  We don't need to do video.  I |
| 15:14:52 | 18 | just have a couple questions and then I'll be done. |
| 15:14:55 | 19 | We can go off the record. |
| 15:14:56 | 20 | (Discussion held off record.) |
| 15:16:29 | 21 | MS. KRAMER:  Greg, he's saying -- and I |
| 15:16:29 | 22 | just tried to call and went through to his voicemail. |
| 15:16:30 | 23 | He's saying his phone overheated and he can't |
| 15:16:31 | 24 | continue. |
| 15:16:31 | 25 | MR. STAPP:  Oh boy. |

*RICHARD SZABO*

**92**

| | | |
|---|---|---|
| 15:16:31 | 1 | MS. KRAMER: He asked if you want him to |
| 15:16:32 | 2 | take his speech [phonetic] out or something to prove |
| 15:16:34 | 3 | it. |
| 15:16:35 | 4 | MR. STAPP: No, I just had a couple more |
| 15:16:37 | 5 | about, you know, why he left, is that's all. Boy, I |
| 15:16:44 | 6 | literally had like two questions, that's so |
| 15:16:48 | 7 | frustrating. He doesn't have a landline I can call |
| 15:16:49 | 8 | in on? I wonder if he has a landline you can call |
| 15:16:52 | 9 | in. |
| 15:20:08 | 10 | (Discussion held off record.) |
| 15:20:08 | 11 | MS. KRAMER: I was saying he has to wait |
| 15:20:09 | 12 | until it cool off before he calls. |
| 15:20:13 | 13 | MR. STAPP: Why don't you if you want to do |
| 15:20:14 | 14 | your call at 3:30 and maybe we will come back really |
| 15:20:16 | 15 | quickly and let everybody go? I really only have two |
| 15:20:19 | 16 | questions. |
| 15:20:20 | 17 | MS. KRAMER: Yeah, I believe you. Should |
| 15:20:23 | 18 | we actually say 4:00, so we have a firm time you or |
| 15:20:26 | 19 | you want to say? |
| 15:20:28 | 20 | (Discussion held off record.) |
| 15:20:28 | 21 | (Recess.) |
| 15:20:28 | 22 | BY MR. STAPP: |
| 15:47:55 | 23 | Q We're ready if you are ready, Ric. Can you |
| 15:47:57 | 24 | hear me? Okay. |
| 15:47:58 | 25 | A Yes, I got you. |

RICHARD SZABO

**93**

15:47:59  1    Q    So we're back on the record.  We were

15:48:02  2  talking about when you left Muncy Industries, my next

15:48:09  3  question to you was when you left Muncy Industries,

15:48:11  4  you didn't end up moving to Savannah, Georgia with

15:48:14  5  your mother, correct?

15:48:15  6    A    No.  That was the intention but, no.

15:48:23  7    Q    I'm sorry, you broke up, that was the

15:48:27  8  intention, but what?

15:48:28  9    A    But no, I did not.

15:48:30  10    Q    And, in fact, did you just stay in the same

15:48:37  11  place in Louisiana?

15:48:38  12    A    No.  I did move to a new apartment.

15:48:43  13    Q    In the same town?

15:48:44  14    A    Yeah.  I'm in the same town.

15:48:47  15    Q    Okay.  And you're working for a company now

15:48:56  16  that's also located in Pennsylvania, like Muncy

15:49:00  17  Industries is, correct?

15:49:00  18    A    Yes, they are.

15:49:03  19    Q    That's all the questions I have, Mr. Szabo.

15:49:09  20    A    All right, yes, sir.

15:49:12  21        MS. KRAMER:  I don't have anything else so

15:49:13  22  we're done, Ric.  You can take off.

15:49:17  23        MR. STAPP:  All right.

15:49:18  24        THE WITNESS:  All right, guys.

15:49:18  25        MS. STAPP:  Thanks, everyone.

RICHARD SZABO

**94**

15:49:19   1              THE WITNESS:  Sorry for all the

15:49:21   2    interruptions, but, yeah, okay.

15:49:24   3              MS. KRAMER:  It happens.

15:49:26   4              MR. STAPP:  Okay.

15:49:28   5              MS. KRAMER:  Talk to you later, Greg.

15:49:31   6              MR. STAPP:  All right.  Talk to you later.

15:49:31   7    Take care, everyone.

15:49:31   8

15:50:23   9              (Deposition concluded at 3:50 p.m.)

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

RICHARD SZABO

**95**

```
 1   COUNTY OF CENTRE              :
                                  :   ss
 2   COMMONWEALTH OF PENNSYLVANIA :

 3       I, HEATHER GOSS BORING, Notary Public,

 4   authorized to administer oaths within and

 5   for the Commonwealth of Pennsylvania and take

 6   depositions in the trial of causes, do hereby

 7   certify that the foregoing is the testimony of

 8   RICHARD SZABO.

 9       I further certify that before the taking

10   of said deposition, the witness was duly sworn; that

11   the questions and answers were taken down

12   stenographically by the said HEATHER GOSS BORING,

13   Notary Public, approved and agreed to, and

14   afterwards reduced to typewriting under the

15   direction of the said Reporter.

16       I further certify that the proceedings and

17   evidence are contained fully and accurately in the

18   notes taken by me in the within deposition, and that

19   this copy is a correct transcript of the same.

20       In testimony whereof, I have hereunto

21   subscribed my hand this 15th day of July 2022.

22

23                     ss:/ Heather Goss Boring
                       (Signed electronically)
24                     HEATHER GOSS BORING, CSR
                       Notary Public
25   My Commission Number 1060904
     expires on February 17, 2023
```

*RICHARD SZABO*

## $

**$15,000** [3] - 66:20, 80:11, 80:25
**$1500** [2] - 40:21, 47:11
**$2,000** [5] - 34:13, 34:19, 34:22, 36:3, 39:1
**$200** [3] - 32:17, 33:5, 35:9
**$2000** [1] - 35:7
**$400** [1] - 33:15
**$45,000** [3] - 37:1, 37:10, 37:19
**$47,000** [2] - 38:14, 38:15
**$50,000** [2] - 36:12, 36:19
**$500** [1] - 36:13
**$800** [1] - 38:10

## '

**'18** [2] - 35:7, 81:21

## 1

**1** [7] - 3:8, 30:24, 64:15, 66:1, 83:6, 83:11, 83:14
**1-page** [6] - 3:8, 3:10, 3:16, 30:23, 35:19, 45:18
**1.5** [1] - 78:22
**100** [1] - 9:13
**1060904** [1] - 95:25
**10:00** [1] - 1:16
**117** [1] - 44:25
**118** [2] - 45:22, 47:15
**12** [1] - 81:3
**120** [3] - 3:18, 46:20, 47:15
**121** [1] - 1:24
**122** [1] - 3:15
**131** [1] - 29:5
**15** [1] - 81:5
**15,000** [1] - 66:17
**1521** [2] - 46:4, 46:5
**153** [2] - 1:18, 2:9
**15th** [2] - 48:21, 95:21
**1628** [1] - 2:4
**16828** [1] - 1:24
**16th** [1] - 82:10
**17** [4] - 32:10, 82:15, 82:24, 95:25
**17701** [2] - 1:19, 2:9
**18** [1] - 32:10
**18th** [1] - 34:13
**19,000** [1] - 81:4
**19103** [1] - 2:4
**1st** [2] - 36:24, 36:25

## 2

**2** [7] - 3:10, 3:14, 3:18, 35:16, 35:20, 39:6, 74:15
**2-Page** [2] - 3:12, 40:6
**20** [2] - 36:13, 74:4
**2000** [1] - 2:3
**2016** [1] - 39:20
**2018** [12] - 7:19, 32:17, 33:6, 33:7, 34:13, 34:18, 34:20, 35:25, 36:8, 38:15, 50:5, 81:9
**2019** [5] - 33:14, 36:25, 38:13, 48:21
**2020** [3] - 64:16, 79:7, 81:21
**2021** [2] - 70:10, 82:10
**2022** [2] - 1:16, 95:21
**2023** [1] - 95:25
**20th** [1] - 70:10
**21** [1] - 74:5
**21-CV-00468** [1] - 1:8
**22** [3] - 74:7, 78:17, 79:17
**22nd** [1] - 64:16
**23rd** [1] - 32:17
**259** [1] - 48:19
**261** [1] - 48:19
**267** [1] - 2:5
**273-1054** [1] - 2:5
**28** [1] - 38:13

## 3

**3** [3] - 3:12, 40:5, 40:7
**30** [4] - 1:16, 3:8, 36:3, 36:9
**300** [1] - 50:2
**31st** [1] - 33:14
**326-1077** [1] - 2:10
**35** [1] - 3:10
**364-1793** [1] - 1:25
**3:30** [1] - 92:14
**3:50** [1] - 94:9

## 4

**4** [5] - 3:4, 3:14, 42:12, 42:15, 76:7
**40** [9] - 3:12, 6:19, 7:2, 66:15, 74:8, 78:21, 78:23, 88:2, 88:14
**40-hour** [3] - 7:7, 7:9, 7:12
**400** [1] - 61:4
**42** [1] - 3:14
**425** [1] - 45:23
**425.97** [3] - 47:3, 47:4, 47:9
**45** [5] - 3:16, 74:6, 78:20, 78:25, 80:5
**47** [1] - 3:18

**48** [1] - 38:3
**49** [2] - 38:3
**4:00** [1] - 92:18

## 5

**5** [3] - 3:16, 45:17, 45:19
**50** [1] - 38:2
**570** [1] - 2:10
**5:00** [1] - 21:7
**5:30** [1] - 21:12

## 6

**6** [4] - 1:18, 3:18, 47:15, 47:20
**60** [1] - 74:5
**62** [1] - 48:19
**6:00** [1] - 21:12

## 7

**74** [1] - 3:22
**77** [1] - 3:22
**78** [1] - 3:22
**79** [1] - 35:14

## 8

**80** [2] - 74:5, 87:19
**814** [1] - 1:25
**85** [1] - 3:4
**87** [4] - 74:6, 78:20, 78:25, 80:5
**89** [1] - 3:4
**892.20** [1] - 41:16

## 9

**990.97** [1] - 45:6

## A

**A.M** [1] - 1:16
**ability** [1] - 26:15
**able** [1] - 55:20
**absolutely** [9] - 9:18, 9:19, 9:20, 9:21, 10:1, 11:12, 28:9, 59:7, 61:9, 81:16
**access** [1] - 76:4
**accredited** [3] - 56:12, 56:14, 56:17
**accurate** [1] - 33:8
**accurately** [1] - 95:17
**Act** [2] - 18:19, 84:11
**action** [3] - 64:16, 83:23,

84:6
**actively** [3] - 16:17, 47:25, 48:4
**actual** [2] - 41:14, 57:5
**adapted** [1] - 55:18
**added** [1] - 34:4
**addition** [2] - 40:9, 42:17
**additional** [1] - 66:20
**address** [3] - 48:23, 58:3, 64:17
**adjusting** [1] - 19:22
**administer** [1] - 95:4
**admit** [1] - 75:11
**advantage** [2] - 36:17, 68:11
**advertisement** [1] - 49:2
**advised** [1] - 66:10
**afterwards** [1] - 95:14
**agencies** [1] - 56:16
**agency** [1] - 84:7
**ago** [3] - 45:15, 47:12, 51:17
**agree** [17] - 8:10, 9:12, 12:11, 25:19, 27:24, 47:6, 54:2, 54:10, 54:12, 60:19, 60:21, 62:13, 62:22, 63:9, 63:19, 82:23, 83:9
**agreed** [1] - 95:13
**Agreement** [3] - 3:13, 39:17, 40:6
**agreement** [1] - 67:12
**ahead** [6] - 20:24, 21:11, 38:22, 72:12, 85:17, 89:24
**airline** [1] - 43:4
**airport** [1] - 80:21
**Alex** [2] - 72:23, 73:2
**allowed** [10] - 8:8, 8:14, 8:15, 8:22, 12:23, 15:6, 27:22, 43:1, 44:3
**almost** [2] - 73:7, 85:15
**altogether** [1] - 91:13
**America** [4] - 70:4, 70:5, 70:9, 71:5
**amount** [6] - 7:6, 45:9, 46:15, 76:13, 79:9, 79:17
**AND** [1] - 3:7
**angry** [2] - 86:2, 86:3
**annual** [1] - 34:22
**answer** [31] - 4:24, 9:23, 9:25, 14:2, 14:5, 14:13, 16:2, 19:12, 19:14, 19:23, 21:23, 31:25, 32:23, 33:16, 37:15, 53:2, 53:10, 53:17, 56:8, 57:6, 57:17, 59:16, 64:6, 69:8, 69:9, 69:11, 71:9, 72:11, 89:25
**answered** [1] - 64:1
**answering** [1] - 25:18
**answers** [3] - 4:22, 37:17, 95:11
**anytime** [1] - 11:21
**Apartment** [2] - 46:4, 46:5

*RICHARD SZABO*

**apartment** [3] - 46:8, 47:5, 93:12
**Apartments** [1] - 46:21
**apologize** [13] - 30:3, 32:8, 34:17, 37:13, 38:20, 41:11, 45:25, 54:15, 58:23, 72:6, 75:2, 76:4, 83:17
**appear** [4] - 32:3, 32:11, 41:14, 50:11
**APPEARING** [2] - 2:6, 2:11
**applies** [1] - 43:25
**appreciate** [1] - 34:9
**approaches** [1] - 20:23
**approaching** [1] - 21:6
**approval** [1] - 71:21
**approved** [1] - 95:13
**April** [4] - 36:24, 38:13, 38:15, 81:10
**area** [1] - 47:5
**argue** [1] - 8:21
**arrive** [2] - 26:25, 27:3
**assignment** [1] - 25:11
**assignments** [2] - 23:25, 85:24
**assistance** [1] - 24:23
**assistant** [2] - 30:19, 46:7
**associated** [1] - 68:23
**assume** [2] - 37:7, 57:9
**assumed** [1] - 20:9
**attempted** [1] - 23:1
**attention** [1] - 76:1
**attitude** [2] - 19:19, 19:20
**attorney** [9] - 5:2, 5:5, 18:3, 18:12, 18:14, 79:3, 79:12, 79:14
**Attorney** [3] - 74:20, 77:13, 78:13
**August** [6] - 32:17, 33:5, 33:7, 34:13, 35:7, 48:21
**authentic** [1] - 42:5
**authorities** [1] - 26:19
**authority** [8] - 10:25, 11:1, 13:6, 24:10, 28:6, 28:10, 87:4, 87:7
**authorized** [1] - 95:4
**avoid** [1] - 61:11
**aware** [6] - 6:2, 70:8, 70:11, 71:11, 71:16, 73:4

---

**B**

**background** [1] - 38:21
**bad** [2] - 17:1, 29:18
**bake** [1] - 60:18
**based** [4] - 33:21, 38:15, 79:9, 81:2
**basing** [1] - 80:12
**Bate** [4] - 29:5, 32:10, 48:19, 50:2

**Bates** [11] - 3:9, 3:11, 3:13, 3:15, 3:17, 3:18, 35:14, 44:25, 45:21, 46:19, 47:15
**bed** [3] - 20:23, 21:5, 50:24
**BEFORE** [1] - 1:14
**begin** [1] - 6:6
**beginning** [2] - 80:2, 88:4
**BEHALF** [2] - 2:6, 2:11
**behalf** [1] - 52:7
**behind** [2] - 9:2, 9:5
**best** [3] - 7:14, 56:7, 57:4
**better** [1] - 47:16
**between** [9] - 4:3, 14:5, 17:9, 25:24, 35:13, 49:20, 77:2, 77:7, 77:16
**bigger** [1] - 89:5
**Bishop** [2] - 50:11, 51:8
**bit** [3] - 47:16, 47:24, 91:2
**biweekly** [1] - 6:12
**bonus** [16] - 32:14, 32:17, 33:5, 33:6, 33:9, 33:15, 33:17, 33:19, 33:25, 34:2, 34:8, 34:12, 35:8, 36:13, 38:10
**bonuses** [8] - 34:3, 37:20, 38:4, 43:18, 66:22, 67:10, 67:11, 87:13
**Boring** [1] - 95:23
**BORING** [5] - 1:14, 1:23, 95:3, 95:12, 95:24
**boringreporting@gmail. com** [1] - 1:25
**bought** [1] - 42:17
**Boulevard** [1] - 2:4
**boy** [2] - 91:25, 92:5
**brand** [1] - 67:15
**brand-new** [1] - 67:15
**break** [5] - 62:6, 73:7, 73:13, 73:16, 75:21
**breaking** [3] - 53:1, 53:5, 62:1
**bring** [1] - 36:23
**broke** [6] - 13:16, 53:10, 53:15, 72:6, 90:17, 93:7
**brother** [1] - 26:1
**brother-in-law** [1] - 26:1
**buckle** [1] - 20:14
**bullshit** [1] - 29:11
**Bunting** [13] - 11:24, 12:6, 12:9, 12:24, 19:3, 27:21, 71:22, 77:4, 77:8, 77:15, 77:23, 84:23, 84:24
**BUNTING** [1] - 12:6
**burden** [1] - 10:3
**business** [5] - 49:7, 49:22, 50:15, 52:8, 84:6
**butt** [1] - 11:12
**buying** [1] - 67:17
**BY** [37] - 1:13, 4:14, 6:22,

13:18, 14:8, 14:17, 15:7, 16:1, 23:19, 29:19, 30:7, 31:9, 35:23, 38:23, 40:8, 41:8, 42:16, 45:20, 47:22, 53:20, 54:6, 63:6, 64:11, 65:7, 65:23, 69:20, 71:4, 73:22, 75:4, 77:14, 78:15, 85:6, 85:21, 89:13, 89:23, 90:15, 92:22

---

**C**

**C-R-O-Y** [1] - 23:24
**calculated** [1] - 81:3
**calibrate** [3] - 24:1, 24:5, 70:1
**calibrated** [2] - 50:23, 51:11
**calibrating** [3] - 50:18, 51:6, 87:20
**calibration** [22] - 20:19, 22:22, 22:25, 23:11, 23:16, 24:24, 28:13, 50:8, 50:21, 51:2, 51:14, 51:21, 54:10, 54:18, 56:13, 61:20, 66:10, 72:3, 72:8, 72:15, 72:19, 87:16
**calibrations** [14] - 24:12, 33:22, 33:25, 34:3, 36:4, 36:9, 36:14, 38:15, 54:21, 54:25, 71:25, 72:1, 86:21, 87:1
**campaign** [3] - 48:13, 49:3, 49:11
**cannot** [1] - 79:20
**capabilities** [2] - 26:5, 59:21
**car** [8] - 39:14, 40:9, 42:17, 43:5, 66:21, 67:12, 67:13, 67:17
**card** [8] - 42:20, 42:22, 43:2, 63:15, 67:3, 67:7, 87:25, 88:9
**cards** [2] - 67:4, 78:2
**care** [2] - 90:4, 94:7
**cars** [3] - 67:15
**case** [15] - 4:17, 20:1, 29:14, 63:25, 64:10, 64:21, 64:22, 65:11, 65:12, 65:15, 69:18, 70:15, 70:16, 71:9, 84:5
**cases** [1] - 68:22
**catch** [1] - 21:24
**category** [1] - 44:1
**causes** [1] - 95:6
**cell** [12] - 44:1, 44:4, 44:7, 44:8, 44:11, 44:16, 66:21, 66:25, 67:7, 87:24, 88:7, 88:23
**Center** [1] - 2:3
**CENTRE** [2] - 1:24, 95:1
**certain** [2] - 26:3, 55:4

**certainly** [2] - 15:6, 77:11
**certification** [5] - 4:5, 55:25, 56:9, 56:21, 56:22
**certified** [6] - 54:21, 54:24, 55:3, 56:12, 56:13, 56:17
**certify** [4] - 56:18, 95:7, 95:9, 95:16
**change** [2] - 45:24, 60:25
**changed** [1] - 90:19
**changes** [1] - 8:4
**Chant** [20] - 14:16, 14:18, 15:17, 16:9, 17:25, 18:4, 18:13, 18:17, 64:25, 68:13, 68:15, 69:4, 69:16, 69:18, 69:21, 69:25, 70:9, 71:11, 71:16, 90:24
**chant** [6] - 16:17, 17:13, 18:22, 67:19, 68:7, 69:2
**characterize** [1] - 20:11
**charged** [1] - 6:1
**CHARLES** [1] - 1:24
**chart** [1] - 80:15
**charting** [1] - 81:6
**check** [1] - 76:3
**checking** [1] - 17:17
**child** [4] - 61:6
**chip** [4] - 60:11, 60:13, 60:15, 60:20
**chips** [1] - 60:17
**chocolate** [5] - 60:11, 60:13, 60:15, 60:16, 60:20
**choice** [4] - 20:9, 21:11, 21:12, 53:25
**choose** [1] - 80:18
**claim** [3] - 18:9, 29:21, 77:24
**claims** [1] - 15:3
**clarification** [11] - 6:21, 13:17, 15:25, 23:18, 41:7, 54:5, 58:21, 69:7, 70:18, 89:22, 90:14
**clarify** [2] - 34:1, 34:7
**classified** [2] - 29:13, 65:3
**clean** [5] - 35:17, 41:5, 41:9, 41:10, 41:11
**clear** [3] - 21:21, 25:22, 62:17
**clearly** [2] - 26:3, 49:17
**client's** [1] - 32:3
**clients** [1] - 87:22
**clock** [6] - 31:20, 31:21, 31:22, 32:11
**clocking** [4] - 32:6, 32:13
**close** [4] - 14:22, 15:22, 21:7, 38:2
**closed** [1] - 78:23
**closer** [1] - 90:10
**cloudy** [1] - 53:23
**CO** [1] - 1:10
**coming** [2] - 31:7, 59:19

**comment** [4] - 8:14, 8:22, 14:22, 71:3
**Commission** [1] - 95:25
**COMMONWEALTH** [1] - 95:2
**Commonwealth** [2] - 83:24, 95:5
**communicated** [1] - 11:16
**communications** [2] - 18:11, 77:2
**Company** [3] - 3:12, 39:16, 40:6
**company** [16] - 19:23, 40:13, 40:21, 43:2, 43:13, 43:19, 44:1, 56:15, 66:25, 67:3, 67:4, 67:6, 70:3, 88:7, 88:8, 93:15
**compensated** [1] - 78:21
**compensation** [1] - 88:2
**competitor** [2] - 65:9, 66:8
**competitors** [1] - 64:24
**Complaint** [10] - 74:1, 74:4, 78:17, 79:2, 82:1, 82:3, 82:10, 82:21, 84:2, 84:11
**complaint** [2] - 82:9, 83:24
**completed** [1] - 36:9
**completely** [2] - 43:13, 68:11
**completeness** [1] - 40:4
**compound** [1] - 7:18
**computer** [1] - 67:8
**concerns** [1] - 66:10
**concluded** [1] - 94:9
**confirm** [2] - 29:24, 33:21
**confirmation** [1] - 42:6
**consider** [1] - 48:8
**consumer** [1] - 84:6
**contained** [1] - 95:17
**contemplating** [1] - 89:20
**contention** [1] - 81:19
**continue** [1] - 91:24
**control** [1] - 59:20
**conversation** [5] - 10:5, 10:7, 15:9, 15:11, 15:20
**conversations** [8] - 11:17, 12:20, 14:4, 16:5, 16:23, 17:2, 17:5, 17:10
**convicted** [1] - 5:22
**cookie** [2] - 60:10, 60:17
**cookies** [6] - 60:11, 60:13, 60:15, 60:18, 60:20, 61:5
**cool** [1] - 92:12
**copy** [3] - 35:17, 42:5, 95:19
**Core** [3] - 50:11, 50:18, 51:8
**correct** [86] - 6:9, 7:13, 8:16, 8:17, 10:19, 12:6, 18:15, 18:16, 18:21, 18:24, 20:20, 21:3, 21:13, 22:22, 22:25, 23:7, 23:12, 24:5, 25:9, 26:16, 28:8, 28:20, 28:21, 31:23, 31:24, 32:7, 32:14, 32:15, 33:22, 34:23, 35:9,

36:1, 36:5, 36:6, 36:16, 37:2, 37:7, 37:11, 37:22, 37:24, 39:7, 39:8, 39:14, 39:21, 39:22, 40:2, 42:11, 42:21, 43:10, 43:11, 47:18, 49:5, 49:24, 51:19, 51:21, 51:23, 52:5, 57:10, 59:25, 62:6, 63:17, 63:18, 63:20, 63:21, 63:24, 64:4, 64:25, 65:17, 66:2, 68:7, 68:13, 68:17, 76:5, 79:13, 80:6, 82:24, 83:1, 83:7, 83:8, 83:11, 83:15, 90:8, 90:20, 93:5, 93:17, 95:19
**correctly** [17] - 8:6, 18:10, 24:21, 25:12, 25:19, 26:20, 29:13, 36:15, 49:9, 50:7, 51:4, 55:24, 59:2, 60:5, 61:13, 62:10
**correspondence** [1] - 11:22
**cost** [2] - 40:12, 87:24
**costs** [1] - 88:5
**counsel** [6] - 4:4, 5:4, 75:20, 77:9, 78:12, 82:4
**count** [1] - 17:1
**COUNTY** [1] - 95:1
**couple** [7] - 5:14, 44:19, 55:23, 89:14, 90:24, 91:18, 92:4
**course** [2] - 8:12, 10:6
**COURT** [2] - 1:1, 1:23
**court** [9] - 8:7, 10:12, 12:4, 37:16, 64:16, 82:2, 82:9, 84:5, 85:13
**Court** [10] - 6:21, 13:17, 15:25, 23:18, 41:7, 54:5, 58:21, 69:7, 89:22, 90:14
**cover** [2] - 29:1, 44:20
**covered** [3] - 22:19, 63:4, 83:5
**CRAPPELL** [1] - 1:6
**Crappell** [19] - 23:10, 24:3, 24:7, 24:22, 25:10, 27:13, 27:23, 28:16, 55:22, 57:8, 57:14, 57:19, 58:12, 59:4, 61:19, 62:19, 72:21, 73:1, 79:23
**create** [2] - 56:4, 75:19
**created** [7] - 22:21, 55:12, 55:25, 59:5, 74:22, 76:20, 80:15
**credit** [7] - 42:19, 42:22, 67:3, 67:4, 67:7, 87:25, 88:9
**crime** [3] - 5:22, 5:24, 6:1
**crimen** [3] - 5:22, 5:24, 6:1
**Croy** [21] - 23:17, 23:21, 23:25, 24:8, 24:23, 25:10, 26:25, 27:6, 27:12, 27:23, 28:16, 55:5, 57:8, 57:15,

57:20, 58:12, 58:15, 67:14, 72:21, 73:2, 79:23
**CROY** [1] - 23:23
**CSR** [1] - 95:24
**curious** [1] - 85:4
**current** [1] - 68:24
**customer** [6] - 24:4, 24:9, 34:4, 50:19, 50:20, 71:5
**customer's** [3] - 9:2, 26:25, 71:23
**customers** [36] - 9:5, 14:25, 15:10, 15:14, 47:25, 48:4, 49:6, 49:13, 49:16, 50:3, 50:6, 50:11, 50:13, 50:14, 50:21, 51:21, 52:1, 52:4, 52:6, 65:17, 66:2, 66:4, 66:9, 68:17, 69:3, 69:17, 69:23, 69:25, 70:1, 70:18, 70:24, 70:25, 71:8, 71:12, 71:17

**D**

**d/b/a** [1] - 1:9
**danger** [1] - 61:21
**DATE** [1] - 1:16
**date** [2] - 34:11, 80:20
**dates** [3] - 9:17, 11:3, 79:7
**days** [4] - 6:14, 7:20, 7:24, 32:4
**deal** [1] - 39:5
**debate** [1] - 75:18
**December** [1] - 70:10
**deception** [1] - 5:25
**decide** [2] - 20:10, 27:12
**decided** [2] - 16:22, 17:10
**decides** [1] - 27:1
**decision** [4] - 10:18, 10:21, 20:11, 21:2
**dedicated** [1] - 20:15
**deep** [1] - 10:13
**DEFENDANT** [2] - 1:10, 2:11
**DEFENDANTS** [1] - 1:13
**definitely** [1] - 55:16
**definition** [6] - 26:12, 60:5, 60:7, 61:14, 61:16, 61:17
**definitions** [1] - 26:13
**degree** [1] - 61:4
**Delahoussaye** [9] - 8:7, 9:9, 12:24, 19:4, 53:24, 59:3, 63:7, 84:22, 84:24
**delegate** [3] - 11:1, 27:8, 27:10
**delegation** [2] - 10:25, 26:19
**deleted** [3] - 63:23, 64:3, 66:8
**demand** [1] - 86:17
**depos** [1] - 22:20
**DEPOSITION** [2] - 1:12, 3:7

**deposition** [11] - 4:16, 4:19, 5:5, 5:6, 5:9, 35:16, 53:25, 64:15, 95:10, 95:18
**Deposition** [2] - 40:4, 94:9
**depositions** [1] - 95:6
**described** [2] - 25:17, 77:23
**describing** [1] - 19:1
**deserve** [1] - 66:13
**designs** [1] - 18:18
**despite** [1] - 32:12
**diary** [2] - 75:8, 76:9
**difference** [1] - 25:24
**different** [6] - 28:8, 45:9, 58:2, 64:21, 65:12, 66:4
**differently** [1] - 72:11
**dig** [1] - 10:13
**directed** [1] - 25:4
**direction** [1] - 95:15
**directions** [1] - 25:18
**directly** [2] - 29:20, 57:22
**disagree** [18] - 8:10, 8:17, 8:21, 9:13, 11:8, 11:11, 12:11, 12:13, 27:24, 37:9, 37:11, 37:12, 54:3, 54:4, 54:10, 61:16, 63:10, 63:11
**discipline** [4] - 82:18, 83:5, 83:9, 88:18
**disciplined** [2] - 83:7, 89:7
**disclose** [2] - 14:11, 65:18
**discovery** [4] - 5:18, 31:13, 46:14, 74:2
**discretion** [2] - 54:8, 54:17
**discuss** [1] - 11:3
**discussed** [3] - 5:3, 39:9, 43:17
**Discussion** [1] - 31:3
**Discussion held off record** [5] - 73:21, 91:10, 91:20, 92:10, 92:20
**dishonesty** [1] - 5:25
**DISTRICT** [2] - 1:1, 1:2
**document** [17] - 29:7, 29:24, 30:9, 31:5, 35:14, 35:18, 39:16, 40:14, 40:17, 44:25, 45:2, 45:4, 45:24, 46:20, 47:3, 48:9, 64:12
**documentation** [8] - 38:11, 74:7, 74:10, 74:16, 75:7, 79:5, 79:8, 79:10
**documentations** [2] - 78:7, 79:4
**documents** [16] - 5:8, 5:11, 5:12, 6:5, 29:5, 30:1, 30:4, 30:18, 31:12, 44:19, 63:15, 73:8, 73:12, 76:17, 77:21, 77:25
**dollars** [1] - 7:7
**done** [17] - 9:11, 12:11, 20:11, 20:15, 20:17, 20:25, 21:7, 21:13, 52:11, 56:7,

RICHARD SZABO

60:18, 62:19, 73:7, 79:2, 85:24, 91:18, 93:22
**dough** [1] - 60:16
**down** [3] - 37:16, 75:21, 95:11
**drafted** [1] - 82:8
**driving** [1] - 39:12
**drop** [1] - 62:6
**dropping** [1] - 62:1
**drove** [2] - 79:21
**duly** [1] - 95:10
**during** [12] - 8:12, 15:8, 15:11, 15:22, 16:15, 17:13, 19:9, 54:2, 57:10, 57:11, 81:20, 88:6
**duty** [1] - 87:15
**dynamic** [1] - 19:1

### E

**e-mail** [26] - 11:22, 14:23, 15:10, 15:17, 15:21, 18:2, 18:3, 18:8, 29:10, 32:16, 34:11, 48:20, 48:21, 48:23, 49:25, 50:10, 50:25, 64:16, 64:17, 64:18, 64:20, 65:14, 65:15, 65:25, 66:3, 67:19
**e-mailed** [1] - 15:2
**e-mails** [8] - 10:8, 11:24, 15:14, 64:8, 66:9, 77:7, 77:16, 77:23
**E4** [2] - 36:3, 36:13
**effect** [1] - 88:14
**effective** [1] - 36:25
**effort** [1] - 24:14
**Eight** [1] - 2:3
**eight** [14] - 8:1, 8:4, 9:11, 9:15, 10:17, 10:18, 10:22, 12:10, 12:15, 12:23, 13:4, 13:8, 22:16, 80:19
**either** [4] - 24:22, 28:16, 28:18, 83:24
**electronically** [1] - 95:23
**Emberwood** [2] - 46:21, 47:14
**employed** [6] - 35:22, 66:18, 71:13, 71:18, 81:15, 81:20
**Employee** [2] - 29:6, 83:6
**employee** [12] - 6:8, 6:16, 7:8, 20:16, 22:8, 26:15, 52:15, 58:3, 60:3, 67:23, 71:21, 86:5
**employees** [5] - 7:9, 8:8, 20:1, 66:24, 67:4
**employer** [5] - 13:20, 14:15, 21:17, 52:1, 65:5
**employer's** [1] - 20:22
**employers** [1] - 24:4
**employment** [17] - 6:7,

17:22, 18:1, 29:20, 29:22, 52:3, 54:17, 63:20, 63:22, 76:24, 77:4, 81:22, 82:16, 83:15, 83:23, 88:6
**Employment** [2] - 3:8, 30:23
**encourage** [1] - 16:17
**encouraging** [2] - 17:14, 17:16
**end** [5] - 50:7, 51:3, 81:10, 82:19, 93:4
**ended** [1] - 23:4
**engineer** [1] - 67:14
**Engineering** [6] - 64:25, 69:22, 70:9, 71:11, 71:16, 90:24
**engineers** [1] - 72:23
**entire** [2] - 12:2, 28:1
**entirety** [1] - 82:5
**entitled** [1] - 29:6
**equals** [1] - 28:11
**error** [1] - 19:21
**especially** [1] - 4:22
**ESQUIRE** [2] - 2:3, 2:8
**essence** [2] - 25:16, 39:11
**establish** [2] - 77:24, 81:14
**establishes** [1] - 74:8
**evidence** [1] - 95:17
**evidentiary** [1] - 75:18
**exactly** [2] - 53:18, 80:20
**exam** [11] - 55:9, 55:15, 55:20, 56:1, 57:9, 57:16, 57:21, 58:1, 58:14, 59:5, 59:9
**EXAMINATION** [4] - 3:2, 4:12, 85:19, 89:11
**examination** [1] - 56:4
**example** [3] - 20:19, 26:1, 80:3
**except** [1] - 4:6
**exchange** [1] - 49:19
**excuse** [2] - 13:22, 86:5
**exercise** [1] - 54:16
**exercised** [2] - 54:7, 54:8
**exhibit** [4] - 32:18, 35:15, 64:15, 83:13
**Exhibit** [21] - 3:8, 3:10, 3:12, 3:14, 3:16, 3:18, 30:24, 35:16, 35:20, 39:6, 40:5, 40:7, 42:15, 45:17, 45:19, 47:15, 47:20, 66:1, 83:6, 83:11, 83:13
**EXHIBITS** [1] - 3:7
**expect** [1] - 20:8
**expected** [2] - 21:16, 22:1
**expense** [3] - 41:17, 44:10, 44:14
**Expense** [3] - 3:16, 40:15, 45:18
**expenses** [13] - 40:10, 41:3, 42:18, 42:23, 43:20, 43:21,

44:23, 45:1, 45:5, 46:23, 47:11, 47:17, 66:20
**expires** [1] - 95:25
**explain** [3] - 5:23, 19:17, 58:6
**explanation** [1] - 47:16
**extra** [4] - 21:19, 22:9, 67:9, 80:14
**extremely** [2] - 50:8, 51:1
**eyes** [1] - 44:24

### F

**facility** [2] - 31:23, 31:24
**fact** [9] - 13:15, 22:12, 37:10, 48:7, 89:19, 89:21, 90:1, 90:23, 93:10
**factory** [1] - 60:10
**Fair** [2] - 18:18, 84:10
**fair** [4] - 9:6, 49:3, 50:22, 76:13
**falsi** [3] - 5:22, 5:24, 6:1
**familiar** [3] - 39:18, 70:3, 80:17
**far** [2] - 39:3, 43:17
**faster** [1] - 33:1
**favor** [2] - 67:1, 67:16
**favors** [1] - 67:6
**fear** [2] - 86:4, 86:5
**February** [1] - 95:25
**federal** [12] - 14:1, 14:20, 15:19, 16:18, 17:10, 18:14, 18:18, 57:2, 57:4, 82:2, 84:4, 84:5
**feedback** [1] - 82:18
**Fetter** [31] - 7:5, 10:9, 10:23, 13:1, 13:2, 13:15, 19:2, 19:16, 23:7, 23:8, 33:4, 35:13, 48:14, 48:20, 49:21, 50:1, 50:5, 50:10, 51:25, 52:3, 55:2, 57:23, 57:24, 72:24, 77:3, 79:22, 86:2, 86:12, 86:21, 89:18, 90:2
**Fetter's** [1] - 49:16
**few** [2] - 24:2, 85:14
**field** [1] - 87:17
**figure** [1] - 44:20
**file** [5] - 16:18, 17:14, 18:14, 84:2, 84:8
**filed** [10] - 18:23, 69:2, 69:15, 73:1, 82:2, 82:3, 82:9, 82:11, 83:22, 84:10
**filing** [2] - 4:5, 18:18
**finally** [1] - 55:13
**fine** [6] - 27:18, 32:1, 73:14, 84:14, 85:3, 91:17
**finish** [3] - 20:25, 21:11, 37:14
**finished** [2] - 21:9, 85:15

**finishing** [1] - 91:15
**fire** [1] - 26:15
**firing** [1] - 26:5
**Firm** [1] - 17:19
**firm** [2] - 17:23, 92:18
**first** [13] - 6:6, 8:1, 13:24, 14:18, 16:8, 16:12, 16:20, 33:3, 46:10, 63:12, 75:20, 81:9, 81:11
**five** [21] - 8:2, 8:4, 9:11, 9:15, 10:17, 10:19, 10:22, 12:10, 12:15, 12:24, 13:4, 13:8, 17:5, 17:9, 20:2, 21:9, 22:4, 22:6, 22:9, 22:16, 73:9
**fix** [1] - 24:17
**flexible** [1] - 19:24
**follow** [3] - 56:14, 85:15, 89:14
**follow-ups** [1] - 89:14
**follows** [2] - 4:10, 82:16
**food** [2] - 43:3, 43:9
**FOR** [1] - 1:1
**foregoing** [1] - 95:7
**form** [4] - 4:6, 41:22, 47:14, 60:1
**former** [5] - 52:1, 68:16, 69:3, 79:12, 79:14
**formula** [1] - 75:19
**forward** [2] - 16:23, 91:2
**four** [1] - 79:23
**FOURTH** [1] - 1:18
**Fourth** [1] - 2:9
**frame** [3] - 16:15, 37:6, 51:11
**freezes** [1] - 53:13
**Friday** [17] - 7:22, 7:25, 8:9, 8:16, 9:3, 9:4, 9:11, 9:15, 10:19, 10:22, 12:10, 12:15, 12:23, 13:4, 13:8, 19:10, 22:16
**front** [2] - 30:3, 78:19
**frozen** [4] - 91:4, 91:7, 91:9, 91:12
**frustrating** [1] - 92:7
**fully** [1] - 95:17
**FURTHER** [1] - 89:11
**future** [1] - 11:5, 33:16

### G

**gears** [1] - 47:23
**gentlemen** [1] - 23:17
**Georgia** [3] - 42:9, 90:9, 93:4
**given** [10] - 12:8, 24:10, 33:15, 34:12, 42:19, 43:16, 45:9, 67:6, 67:8, 76:3
**goal** [3] - 90:11, 90:12, 90:16
**Golf** [3] - 70:4, 70:9, 71:5
**golf** [1] - 70:5

RICHARD SZABO

**Google** [4] - 80:16, 80:17, 81:1, 81:13
**gosh** [3] - 17:1, 62:7, 79:24
**Goss** [1] - 95:23
**GOSS** [4] - 1:14, 95:3, 95:12, 95:24
**government** [4] - 26:2, 56:10, 57:3, 84:4
**grateful** [3] - 67:11, 68:9
**Greg** [16] - 4:16, 15:2, 29:9, 30:4, 30:12, 30:25, 62:24, 65:1, 68:21, 69:19, 70:20, 73:14, 73:18, 85:1, 91:21, 94:5
**GREGORY** [1] - 2:8
**Group** [1] - 17:18
**GROUP** [1] - 2:2
**Group's** [1] - 18:6
**gstapp@stapplaw.net** [1] - 2:10
**guess** [8] - 16:19, 34:4, 41:10, 42:9, 54:23, 56:6, 56:16, 75:25
**guessed** [1] - 46:13
**guy** [2] - 29:18, 72:22
**guys** [5] - 16:25, 29:3, 60:12, 85:8, 93:24

## H

**HALL** [1] - 1:24
**hand** [3] - 61:3, 61:6, 95:21
**handbook** [9] - 7:8, 7:12, 7:15, 76:9, 76:12, 76:18, 76:19, 76:21, 76:22
**hands** [9] - 55:14, 56:1, 56:4, 57:16, 57:21, 58:1, 58:14, 59:5, 59:9
**hands-on** [9] - 55:14, 56:1, 56:4, 57:16, 57:21, 58:1, 58:14, 59:5, 59:9
**handwriting** [3] - 38:17, 41:21, 45:2
**handwritten** [2] - 38:12, 75:8
**Hang** [1] - 12:4
**hang** [3] - 49:24, 50:1, 53:4
**hard** [1] - 22:20
**Haul** [6] - 3:14, 41:15, 41:16, 41:18, 42:1, 42:14
**heads** [1] - 11:12
**hear** [7] - 15:6, 16:2, 31:10, 73:23, 75:6, 91:11, 92:24
**heard** [2] - 63:11, 63:12
**hearing** [2] - 85:13, 89:24
**HEATHER** [4] - 1:14, 95:3, 95:12, 95:24
**Heather** [1] - 95:23
**heavy** [2] - 62:2, 62:6
**held** [2] - 12:20, 31:3

**help** [10] - 7:1, 18:13, 24:12, 25:6, 25:23, 30:20, 39:10, 40:19, 42:25, 55:9
**helped** [1] - 55:3
**helpful** [1] - 58:6
**helping** [3] - 25:18, 54:24, 61:11
**hereby** [2] - 4:3, 95:6
**hereunto** [1] - 95:20
**herself** [3] - 61:20, 62:1, 62:20
**himself** [2] - 23:7, 74:23
**hire** [1] - 26:15
**hired** [7] - 7:5, 7:19, 15:23, 22:7, 35:25, 67:13, 88:4
**hiring** [1] - 26:5
**history** [1] - 5:13
**HOLA** [1] - 56:17
**Home** [1] - 47:14
**home** [4] - 11:9, 12:2, 60:11, 90:18
**honest** [2] - 38:3, 38:7
**honor** [1] - 38:18
**honored** [3] - 38:25, 39:2, 39:4
**hope** [1] - 49:24
**hot** [1] - 61:6
**hotel** [2] - 43:3, 43:10
**hour** [11] - 20:3, 20:4, 20:8, 20:10, 20:12, 21:3, 21:21, 22:3, 22:4, 22:10
**hourly** [7] - 21:17, 22:2, 52:15, 52:16, 52:18, 87:10, 87:12
**hours** [28] - 6:15, 6:19, 7:2, 7:20, 7:24, 8:13, 10:18, 54:2, 66:15, 74:5, 74:6, 74:8, 75:9, 75:23, 77:4, 78:20, 78:21, 78:22, 78:23, 78:25, 79:9, 80:5, 80:10, 80:14, 88:2, 88:13, 88:14
**hundred** [1] - 81:18
**hurt** [1] - 61:12
**hyphen** [1] - 40:16

## I

**idea** [4] - 48:15, 49:15, 49:16, 49:17
**ill** [2] - 89:19, 90:3
**important** [2] - 4:24, 26:13
**improperly** [2] - 13:15, 67:24
**inaudible** [1] - 8:25
**INC** [3] - 1:10, 1:23, 2:8
**include** [1] - 75:7
**including** [1] - 37:19
**inclusive** [1] - 47:12
**incorrectly** [1] - 24:18
**increase** [6] - 36:3, 36:8,

37:25, 38:13, 38:14, 38:25
**increases** [1] - 43:18
**indicate** [2] - 36:11, 88:1
**indicated** [1] - 20:2
**indicates** [1] - 74:4
**indications** [1] - 68:22
**individual** [1] - 26:23
**individuals** [7] - 22:24, 23:14, 27:23, 49:21, 50:12, 55:19, 72:18
**Industries** [69] - 13:10, 14:24, 15:18, 16:18, 17:15, 18:19, 19:3, 20:5, 20:20, 21:6, 22:14, 22:19, 22:22, 22:25, 28:18, 29:21, 33:5, 37:21, 39:4, 40:15, 41:23, 45:7, 46:14, 47:9, 47:24, 48:3, 48:14, 50:16, 51:20, 51:25, 52:7, 54:9, 54:18, 63:16, 63:20, 64:2, 64:23, 65:10, 65:16, 65:25, 66:7, 66:11, 67:21, 69:25, 71:6, 71:14, 71:18, 71:20, 72:1, 72:4, 74:9, 75:10, 75:22, 76:10, 76:24, 77:3, 78:11, 81:15, 81:22, 83:7, 83:15, 83:23, 84:3, 84:8, 89:15, 89:20, 93:2, 93:3, 93:17
**INDUSTRIES** [1] - 1:9
**Industries'** [4] - 32:5, 44:17, 65:16, 69:22
**Industry** [1] - 68:16
**information** [7] - 5:18, 18:7, 63:24, 64:3, 64:9, 66:8, 79:5
**initial** [1] - 18:9
**initiated** [1] - 68:14
**instance** [1] - 32:16
**instances** [2] - 9:17, 51:18
**instead** [3] - 9:24, 9:25, 88:1
**Institute** [1] - 56:24
**intend** [1] - 84:15
**intention** [2] - 93:6, 93:8
**interested** [2] - 50:8, 51:1
**interrogatories** [1] - 5:19
**interrupt** [1] - 56:20
**interrupting** [1] - 38:22
**interruptions** [1] - 94:2
**interview** [2] - 15:22, 16:13
**intuition** [1] - 56:5
**involved** [1] - 5:16
**involving** [1] - 5:24
**irrelevant** [1] - 68:8
**ISO** [3] - 56:14, 56:16, 56:21
**issue** [2] - 29:1, 63:5
**issued** [3] - 88:7, 88:8
**issues** [2] - 56:9, 56:21
**items** [4] - 43:13, 43:22, 88:1, 88:12
**itinerary** [1] - 11:25

**itself** [1] - 56:15

## J

**January** [3] - 33:14, 35:25, 81:21
**Jason** [21] - 7:5, 8:19, 8:23, 9:18, 9:19, 10:23, 13:1, 13:2, 13:6, 13:15, 19:16, 38:17, 45:4, 46:12, 51:25, 57:23, 58:9, 59:19, 71:22, 82:1, 86:21
**job** [26] - 16:13, 20:16, 21:7, 21:9, 21:13, 22:6, 23:8, 23:25, 24:21, 25:11, 25:19, 26:4, 26:9, 26:10, 26:20, 27:2, 27:14, 27:22, 28:3, 28:6, 28:18, 28:19, 34:4, 59:24, 87:15, 90:24
**jobs** [4] - 24:3, 82:17, 87:10, 87:12
**John** [5] - 2:4, 58:8, 58:16
**join** [1] - 40:13
**judge** [1] - 69:14
**judgment** [3] - 54:8, 54:9, 54:17
**July** [5] - 34:18, 34:20, 36:8, 64:16, 95:21
**JUNE** [1] - 1:16
**jury** [1] - 15:5
**justifiable** [3] - 82:18, 83:4, 83:11

## K

**keep** [5] - 21:3, 21:13, 70:23, 75:12, 76:8
**keeping** [5] - 21:8, 31:19, 75:8, 78:9
**keeps** [1] - 80:18
**Kennedy** [1] - 2:4
**kept** [2] - 31:15, 76:12
**key** [1] - 8:14
**kid** [1] - 61:3
**kids** [2] - 60:11, 60:14
**Kimberly** [6] - 19:3, 27:21, 71:22, 84:21, 84:23, 84:24
**kind** [16] - 5:9, 5:24, 6:1, 10:8, 11:21, 45:22, 52:25, 75:19, 75:22, 76:8, 76:10, 76:23, 77:1, 78:3, 78:5, 84:5
**kinds** [1] - 43:1
**kitchen** [1] - 60:14
**knowledge** [2] - 7:14, 57:5
**KRAMER** [38] - 2:3, 14:4, 14:10, 15:1, 29:9, 29:12, 29:15, 30:6, 30:12, 30:19, 30:25, 31:6, 62:24, 63:2,

64:6, 65:1, 65:18, 68:20, 69:5, 69:10, 69:19, 70:20, 70:23, 73:14, 73:18, 74:21, 85:1, 85:14, 85:21, 91:4, 91:14, 91:21, 92:1, 92:11, 92:17, 93:21, 94:3, 94:5
**Kramer** [6] - 3:4, 5:3, 18:9, 74:11, 75:19, 79:16

## L

**labor** [1] - 67:25
**Labor** [2] - 18:19, 84:10
**laboratory** [1] - 56:12
**Lafayette** [1] - 42:9
**landline** [2] - 92:7, 92:8
**language** [1] - 7:11
**laptop** [9] - 63:23, 63:24, 64:3, 64:4, 64:7, 64:8, 66:7, 66:21, 88:8
**last** [7] - 23:20, 23:21, 72:22, 72:24, 85:7, 88:13, 88:16
**LAW** [3] - 1:17, 2:2, 2:8
**law** [10] - 13:16, 14:1, 14:20, 15:19, 17:23, 26:1, 26:13, 67:22, 67:25
**Law** [3] - 17:18, 17:19, 18:6
**lawsuit** [10] - 16:18, 17:11, 17:14, 18:14, 18:18, 18:23, 69:2, 69:15, 73:2, 83:20
**lawyer** [2] - 17:22, 18:1
**lay** [1] - 35:12
**leader** [1] - 28:12
**leading** [1] - 62:16
**lean** [1] - 91:2
**learn** [2] - 24:21, 60:13
**learned** [2] - 28:3, 55:18
**learning** [4] - 57:20, 57:25, 58:13, 59:4
**least** [5] - 19:1, 33:19, 37:13, 39:4, 66:17
**leave** [4] - 9:23, 9:25, 11:10, 12:1
**leaving** [8] - 65:10, 65:16, 89:3, 89:15, 89:20, 90:3, 90:7, 90:25
**left** [10] - 37:21, 58:16, 64:23, 65:25, 83:14, 88:16, 88:25, 92:5, 93:2, 93:3
**less** [3] - 17:7, 17:8, 17:17
**Letter** [2] - 3:11, 35:19
**letter** [1] - 35:21
**level** [1] - 39:1
**Lifting** [5] - 50:11, 50:12, 50:18, 51:8
**lines** [1] - 49:11
**Lisonring** [2] - 58:8, 58:11
**literally** [2] - 86:4, 92:6
**litigation** [1] - 10:2

**live** [1] - 90:21
**lives** [2] - 90:7, 90:9
**living** [1] - 65:4
**LLC** [2] - 1:9, 2:2
**loan** [3] - 40:20, 40:22, 47:11
**local** [1] - 50:6
**locate** [2] - 7:16, 18:14
**located** [1] - 93:16
**location** [3] - 9:3, 27:1, 32:5
**logic** [2] - 9:2, 9:5
**look** [5] - 13:23, 50:25, 67:5, 73:8, 73:11
**looked** [5] - 33:14, 34:22, 38:12, 49:20, 49:25
**looking** [3] - 44:24, 74:1, 74:6
**looks** [23] - 32:7, 34:16, 34:18, 36:2, 36:24, 39:4, 41:15, 41:16, 41:25, 45:1, 45:23, 46:9, 46:22, 46:23, 47:2, 48:12, 49:1, 50:5, 50:20, 51:12, 63:14, 91:4
**loop** [1] - 35:4
**lose** [2] - 30:11, 45:17
**lost** [2] - 65:13, 66:14
**Louisiana** [6] - 32:5, 42:9, 63:17, 83:25, 90:7, 93:11
**lunch** [14] - 20:3, 20:4, 20:8, 20:10, 20:12, 20:23, 21:3, 22:10, 85:22, 85:25, 86:7, 86:10, 86:13, 86:14

## M

**Machine** [1] - 31:15
**machine** [1] - 62:6
**MACHINE** [1] - 1:9
**machines** [1] - 87:20
**mad** [1] - 86:5
**MADE** [1] - 3:21
**magazine** [2] - 49:12, 49:13
**mail** [16] - 11:22, 14:23, 15:10, 15:17, 15:21, 18:2, 18:3, 18:8, 29:10, 32:16, 34:11, 48:20, 48:21, 48:23, 49:25, 50:10, 50:25, 64:16, 64:17, 64:18, 64:20, 65:14, 65:15, 65:25, 66:3, 67:19
**Mailchimp** [4] - 48:13, 48:16, 49:2, 49:5
**mailed** [1] - 15:2
**mails** [8] - 10:8, 11:24, 15:14, 64:8, 66:9, 77:7, 77:16, 77:23
**main** [2] - 87:15, 87:21
**man** [4] - 29:18, 65:11, 67:22, 67:25
**manager** [2] - 46:7, 58:9
**manner** [1] - 64:1

**Maps** [1] - 80:17
**March** [3] - 50:4, 81:10, 82:10
**mark** [8] - 32:18, 35:15, 38:3, 40:4, 41:13, 42:12, 45:16, 47:13
**MARKED** [1] - 3:7
**marked** [12] - 30:23, 35:14, 35:20, 39:6, 40:6, 42:14, 45:18, 47:19, 64:14, 66:1, 83:10, 83:13
**Mary** [7] - 5:13, 14:3, 18:9, 69:9, 74:18, 82:7, 85:13
**MARY** [1] - 2:3
**matter** [2] - 82:2, 84:16
**mean** [28] - 7:1, 9:2, 20:15, 21:22, 24:19, 25:16, 27:5, 28:21, 32:7, 36:7, 51:16, 56:20, 65:8, 67:18, 69:13, 69:14, 71:19, 72:13, 75:17, 76:3, 76:20, 78:16, 80:10, 80:12, 85:3, 86:1, 87:19
**meaning** [1] - 40:25
**means** [5] - 5:23, 5:24, 8:14, 19:18, 26:14, 54:14
**meant** [1] - 55:10
**Megan** [20] - 8:5, 9:9, 12:9, 19:4, 27:21, 53:24, 54:7, 54:20, 55:7, 58:25, 59:1, 59:3, 59:8, 59:19, 63:7, 77:4, 84:20, 84:22, 84:24
**members** [1] - 67:20
**memoranda** [1] - 76:9
**memory** [2] - 35:5, 53:23
**mention** [2] - 66:24, 88:24
**mentioned** [3] - 78:5, 89:21, 90:1
**message** [1] - 11:22
**messages** [1] - 10:9
**messed** [1] - 87:6
**met** [2] - 18:17, 18:22
**mic** [1] - 91:3
**Michigan** [1] - 79:25
**MIDDLE** [1] - 1:2
**mind** [2] - 28:22, 37:20
**minutes** [5] - 73:9, 74:6, 78:20, 78:25, 80:5
**miscategorized** [1] - 67:23
**mischaracterized** [1] - 68:5
**mislabeled** [1] - 67:24
**misremembering** [1] - 86:19
**miss** [1] - 85:8
**Miss** [2] - 5:13, 69:9
**missed** [1] - 35:4
**misunderstood** [2] - 75:3, 76:16
**mkramer@**
**phillyemploymentlaw.**
**com** [1] - 2:5
**mom** [3] - 90:3, 90:7, 90:21

**moment** [1] - 47:12
**Monday** [20] - 7:21, 7:24, 8:9, 8:15, 9:3, 9:4, 9:10, 9:15, 9:23, 9:25, 10:19, 10:22, 12:10, 12:15, 12:23, 13:3, 13:8, 19:6, 19:10, 22:16
**money** [4] - 41:1, 66:12, 67:21, 68:5
**month** [12] - 34:21, 35:1, 46:10, 81:1, 81:2, 81:7, 81:11, 83:14, 88:25
**months** [5] - 44:15, 55:8, 55:20, 81:3, 81:5
**morning** [1] - 19:6
**most** [2] - 86:6, 86:14
**mother** [3] - 89:16, 89:19, 93:5
**motivation** [1] - 15:5
**move** [7] - 19:5, 29:1, 46:23, 47:1, 47:5, 90:10, 93:12
**move-in** [1] - 46:23
**moved** [2] - 40:13, 46:10
**moving** [17] - 19:21, 40:10, 40:12, 41:3, 41:15, 41:17, 42:8, 42:18, 43:20, 44:22, 45:1, 45:5, 47:11, 47:17, 66:20, 88:5, 93:4
**Moving** [1] - 40:15
**multiple** [5] - 16:5, 16:7, 16:23, 16:24, 17:2
**MUNCY** [1] - 1:9, 1:9
**Muncy** [110] - 5:16, 6:8, 13:10, 14:24, 15:10, 15:18, 16:18, 17:15, 18:19, 19:3, 20:5, 20:20, 21:6, 22:14, 22:15, 22:18, 22:22, 22:25, 26:21, 28:18, 29:21, 31:15, 32:5, 33:5, 37:21, 39:4, 39:10, 40:15, 41:23, 43:8, 43:16, 43:21, 44:17, 45:7, 46:14, 47:9, 47:24, 48:3, 48:13, 49:13, 50:16, 51:9, 51:20, 51:25, 52:7, 54:9, 54:18, 56:11, 56:15, 59:18, 63:8, 63:16, 63:20, 63:23, 64:2, 64:23, 65:4, 65:10, 65:16, 65:25, 66:1, 66:3, 66:7, 66:9, 66:11, 67:20, 68:16, 69:3, 69:17, 69:22, 69:25, 70:1, 71:5, 71:14, 71:18, 71:20, 72:1, 72:4, 72:16, 74:9, 75:9, 75:22, 76:10, 76:20, 76:21, 76:24, 77:3, 78:11, 80:6, 81:15, 81:22, 83:7, 83:15, 83:23, 84:3, 84:8, 87:9, 87:15, 87:25, 88:17, 89:1, 89:3, 89:15, 89:20, 90:25, 93:2, 93:3, 93:16
**Muncy's** [1] - 72:9

MUNCY-000076 [1] - 3:13
MUNCY-000079 [1] - 3:11
MUNCY-000131 [1] - 3:9
MUNCY-001117 [1] - 3:17
MUNCY-118 [1] - 3:18
MUNCY-121 [1] - 3:15
Murphy [5] - 17:18, 17:19, 17:21, 18:6, 18:8
MURPHY [1] - 2:2
mutual [1] - 16:19

## N

name [10] - 4:15, 17:19, 18:1, 23:20, 23:21, 58:8, 72:22, 72:23, 72:24, 79:3
named [1] - 23:15
National [1] - 56:24
nature [1] - 73:3
need [13] - 10:1, 10:15, 11:2, 11:6, 14:13, 30:25, 58:4, 68:20, 69:11, 70:20, 83:22, 88:10, 91:17
needed [6] - 6:18, 20:14, 43:4, 46:25, 85:24, 90:3
needs [1] - 68:24
negligent [1] - 76:1
never [10] - 18:22, 28:17, 28:22, 35:3, 61:24, 63:11, 76:2, 76:4, 86:14
new [7] - 13:20, 14:15, 47:25, 48:4, 51:20, 67:15, 93:12
next [4] - 36:23, 38:25, 45:21, 93:2
nine [1] - 81:5
NIST [2] - 56:24, 56:25
NO [1] - 1:8
none [2] - 66:23, 77:18
north [2] - 79:20, 79:25
Notary [3] - 95:3, 95:13, 95:24
NOTARY [1] - 1:15
note [7] - 38:12, 38:13, 38:17, 40:16, 75:8, 75:9, 76:22
notepad [1] - 76:9
notes [5] - 75:12, 76:14, 76:15, 85:8, 95:18
nothing [5] - 5:19, 29:17, 63:25, 65:12, 67:9
notification [1] - 35:2
number [5] - 8:25, 9:1, 47:3, 66:25, 67:1
Number [11] - 35:16, 39:6, 47:15, 66:1, 67:2, 74:15, 76:7, 83:6, 83:11, 83:14, 95:25
numerous [1] - 20:6

## O

o'clock [2] - 13:4, 22:4
oaths [1] - 95:4
object [2] - 15:1, 30:6
objection [1] - 74:16
objections [1] - 4:6
obtain [2] - 47:25, 49:22
occasional [2] - 7:22, 43:3
occasionally [1] - 85:23
occasions [1] - 20:6
occurred [1] - 49:20
OF [7] - 1:2, 1:12, 2:6, 2:11, 3:2, 95:1, 95:2
Offer [2] - 3:11, 35:19
offer [2] - 35:21, 51:24
offering [1] - 40:20
office [7] - 8:2, 11:20, 14:11, 14:13, 63:9, 86:13, 86:15
official [1] - 38:11
older [1] - 33:3
ON [3] - 2:6, 2:11, 3:21
once [64] - 8:25, 12:4, 23:3, 23:6, 24:6, 25:5, 28:18, 30:2, 30:22, 33:3, 33:4, 33:13, 33:19, 34:11, 34:16, 34:18, 34:20, 34:21, 35:15, 36:24, 37:15, 38:7, 38:8, 38:10, 41:13, 45:16, 45:21, 46:19, 48:7, 48:12, 49:24, 51:24, 53:2, 53:21, 55:2, 56:6, 56:19, 56:20, 59:3, 59:8, 59:12, 59:13, 64:24, 65:21, 66:25, 71:15, 72:22, 73:8, 76:20, 79:18, 80:22, 80:25, 81:1, 81:2, 81:18, 83:17, 84:11, 85:7, 86:3, 87:21, 88:12
ones [1] - 33:16
online [2] - 76:2, 76:3
open [1] - 27:15
order [2] - 34:17, 42:1
organization [1] - 57:2
otherwise [2] - 14:13, 68:10
outside [6] - 10:17, 10:22, 13:3, 13:7, 22:16, 66:14
oven [1] - 61:4, 61:6, 61:7
overheated [1] - 91:23
overtime [8] - 22:13, 52:18, 65:13, 72:9, 72:14, 72:16, 72:19
owed [5] - 66:16, 66:19, 68:5, 77:25, 80:12
owes [2] - 66:12, 67:21
own [1] - 80:15

## P

p.m [2] - 9:11, 94:9
PA [4] - 1:19, 1:24, 2:4, 2:9
page [3] - 34:19, 35:11, 49:12
Page [3] - 29:5, 32:10, 50:2
Pages [3] - 3:14, 3:18, 42:14, 47:19
pages [1] - 5:14
PAGES [1] - 3:22
paid [54] - 6:1, 6:18, 7:2, 7:5, 7:6, 7:9, 9:7, 13:9, 13:14, 13:25, 14:19, 20:9, 21:15, 21:17, 21:19, 21:20, 22:2, 22:3, 22:9, 22:13, 22:15, 29:12, 32:13, 32:17, 32:21, 33:25, 40:22, 41:16, 42:18, 43:13, 43:16, 43:21, 44:1, 45:5, 45:6, 45:9, 45:11, 47:18, 52:19, 52:23, 53:8, 53:9, 53:21, 67:10, 67:24, 68:1, 72:14, 75:24, 87:10
pan [1] - 60:18
paragraph [3] - 80:3, 82:20, 82:22
Paragraph [5] - 74:7, 78:17, 79:17, 82:15, 82:24
Paragraphs [1] - 74:4
paralegal [1] - 18:5
parse [1] - 85:7
part [14] - 15:3, 21:24, 27:2, 27:13, 46:17, 47:10, 47:17, 49:25, 54:23, 55:13, 57:2, 62:22, 80:2, 90:5
partaking [1] - 16:19
partial [1] - 40:12
particular [1] - 80:3
parties [1] - 4:4
parts [1] - 55:14
pass [2] - 55:9, 55:20
past [4] - 13:22, 20:2, 21:9, 22:9
pay [16] - 9:1, 35:13, 39:7, 41:1, 41:2, 41:4, 43:14, 43:24, 44:4, 45:15, 46:15, 47:4, 67:2, 75:22, 78:6, 78:22
paying [4] - 43:8, 43:9, 76:1
payment [5] - 40:16, 41:15, 41:23, 46:17, 46:25
payments [1] - 41:14
Penn [1] - 2:3
PENNSYLVANIA [2] - 1:2, 95:2
Pennsylvania [4] - 16:13, 83:25, 93:16, 95:5
people [3] - 13:21, 23:6,

25:10, 26:3, 26:5, 26:6, 26:10, 30:3, 51:7, 54:24, 55:2, 86:13
per [2] - 66:17, 88:3
percent [3] - 9:13, 81:18, 87:19
perform [6] - 24:12, 24:25, 25:6, 36:4, 36:14, 61:12
performed [1] - 82:17
performing [2] - 34:3, 61:21
period [2] - 78:23, 82:19
person [9] - 11:19, 13:24, 14:18, 18:9, 19:24, 27:1, 55:17, 68:12, 86:24
person's [1] - 18:7
personal [2] - 44:7, 44:12
personally [1] - 44:4
perspective [4] - 25:24, 31:16, 42:25, 87:21
Phil [7] - 14:16, 14:18, 15:17, 16:9, 18:4, 18:13, 18:17
Philadelphia [1] - 2:4
Philip [3] - 68:13, 69:16, 69:18
phone [16] - 11:3, 11:19, 21:18, 22:5, 44:1, 44:4, 44:8, 44:11, 44:16, 66:21, 67:7, 87:24, 88:7, 88:23, 91:23
phones [1] - 66:25
phonetic [1] - 92:2
pickup [1] - 79:21
picture [4] - 70:12, 70:19, 71:3, 89:5
piled [1] - 86:10
PLACE [1] - 1:17
place [1] - 93:11
Plaintiff [1] - 78:19
PLAINTIFFS [2] - 1:7, 2:6
Plaintiffs [2] - 82:17, 83:3
plan [1] - 11:4
plans [1] - 12:17
plant [1] - 58:8
plenty [2] - 30:1, 30:4
point [14] - 28:4, 28:7, 28:11, 36:9, 36:18, 48:7, 48:12, 50:16, 50:22, 51:24, 61:7, 84:16, 87:25, 88:19
policy [3] - 67:2, 67:3, 67:6
position [1] - 54:9
positive [1] - 82:18
possession [4] - 46:12, 77:6, 77:8, 77:22
possible [5] - 10:16, 28:21, 47:4, 51:10, 52:9
possibly [2] - 46:15, 66:3
potential [2] - 49:6, 50:3
prepare [1] - 57:8
prepared [1] - 59:9
pretty [10] - 6:20, 23:21,

*RICHARD SZABO*

39:18, 45:8, 45:13, 46:11,
58:15, 76:1, 78:8, 86:2
**previous** [3] - 4:19, 66:3,
79:2
**previously** [2] - 64:14, 66:1
**Pria** [2] - 79:3, 79:8
**pria** [1] - 82:6
**primary** [1] - 4:21
**privacy** [1] - 14:3
**private** [1] - 57:1
**proceeded** [1] - 16:23
**proceedings** [1] - 95:16
**process** [5] - 26:21, 55:25,
57:10, 57:12, 62:23
**produce** [2] - 10:14, 75:12
**PRODUCED** [1] - 3:7
**produced** [2] - 31:13, 76:2
**production** [1] - 74:14
**program** [4] - 22:22, 38:21,
55:13, 66:11
**promissory** [1] - 40:16
**pronounce** [1] - 8:5
**proof** [1] - 10:3
**proper** [1] - 13:20
**properly** [2] - 60:19, 60:24
**prorated** [2] - 46:9, 46:10
**protection** [1] - 84:7
**prove** [1] - 92:2
**provide** [6] - 36:13, 39:10,
46:25, 74:21, 75:2, 77:10
**provided** [3] - 40:12, 74:11,
75:1
**providing** [1] - 67:9
**PUBLIC** [1] - 1:15
**Public** [3] - 95:3, 95:13,
95:24
**pull** [3] - 30:2, 48:8, 48:11
**punched** [1] - 63:16
**purchase** [3] - 39:14, 43:1,
43:18
**purchases** [1] - 43:3
**purchasing** [1] - 39:11
**purpose** [1] - 34:10
**purposes** [1] - 40:3
**pursue** [1] - 17:10
**push** [1] - 20:16
**put** [9] - 11:21, 33:2, 43:5,
49:12, 60:16, 61:3, 61:6,
61:20, 63:3
**putting** [2] - 61:25, 62:20

## Q

**questions** [17] - 22:21, 25:1,
25:3, 25:18, 44:22, 65:22,
73:11, 83:21, 85:12, 85:17,
86:23, 89:9, 91:18, 92:6,
92:16, 93:19, 95:11
**quick** [1] - 73:15

**quickly** [3] - 29:1, 73:12,
92:15
**quiet** [1] - 28:22
**quit** [4] - 58:16, 63:19, 63:22,
64:2
**quite** [1] - 36:22
**quitting** [1] - 66:7
**quote** [7] - 9:19, 51:1, 51:3,
78:23, 82:16, 82:19, 88:6
**quotes** [4] - 50:9, 51:3, 51:7,
51:9

## R

**raise** [6] - 34:2, 34:13, 34:14,
34:22, 35:7
**raises** [2] - 34:8, 34:25
**rate** [2] - 39:7, 78:22
**rather** [1] - 9:3
**rckid1973@gmail.com** [1] -
64:17
**re** [1] - 40:15
**reach** [2] - 51:25, 52:6
**reached** [5] - 16:9, 17:18,
18:2, 18:3, 18:13
**reaching** [2] - 49:22, 52:4
**read** [3] - 45:23, 53:17, 78:17
**reading** [4] - 4:4, 36:14, 50:7,
51:3
**reads** [1] - 82:15
**ready** [3] - 32:23, 92:23
**really** [8] - 22:20, 32:1,
39:11, 44:23, 57:17, 73:12,
92:14, 92:15
**reason** [8] - 37:9, 69:1,
69:15, 86:6, 87:13, 88:19,
90:5, 90:6
**receipt** [5] - 41:25, 42:5,
45:22, 46:8, 47:13
**Receipts** [4] - 3:15, 3:18,
42:14, 47:19
**receive** [2] - 36:2, 87:13
**received** [4] - 83:3, 83:4,
83:10, 88:18
**receiving** [2] - 82:17, 88:1
**Recess** [3] - 31:8, 73:17,
92:21
**recite** [1] - 67:25
**recognize** [8] - 29:7, 35:17,
39:16, 40:16, 42:4, 45:1,
45:24, 48:21
**recollection** [2] - 38:24, 55:8
**record** [12] - 21:14, 31:2,
31:3, 31:14, 32:9, 65:19,
73:25, 74:20, 77:13, 78:13,
91:19, 93:1
**RECORD** [1] - 3:21
**records** [6] - 32:11, 74:16,
75:6, 75:21, 78:3, 80:13

**recruit** [1] - 48:4
**reduced** [1] - 95:14
**refer** [1] - 72:23
**referring** [2] - 32:9, 83:4
**reflect** [1] - 32:9
**regard** [3] - 4:18, 6:7, 82:1
**regarding** [2] - 39:6, 49:21
**regardless** [3] - 6:19, 6:23,
66:24
**registered** [1] - 56:23
**regular** [1] - 78:22
**reimburse** [1] - 43:12
**reimbursement** [2] - 40:10,
47:8
**related** [10] - 29:20, 41:14,
43:5, 43:7, 44:22, 46:17,
65:24, 81:21, 83:22, 89:4
**relation** [1] - 14:23
**relevant** [7] - 15:4, 65:2,
68:21, 68:25, 69:4, 69:18,
70:15
**remember** [19] - 33:10,
33:17, 33:18, 34:24, 34:25,
37:5, 40:18, 45:14, 46:18,
48:16, 49:9, 50:18, 51:17,
72:22, 79:1, 79:7, 79:18,
79:22, 79:24
**removed** [2] - 64:8, 64:9
**rent** [2] - 46:9, 46:10
**repeat** [7] - 22:21, 48:2, 54:4,
68:18, 68:20, 71:15, 88:23
**repeated** [1] - 16:5
**rephrase** [3] - 54:13, 72:10,
88:10
**Report** [5] - 3:9, 29:6, 30:23,
83:6, 83:10
**reporter** [6] - 6:21, 8:7,
12:4, 13:17, 15:25, 23:18,
37:16, 41:7, 54:5, 58:21,
69:7, 89:22, 90:14
**Reporter** [1] - 95:15
**REPORTING** [1] - 1:23
**request** [6] - 14:23, 38:25,
47:8, 67:19, 74:13, 77:13
**REQUEST** [1] - 3:21
**Request** [4] - 74:15, 74:20,
76:7, 78:13
**requested** [4] - 9:18, 39:10,
50:9, 51:2
**require** [2] - 10:24, 11:12
**resend** [1] - 35:4
**reservation** [2] - 42:1, 42:5
**reserved** [1] - 4:7
**respective** [1] - 4:4
**response** [2] - 15:24, 64:5
**responsibilities** [1] - 87:22
**responsible** [1] - 56:20
**restate** [1] - 21:23
**result** [1] - 29:22
**return** [1] - 12:2

**returning** [1] - 66:7
**review** [8] - 5:8, 5:11, 74:23,
82:3, 82:5, 82:15, 82:20,
82:25
**reviewed** [6] - 5:17, 6:5,
47:11, 63:15, 82:10, 82:21
**reviewing** [1] - 46:6
**Reviewing** [2] - 46:22, 83:18
**revisit** [1] - 70:21
**Ric** [11] - 11:2, 14:4, 29:15,
63:2, 64:6, 74:24, 78:19,
85:22, 89:9, 92:23, 93:22
**RIC** [1] - 1:6
**ric@muncyindustries.com**
[1] - 48:24
**RICHARD** [4] - 1:12, 3:3, 4:9,
95:8
**risk** [3] - 62:1, 62:21, 63:5
**road** [2] - 43:9, 87:20
**Roberts** [5] - 52:1, 52:4,
52:6, 52:14, 52:20
**room** [2] - 19:20, 19:21
**routine** [1] - 81:3
**Roy** [1] - 23:22
**rules** [2] - 4:18, 37:15

## S

**salaried** [7] - 6:8, 6:16, 7:9,
21:15, 22:1, 22:8, 52:14
**salaries** [1] - 66:22
**salary** [21] - 6:19, 7:6, 7:7,
28:25, 29:2, 29:8, 30:15,
30:22, 32:14, 36:3, 36:8,
36:12, 36:18, 37:1, 37:20,
38:1, 38:14, 39:6, 43:18
**sales** [1] - 87:22
**satisfaction** [1] - 34:5
**Saturday** [6] - 7:22, 8:20,
8:24, 11:10, 19:5, 79:6
**Savannah** [3] - 42:9, 90:9,
93:4
**save** [1] - 44:14
**saved** [1] - 44:10
**scenario** [1] - 60:19
**schedule** [2] - 63:8, 77:17
**scheduling** [1] - 77:5
**Scion** [1] - 39:20
**SCION** [1] - 39:20
**screen** [10] - 6:6, 28:24, 29:3,
30:14, 38:20, 48:10, 53:6,
70:13, 91:7
**scroll** [2] - 30:21, 33:1
**scrolling** [2] - 32:22, 34:20
**sealing** [1] - 4:5
**second** [7] - 12:4, 38:21,
48:10, 49:24, 50:2, 53:4,
83:17
**see** [14] - 7:15, 17:17, 30:13,

*RICHARD SZABO*

30:16, 32:18, 32:19, 34:19, 34:20, 39:25, 44:24, 49:23, 70:13, 74:19, 80:20

**send** [5] - 14:23, 15:9, 15:13, 15:16, 49:6

**sending** [3] - 49:1, 66:9, 67:18

**sense** [2] - 40:23, 70:2

**sent** [14] - 5:12, 14:24, 35:2, 38:17, 50:1, 50:10, 64:19, 65:15, 65:25, 66:3, 74:2, 74:13, 74:22, 82:14

**separate** [3] - 44:8, 44:9, 44:11

**served** [1] - 40:23

**services** [5] - 50:8, 50:21, 51:2, 51:14, 51:22

**several** [5] - 9:16, 12:16, 12:19, 13:21, 22:24

**SHANDI** [1] - 1:6

**Shandi** [18] - 23:10, 24:7, 25:10, 27:23, 57:12, 57:14, 58:12, 58:17, 58:19, 58:20, 58:24, 59:4, 61:19, 62:19, 72:21, 79:4, 79:23

**shape** [1] - 59:25

**Share** [5] - 28:24, 29:2, 30:14, 53:6, 70:13

**sharing** [1] - 6:6

**Sharing** [1] - 48:10

**sheets** [1] - 78:3

**shift** [1] - 47:23

**short** [2] - 73:7, 73:13

**shortly** [2] - 65:9, 65:15

**show** [12] - 10:12, 10:13, 32:19, 33:2, 34:2, 35:11, 38:9, 39:15, 41:12, 48:18, 64:14, 70:12

**showed** [2] - 38:5, 39:5

**showing** [4] - 31:12, 35:14, 40:14, 60:15

**shows** [1] - 75:23

**shrug** [1] - 4:22

**sic** [1] - 72:1

**sick** [1] - 89:16

**side** [2] - 32:2, 32:3

**sides** [1] - 32:2

**sign** [1] - 39:19

**signature** [6] - 29:23, 30:2, 30:9, 39:23, 40:1, 47:2

**Signed** [1] - 95:23

**signing** [2] - 4:5, 87:22

**simple** [3] - 29:25, 65:8, 66:13

**simply** [1] - 87:8

**single** [1] - 80:22

**sister** [1] - 81:24

**site** [8] - 20:22, 24:9, 26:24, 27:22, 28:7, 28:18, 28:19, 71:23

**sites** [1] - 24:4

**situation** [3] - 7:22, 20:18, 66:24

**six** [2] - 55:8, 55:20

**slate** [1] - 41:10

**solicit** [2] - 49:16, 51:13

**solicitations** [1] - 49:6

**someone** [14] - 24:20, 26:3, 26:8, 26:9, 26:14, 26:20, 33:4, 38:13, 56:18, 63:3, 68:10, 68:23, 70:8

**sometimes** [13] - 8:4, 11:8, 11:24, 12:5, 20:2, 20:14, 27:16, 52:21, 52:22, 53:7, 53:12, 74:5, 75:11

**somewhere** [4] - 17:9, 79:21, 79:25

**soon** [1] - 10:16

**sorry** [19] - 6:25, 16:4, 21:24, 23:9, 29:16, 32:25, 41:21, 48:2, 56:19, 64:1, 70:14, 75:16, 76:15, 77:20, 89:25, 90:16, 93:7, 94:1

**sort** [1] - 18:6

**sound** [4] - 41:17, 54:8, 54:17, 56:15

**sounds** [2] - 26:12, 47:6

**specific** [2] - 18:7, 51:18

**specifically** [2] - 43:6, 49:10

**speech** [1] - 92:2

**spell** [1] - 23:22

**spelling** [1] - 8:6

**split** [1] - 80:1

**ss** [2] - 95:1, 95:23

**staff** [1] - 67:20

**stamp** [4] - 46:20, 47:15, 50:2

**Stamped** [2] - 29:5, 48:19

**stamped** [2] - 32:10, 45:22

**Standards** [3] - 18:19, 56:24, 84:10

**Stapp** [6] - 3:4, 4:16, 74:20, 75:2, 77:13, 78:13

**STAPP** [67] - 1:17, 2:8, 2:8, 3:22, 4:14, 6:22, 13:18, 14:8, 14:17, 15:4, 15:7, 16:1, 23:19, 29:19, 30:7, 30:11, 30:13, 30:21, 31:4, 31:9, 35:23, 38:23, 40:8, 41:8, 42:16, 45:20, 47:22, 53:20, 54:6, 63:6, 64:11, 65:6, 65:7, 65:21, 65:23, 68:25, 69:6, 69:13, 69:20, 71:1, 71:4, 73:6, 73:15, 73:22, 74:13, 75:4, 77:14, 78:15, 85:3, 85:6, 85:11, 85:16, 89:13, 89:23, 90:15, 91:5, 91:8, 91:11, 91:16, 91:25, 92:4, 92:13, 92:22, 93:23, 93:25, 94:4, 94:6

**start** [3] - 5:1, 27:16, 51:6

**started** [4] - 8:1, 18:8, 61:19, 81:12

**starting** [1] - 36:25

**starts** [1] - 61:3

**state** [8] - 21:14, 50:6, 56:10, 64:15, 65:11, 70:15, 83:24, 84:3

**Statement** [2] - 3:16, 45:18

**statement** [14] - 8:10, 9:12, 18:15, 18:16, 27:24, 34:1, 49:3, 50:22, 51:3, 54:3, 54:11, 79:11, 82:24, 83:2

**STATES** [1] - 1:1

**stay** [2] - 71:22, 93:10

**stayed** [2] - 22:4, 40:25

**stenographer** [1] - 53:17

**stenographically** [1] - 95:12

**step** [1] - 63:1

**stepped** [3] - 62:21, 68:10, 68:12

**stick** [1] - 8:3

**stickler** [1] - 86:3

**still** [7] - 22:6, 30:12, 53:14, 66:11, 67:20, 91:5, 91:12

**stipulated** [1] - 4:3

**STIPULATION** [1] - 4:1

**stood** [2] - 59:23, 59:24

**stop** [3] - 48:10, 62:15, 62:21

**straight** [1] - 90:1

**STREET** [2] - 1:18, 1:24

**Street** [1] - 2:9

**structure** [1] - 32:14

**structures** [1] - 33:19

**stub** [1] - 76:3

**stubs** [2] - 75:22, 78:6

**stuff** [9] - 27:15, 28:25, 30:15, 30:22, 66:23, 76:4, 78:9, 78:10, 81:24

**submitted** [2] - 41:23, 45:4

**subscribed** [2] - 49:14, 95:21

**successfully** [1] - 36:4

**sue** [1] - 15:17

**suggest** [1] - 61:8

**suggested** [2] - 48:7, 48:13

**SUITE** [1] - 1:18

**Suite** [1] - 2:3

**Sunday** [12] - 8:20, 8:24, 9:24, 9:25, 10:1, 11:10, 19:5, 52:25, 53:13, 79:6, 79:7

**supervise** [6] - 24:8, 24:11, 27:22, 28:6, 57:14, 58:11

**supervises** [1] - 26:14

**supervising** [10] - 57:9, 57:19, 58:5, 58:19, 58:24, 59:3, 59:13, 60:20, 62:9, 63:4

**supervision** [8] - 25:17, 25:20, 25:25, 57:25, 60:6, 60:8, 61:14, 62:11

**supervisor** [13] - 10:23, 25:22, 26:4, 26:7, 26:22, 57:11, 58:7, 58:9, 59:25, 61:2, 62:16, 62:18, 63:5

**supervisory** [3] - 26:5, 59:21, 61:17

**sworn** [2] - 4:10, 95:10

**SZABO** [5] - 1:6, 1:12, 3:3, 4:9, 95:8

**Szabo** [22] - 4:15, 5:21, 22:20, 29:12, 30:8, 31:10, 35:18, 51:19, 53:4, 63:19, 64:15, 64:19, 66:1, 73:23, 78:19, 83:19, 85:12, 89:15, 91:3, 91:6, 91:11, 93:19

**Szabo's** [1] - 91:7

**T**

**tackled** [1] - 27:5

**tackling** [1] - 27:16

**TAKEN** [1] - 1:13

**talks** [1] - 76:7

**task** [4] - 25:7, 60:3, 61:12, 61:21

**tasks** [2] - 57:20, 57:25

**taught** [3] - 22:24, 23:10, 86:21

**tax** [3] - 78:6, 78:9, 78:10

**teach** [7] - 23:7, 23:11, 23:15, 25:14, 26:10, 60:10, 87:1

**teacher** [1] - 60:24

**teaching** [9] - 26:9, 59:8, 60:2, 60:15, 60:21, 60:23, 61:15, 87:3, 87:8

**team** [3] - 5:12, 24:14, 28:12

**teammates** [1] - 28:4

**technician** [6] - 20:19, 28:13, 54:10, 54:18, 61:20, 87:16

**technicians** [5] - 28:13, 72:3, 72:8, 72:16, 72:20

**technique** [1] - 24:24

**techniques** [2] - 23:11, 23:16

**ten** [5] - 17:7, 17:8, 17:9, 73:9

**test** [14] - 20:23, 21:5, 50:24, 55:12, 55:14, 55:25, 56:4, 57:9, 57:16, 57:21, 58:1, 58:13, 59:5, 59:10

**testified** [8] - 4:10, 9:9, 20:1, 53:24, 54:7, 55:7, 69:1, 83:19

**TESTIMONY** [1] - 3:2

**testimony** [11] - 12:8, 12:12, 20:7, 27:20, 28:15, 28:17,

*RICHARD SZABO*

**10**

39:3, 63:10, 69:6, 95:7, 95:20
**Testing** [1] - 56:25
**text** [2] - 10:9, 11:22
**THE** [13] - 1:1, 2:11, 14:2, 14:7, 14:14, 29:16, 38:19, 69:9, 69:12, 70:22, 74:25, 93:24, 94:1
**theft** [2] - 5:25
**theirs** [2] - 44:12, 44:14
**thinking** [2] - 52:2, 88:23
**three** [5] - 23:2, 55:8, 55:19, 55:21, 67:2
**Throughout** [1] - 82:16
**throughout** [2] - 11:4, 52:3
**ticket** [1] - 43:4
**Timeline** [3] - 80:16, 81:1, 81:14
**timeline** [1] - 80:18
**tires** [1] - 43:5
**titled** [1] - 40:15
**today** [12] - 6:5, 28:17, 37:16, 38:6, 40:4, 43:17, 66:6, 69:1, 80:4, 80:11, 83:5, 83:20
**today's** [2] - 5:5, 5:9
**together** [3] - 35:7, 47:14, 79:24
**tonight** [2] - 60:10, 60:12
**took** [8] - 55:8, 55:16, 79:5, 79:18, 80:21, 81:20, 86:14, 90:23
**Tool** [1] - 31:15
**TOOL** [1] - 1:10
**top** [3] - 29:4, 30:16, 30:21
**total** [3] - 7:7, 23:1, 37:1
**totally** [1] - 91:8
**touch** [1] - 61:7
**towards** [2] - 19:19, 19:20
**town** [2] - 93:13, 93:14
**Toyota** [1] - 39:20
**track** [1] - 45:17
**train** [1] - 26:8
**trained** [3] - 28:5, 28:16, 55:17
**trainer** [2] - 25:21, 26:2
**training** [12] - 24:20, 26:8, 27:25, 28:1, 55:9, 55:20, 57:7, 57:10, 57:11, 57:15, 62:22, 63:5
**trains** [1] - 26:3
**transcript** [1] - 95:19
**travel** [33] - 5:13, 8:4, 8:9, 8:12, 8:15, 8:20, 8:24, 9:4, 9:7, 9:10, 9:15, 10:10, 11:2, 11:13, 12:1, 12:9, 12:15, 12:23, 13:3, 19:4, 19:9, 19:10, 22:15, 42:22, 43:20, 52:19, 53:7, 53:13, 53:21, 53:25, 72:1, 72:4

**traveled** [8] - 8:2, 22:15, 54:1, 67:5, 67:7, 72:19, 79:10, 86:15
**traveling** [3] - 13:7, 42:19, 81:12
**trial** [3] - 4:7, 84:16, 95:6
**tried** [8] - 19:7, 23:10, 47:25, 48:4, 48:13, 53:9, 63:7, 91:22
**trip** [9] - 11:5, 12:3, 79:5, 79:18, 79:19, 81:19, 81:23
**trips** [4] - 19:20, 80:23, 81:2, 81:23
**truck** [1] - 79:21
**true** [7] - 10:20, 33:23, 36:10, 42:4, 59:7, 59:11, 79:11
**try** [14] - 6:5, 8:3, 8:5, 19:2, 22:20, 26:11, 28:23, 29:2, 30:17, 48:8, 49:16, 49:22, 52:7, 67:16
**trying** [7] - 25:11, 29:24, 32:1, 44:20, 50:15, 70:18, 77:24
**turn** [1] - 45:25
**turned** [5] - 45:25, 63:23, 64:3, 64:4, 64:7
**twist** [1] - 26:17
**two** [19] - 9:1, 17:3, 23:4, 23:14, 34:25, 38:5, 40:25, 41:13, 50:10, 55:14, 56:15, 56:16, 64:25, 65:21, 67:1, 73:8, 83:14, 92:6, 92:15
**Two** [2] - 42:14, 47:19
**type** [7] - 7:22, 26:22, 31:14, 73:1, 83:23, 84:2, 84:3
**typewriting** [1] - 95:14
**Typewritten** [1] - 35:19
**typing** [1] - 11:25

**U**

**U-Haul** [6] - 3:14, 41:15, 41:16, 41:18, 42:1, 42:14
**Undated** [2] - 3:10, 35:19
**under** [3] - 57:22, 59:1, 95:14
**understood** [2] - 22:11, 52:10
**unintelligible** [3] - 52:24, 52:25, 90:13
**UNITED** [1] - 1:1
**unless** [2] - 14:4, 14:10
**unpaid** [1] - 13:12
**up** [38] - 10:12, 11:3, 12:2, 16:12, 20:14, 23:4, 27:15, 30:3, 30:15, 48:9, 48:11, 49:23, 53:1, 53:5, 53:10, 53:13, 53:15, 55:16, 68:10, 68:12, 70:25, 72:6, 78:25, 79:9, 79:20, 79:25, 81:4,

85:15, 86:11, 87:6, 87:22, 88:25, 90:1, 90:17, 91:9, 91:15, 93:4, 93:7
**upcoming** [1] - 11:5
**ups** [1] - 89:14

**V**

**vacation** [1] - 81:24
**vary** [1] - 8:3
**Vehicle** [3] - 3:13, 39:16, 40:6
**vehicle** [3] - 39:11, 39:12, 43:19
**verbal** [4] - 4:22, 10:5, 10:6, 11:17
**verbally** [5] - 11:19, 12:20, 50:9, 51:2, 82:6
**verify** [1] - 29:23
**versus** [1] - 34:8
**VIA** [1] - 2:3
**via** [3] - 4:23, 18:2, 18:3
**video** [1] - 91:17
**violation** [3] - 14:1, 14:20, 15:18
**voicemail** [1] - 91:22
**VS** [1] - 1:8

**W**

**W-2s** [1] - 78:5
**wage** [3] - 74:15, 75:6, 75:21
**wages** [6] - 29:22, 65:13, 66:14, 73:2, 77:25, 83:25
**wait** [4] - 37:14, 46:8, 88:22, 92:11
**waived** [1] - 4:6
**wants** [1] - 63:3
**Warning** [5] - 3:9, 29:6, 30:23, 83:6, 83:10
**watched** [1] - 59:23
**watching** [4] - 60:3, 61:12, 61:22, 62:9
**ways** [1] - 80:1
**week** [18] - 6:19, 7:3, 7:8, 7:9, 7:12, 7:20, 8:12, 11:4, 11:10, 63:9, 64:25, 74:6, 74:8, 80:3, 80:5, 80:9, 88:3, 88:13
**weekend** [4] - 9:8, 10:10, 19:5, 72:19
**weekends** [6] - 9:6, 11:13, 12:17, 19:11, 72:2, 72:5
**weekly** [2] - 6:12, 6:13
**weeks** [2] - 55:23, 90:24
**weigh** [1] - 69:14
**weight** [2] - 62:2, 62:6
**Welcome** [1] - 47:14

**WEST** [1] - 1:18
**West** [1] - 2:9
**whatsoever** [1] - 15:12
**whereas** [1] - 64:7
**whereof** [1] - 95:20
**whole** [4] - 9:7, 34:10, 63:5, 81:14
**William** [13] - 23:17, 24:8, 25:10, 26:25, 27:23, 55:5, 57:12, 57:15, 58:12, 58:15, 67:14, 72:21, 79:23
**Williamsport** [1] - 2:9
**WILLIAMSPORT** [1] - 1:19
**wiped** [1] - 41:10
**wish** [1] - 33:12
**witness** [2] - 4:9, 95:10
**WITNESS** [11] - 14:2, 14:7, 14:14, 29:16, 38:19, 69:9, 69:12, 70:22, 74:25, 93:24, 94:1
**witnesses** [1] - 84:15
**wonder** [1] - 92:8
**word** [1] - 8:14
**works** [4] - 18:4, 18:12, 18:13, 26:2
**worry** [1] - 86:25
**write** [1] - 88:25
**write-up** [1] - 88:25
**writing** [1] - 50:5
**written** [9] - 11:22, 55:12, 55:15, 57:16, 57:21, 58:1, 58:13, 59:5, 59:10
**wrote** [2] - 38:13, 50:1

**Y**

**yadda** [2] - 56:13
**year** [6] - 66:17, 80:11, 81:4, 81:7, 81:9, 81:25
**years** [3] - 41:1, 78:11, 80:19
**yelled** [1] - 86:6
**yourself** [5] - 63:3, 72:2, 77:2, 77:16, 83:4

**Z**

**zero** [2] - 59:21, 65:13
**Zoom** [7] - 4:23, 8:25, 52:24, 52:25, 53:13, 90:12, 91:7
**ZOOM** [2] - 1:12, 2:3