# EXHIBIT J

1    IN THE UNITED STATES DISTRICT COURT FOR THE

2        MIDDLE DISTRICT OF PENNSYLVANIA

3   RIC SZABO,                    :

        Plaintiff            :

4                                 :   Civil Action No.:

        vs.              :   21-cv-00468

5                                 :

    MUNCY INDUSTRIES, LLC   :

6   D/B/A MUNCY MACHINE &   :

    TOOL CO., INC.,         :

7        Defendant         :

8                   - - -

9            Wednesday, June 15, 2022

10                  - - -

11           Remote oral deposition of KIMBERLY

12   LEXLAURA BUNTING, via Zoom videoconference,

13   conducted at the location of the witness in

14   Jersey Shore, Pennsylvania, taken on the above

15   date, beginning at approximately 3:25 p.m.,

16   before Jessica M. Gericke, RPR, CCR-NJ, and

17   Notary Public in and for Delaware, New Jersey,

18   and Pennsylvania.

19

20

21

22

23

24

Kimberly Lex laura Bunting

```
 1    APPEARANCES VIA ZOOM VIDEO CONFERENCE:
 2       MURPHY LAW GROUP, LLC
         BY:  MARY KRAMER, ESQUIRE
 3       1628 John F. Kennedy Boulevard
         Eight Penn Center, Suite 2000
 4       Philadelphia, PA  19103
         267-273-1054
 5       mkramer@phillyemploymentlawyer.com
 6       Counsel for Plaintiff
 7

         STAPP LAW, LLC
 8       BY:  GREGORY A. STAPP, ESQUIRE
         153 West Fourth Street
 9       Suite 6
         Williamsport, PA  17701
10       570-326-1077
         gstapp@stapplaw.net
11

         Counsel for Defendant
12
13                       - - -
14
15
16
17
18
19
20
21
22
23
24
```

Kimberly Lexlaura Bunting

```
 1                  I N D E X

 2    WITNESS NAME                          PAGE

 3       Kimberly Lexlaura Bunting

 4             By Ms. Kramer                4, 35

 5             By Mr. Stapp                 28

 6                    - - -

 7


 8                 E X H I B I T S

 9    NO.          DESCRIPTION              PAGE

10            (No exhibits were marked.)

11                    - - -

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Kimberly Lexlaura Bunting

1                         - - -

2                    THE COURT REPORTER:  All

3        parties to this deposition are appearing

4        remotely and have agreed to the witness

5        being sworn in remotely.  Due to the

6        nature of remote reporting, please pause

7        briefly before speaking to ensure all

8        parties are heard completely.

9                    Counsel, please state your

10       appearance.

11                   MS. KRAMER:  Mary Kramer for

12       the plaintiff, Ric Szabo.

13                   MR. STAPP:  Greg A. Stapp for

14       Muncy Industries.

15                         - - -

16                   KIMBERLY LEXLAURA BUNTING,

17       after having been first duly sworn, was

18       examined and testified as follows:

19  BY MS. KRAMER:

20     Q.    Good afternoon, Miss Bunting.  My

21  name is Mary Kramer and I am one of the

22  attorneys representing Ric Szabo in the matter

23  he has brought against Muncy Industries.

24                   The reason I have asked you

Kimberly LexLaura Bunting

1   here today is just to ask you about what facts

2   you have personal knowledge of and after I am

3   finished, Attorney Stapp may have some

4   follow-up questions and we'll be done here.

5   Okay?

6        A.    Okay.

7        Q.    I would like to go over just a few

8   instructions with you.

9              Have you ever had your

10  deposition taken before?

11       A.    No.  This is my first time.

12       Q.    So with that in mind, I am going to

13  ask you to allow me to finish asking my

14  question before answering and, likewise, I

15  will do my best to allow you to finish

16  answering before I ask you my next question.

17  Okay?

18       A.    Okay.

19       Q.    I will also ask that you keep your

20  responses verbal instead of nodding or shaking

21  your head or saying uh-huh or unh-unh.

22  Because, otherwise, the court reporter will

23  have a difficult time getting everything down.

24  Okay?

1       A.      Okay.

2       Q.      Thank you.  Are you represented by

3  an attorney today?

4       A.      No, I am not.

5       Q.      So if Attorney Stapp has an

6  objection, I will just ask that you allow us

7  to resolve the objection, and then go ahead

8  and answer the question.

9               Finally, if at any time you

10 need a break -- I don't think this will take

11 too long -- just let me know, and I will be

12 happy to take a break.  I would just ask that

13 you finish the question before we pause.

14 Okay?

15      A.      Okay.

16      Q.      With that out of the way, could you

17 state your name for the record?

18      A.      Yes.  My name is Kimberly Lexlaura

19 Bunting.

20      Q.      And what is your current mailing

21 address?

22      A.      400 Baer Street, Jersey Shore,

23 Pennsylvania 17740.

24      Q.      And (inaudible)?

1    A.    Can you restate that?

2    Q.    Is there anybody in the room with

3   you right now?

4    A.    No, ma'am, there is not.

5    Q.    Do you have any notes with you?

6    A.    No, ma'am, I do not.

7    Q.    Okay.  How did you prepare for

8   today's deposition?

9    A.    I looked online to see if I can see

10  kind of what was going on and anything that I

11  could see for public record.  Other than that,

12  I haven't really done anything.  This is my

13  first deposition.  So I haven't -- I don't

14  really know how to prepare.

15   Q.    That's totally understandable.

16         When you did your online

17  search, were you able to find anything?

18   A.    Yes, I was.

19   Q.    Would you mind just telling us what

20  you reviewed online?

21   A.    Yes.  It wasn't anything that was

22  for Ric Szabo versus Muncy Industries.  It was

23  for Shandi -- I can't recall her last name --

24  and Ric, it looks like on a prior suit that

1    had taken place, nothing that was giving me

2    any knowledge into this particular suit in

3    question.

4        Q.    So it was Shandi and Ric on the same

5    caption at the top?

6        A.    Yes.

7        Q.    Okay.  Did you see a complaint?

8        A.    It was kind of hard to follow along.

9    They were just advising that it was some

10   employee discrimination suit that was against

11   Muncy Industries.

12       Q.    Okay.  And I will just put on the

13   record that I believe that you were looking at

14   this case.  It used to have both of them.  Now

15   it's just Ric, but that works.

16             Did you speak to anyone today

17   about -- or with anyone about today's

18   deposition?

19       A.    No, I have not.

20       Q.    I don't mean offense by this.

21             Are you currently taking any

22   drugs or medication that would interfere with

23   your ability to understand my questions or to

24   tell the truth?

```
1        A.     No, ma'am.

2        Q.     When (inaudible) against Muncy?

3        A.     Can you restate the question?

4        Q.     When did you learn about Mr. Szabo's

5   claims against Muncy?

6        A.     That I saw online?  Is that what you

7   mean?

8        Q.     Were you aware of the -- when you

9   worked for Muncy, were you aware that he had

10  filed a lawsuit?

11       A.     I was not employed with Muncy at the

12  time that I became -- it was brought to my

13  attention that he had.

14       Q.     Okay.  Have you ever pleaded guilty

15  or no contest to or been convicted of a felony

16  or a misdemeanor?

17       A.     No, ma'am, I have not.

18       Q.     Have you ever been arrested or

19  charged for a crime, regardless of whether or

20  not you were convicted?

21       A.     No, ma'am, I have not.

22       Q.     What is your highest level of

23  education?

24       A.     Master's degree.
```

1    Q.    Okay.  And in what?

2    A.    I have an MBA in business

3  administration.

4    Q.    When did you get that degree?

5    A.    I graduated December 2017.

6    Q.    Okay.  From where?

7    A.    Texas A&M University-Commerce.

8    Q.    What was your first job after

9  graduating college -- getting your master's?

10  I am sorry.

11    A.    I was actually currently employed at

12  Muncy Industries when I had graduated with my

13  MBA.

14    Q.    So then when did you officially

15  start working for Muncy?

16    A.    In 2014.

17    Q.    2014?  Who hired you?

18    A.    I apologize.  I am sorry.  I got

19  hired at Muncy in 2017.  I graduated

20  December 2017.  My apologies.

21    Q.    So it was 2017 you were hired, not

22  2014?

23    A.    Correct.  I apologize.  I misspoke.

24    Q.    That's totally okay.  Who hired you

1    in 2017?

2        A.    Ophelia Fetter.

3        Q.    Okay.  Who is she to the company?

4        A.    She is the president and owner of

5    Muncy Industries.

6        Q.    Okay.  What was your position at the

7    time of your hiring?

8        A.    Inside sales representative.

9        Q.    What were your job duties in this

10   position?

11       A.    As an inside sales representative,

12   it was my responsibility to report into the

13   office and answer incoming phone calls, in

14   addition to placing outgoing phone calls in

15   regards to quoting activity for our customers,

16   work on special projects deemed from our vice

17   president of sales and order entry; and

18   working with our cross-functional teams to

19   ensure successful order entry, as well as

20   shipping of orders.

21       Q.    Okay.  Did you have the authority to

22   hire and fire any employees?

23       A.    No, I did not.

24       Q.    Were you involved in decisions to

1    hire and fire employees?

2         A.    Not that I recall.

3         Q.    Okay.  And were you an inside sales,

4    you said, representative?

5         A.    Yes.

6         Q.    From January 8, 2018, until you

7    left?

8         A.    No.  I was promoted to an inside

9    sales manager.

10        Q.    Okay.  What were your job duties in

11   your position as inside sales manager?

12        A.    I had two representatives that would

13   be my direct reports and I was to oversee the

14   sales department; that included quoting and

15   order entry, as well as customer escalations

16   that would take place, and also bring any

17   issues to the attention of the vice president

18   of sales.

19        Q.    When did you get that promotion?

20        A.    I do not recall a specific date.

21        Q.    And who was the vice president of

22   sales during that period?

23        A.    Jason Fetter.

24        Q.    Okay.  Once you were an inside sales

Kimberly DeKlaura Dunemig

1    manager, did you have authority to hire and

2    fire anyone?

3        A.    No, I did not.

4        Q.    Okay.  What was your work schedule

5    in this position?

6        A.    You mean my hours and the days of

7    the week that I worked?

8        Q.    Yes.

9        A.    It was Monday through Friday, 8:00

10   to 4:30.

11       Q.    8:00 to 4:30.  And was this every

12   day?  Did it change?

13       A.    That was what my hours were.  I did

14   often work after hours, but that was the hours

15   that -- the shift that I was required to work

16   every day.

17       Q.    Were you paid hourly or were you a

18   salary employee?

19       A.    I was a salary employee.

20       Q.    What was your salary?

21       A.    I do not recall a specific number.

22       Q.    So you worked overtime sometimes.

23             Was that your decision or were

24   you asked to?

1      A.    I do not recall.

2      Q.    Okay.  Were you paid when you worked

3    overtime?

4      A.    As a salary employee, no, I wasn't

5    compensated for my overtime time.

6      Q.    Okay.  And you said you reported to

7    Mr. Fetter?

8      A.    Yes, I did.

9      Q.    What was your relationship with

10    Mr. Fetter?

11      A.    How do you mean?

12      Q.    Did you have a good relationship?

13    Was it just strictly professional?  Did you

14    like him?

15      A.    It was strictly just professional

16    relationship.  It was a working one.  There

17    would be times where, obviously, because he

18    was traveling a majority of the time, I would

19    say about 90 percent, if not more was based on

20    the phone.

21          So phone calls that either

22    myself or the sales staff would place into him

23    to seek approval on a variety of different

24    topics, but it was a professional

1    relationship.

2         Q.    Okay.  Did you ever have to travel

3    for work?

4         A.    Yes, I did.

5         Q.    And when you traveled, was it after

6    4:30 or before 8:00?

7         A.    Yes.

8         Q.    Were you paid for that travel --

9         A.    As a salary --

10        Q.    -- time?

11        A.    As a salary employee, I took that as

12   my duties.

13        Q.    Okay.  And you are no longer with

14   Muncy, correct?

15        A.    That is correct.

16        Q.    Did you resign or were you

17   terminated?

18        A.    I resigned.

19        Q.    Why did you leave?

20        A.    I got another position with higher

21   wages and higher responsibility.

22        Q.    Okay.  So you're currently working

23   there now?

24        A.    No.  I am actually not working at

1    that place any longer.

2        Q.    Okay.  Are you currently working

3    right now?

4        A.    No, I am not actually.  I am not.

5        Q.    (Inaudible)?

6        A.    Can you restate that?

7        Q.    Are you familiar with Ric Szabo?

8        A.    Yes, I am familiar with him.

9        Q.    Did you work with him?

10       A.    I did.

11       Q.    How (inaudible)?

12       A.    How often?

13       Q.    Yes.

14       A.    Once he was hired onto Muncy and was

15   traveling for the calibration team, Ric and I

16   had to work closely together in regards to

17   scheduling calibration trips, as well as I was

18   to -- what we call a cert check.  I was to

19   double-check his certification work that he

20   would be doing on site.

21               And, also, if he had any issues

22   when he was out in the field that required

23   troubleshooting or to kind of discuss what the

24   issue was, I was his first contact.

1    Q.    Okay.  Did you at any point give him

2    assignments or was that not part of

3    scheduling?

4    A.    So my responsibility was to provide

5    him with a calibration schedule, which would

6    be a list of -- like, an itinerary, for lack a

7    of better word, of just communicating which

8    days he was to travel, what cities, and he

9    also had calibration equipment.

10            I would be advising whether

11   that calibration equipment would be arriving

12   on site or where that would be stored so he

13   understood where the equipment was for the

14   job.

15    Q.    If I am understanding correctly, it

16   was your decision where Ric or the other

17   calibration techs would be traveling, you

18   picked those assignments, or did you just --

19   sorry -- did you just send the itinerary out?

20    A.    I just sent the itinerary out.  The

21   decisions as to where Ric Szabo would go and

22   the duration in which he would be there is

23   something that would have approval from the

24   vice president of sales.

Kimberly Lexlaura Dunning

1    Q.    Okay.  So the calibration

2  technicians had no authority to choose where

3  they would go?  They got that assigned to them

4  by Mr. Fetter?

5    A.    So there would be an instance, we

6  would have a group of customers.  We would try

7  to consolidate them into a certain area.

8              Once we knew that those

9  customers needed to be calibrated, Jason and

10  myself would be talking about what would be

11  the correct manner in which travel should go,

12  what would be the most cost effective way to

13  go.

14              And then it was my -- once

15  Jason had provided his approval to me that

16  that trip -- that, you know, location A, B,

17  and C; and the order in which that was

18  supposed to be done; and the manner in which

19  the equipment was supposed to move -- it was

20  my responsibility to get with Ric to

21  communicate that plan that's been approved by

22  Jason.

23              And the manner in which I did

24  that was either phone call or I would send an

1  e-mail advising kind of calibrations week of.

2  And it was Ric's responsibility to go and book

3  his flights and hotel.  I did not have a

4  company card.  So Ric had to go ahead and make

5  his own travel arrangements.

6       Q.    You said when they would go.

7              Does that mean when in the day

8  or just when in the week, from site to site?

9       A.    When in the week.  So more like days

10  of the week.  Let's say, Monday he would

11  travel this day; Tuesday, Wednesday, Thursday.

12  I organized it based on when he was to fly out

13  and I would keep it just on the day as to when

14  he was to fly back in.

15       Q.    Okay.  On a typical day, when would

16  the traveling, if you know, from job site to

17  job site take place?

18       A.    Usually, from my understanding, it

19  would be from Monday trying to fly out to

20  whatever direction and then fly back in by

21  Friday.  There were times where it did not

22  require week travel and it would be two days,

23  three days.  Sometimes it did not take a full

24  week.

1              Sometimes there were times that

2    he -- that Ric could go ahead and drive to

3    those locations and did not require a flight,

4    but the majority of the time it would be

5    focused on Monday to fly out if it required a

6    week trip and fly back in on Friday.

7        Q.    Okay.  Are you familiar with how

8    long a calibration typically takes?

9        A.    I do not recall.

10       Q.    Okay.  Do you know how much time a

11   calibration technician would spend driving

12   from job site to job site?

13       A.    I do not recall.

14       Q.    As far as you know, was Mr. Szabo

15   ever involved in the hiring or firing of

16   employees?

17       A.    I don't recall.

18       Q.    Do you know if he was involved in

19   making decisions about hiring and firing

20   employees?

21       A.    I do not recall.

22       Q.    As far as you know, did Mr. Szabo

23   supervise any other Muncy employees and direct

24   their work?

1    A.    I don't recall.

2    Q.    As far as you know, did Mr. Szabo,

3 in his position as a calibration technician,

4 have authority to make independent choices

5 free from immediate direction or supervision?

6    A.    If it involved -- when Ric was on a

7 calibration site, he had the designation, from

8 my understanding, that if there was something

9 technically that could be troubleshooted on

10 site as a calibration technician, that Ric

11 would go ahead and troubleshoot in those

12 technical aspects.

13        However, if it did involve

14 customer involvement, if it involved cost, if

15 it involved staying an extra night or if there

16 was a greater level of impact, he was required

17 to communicate that to myself and/or Jason

18 Fetter.

19    Q.    Okay.  And then did you or

20 Mr. Fetter approve it or did someone else have

21 that work?

22    A.    So mostly Ric would communicate with

23 me.  Because Muncy did not have a after-hours

24 troubleshooting staff.  So I would be the

1    first contact that he would have.

2              I would go ahead and evaluate

3    what concern that Ric had.  If there was a

4    customer impact, cost impact or anything that

5    I would consider to be a high impact, then I

6    would communicate with Jason myself or I would

7    communicate to Ric to contact Jason directly

8    to explain the situation to get the designated

9    approval.

10   Q.    Okay.  You say they didn't have an

11   after-hours line.

12             Would he be calling you after

13   hours because of a time difference or because

14   of when the work would be done?  And I don't

15   know if -- was it a time difference issue that

16   he was calling after hours?

17   A.    Sometimes there would be.  If I

18   remember correctly, they were one hour behind

19   us or two, but there were other times, aside

20   from just a time zone difference, that he

21   would be currently actively on the job or he

22   would be traveling for a flight or there would

23   be something that would be taking place,

24   either calibration equipment not arriving or

Kimberly DeLaura Duncing

1 arriving on the site, that was not directly

2 tied to the time difference.  It was based on

3 the criteria of the job that needed to be

4 done.

5    Q.    When you were working for Muncy, did

6 you have to send Mr. Fetter a daily update

7 regarding what you had done that day by

8 e-mail?

9    A.    Usually, as an inside sales

10 representative and then an inside sales

11 manager, Jason Fetter would be calling in for

12 updates as to what were the levels for sales

13 that day, anything that he needed to be made

14 aware of.  Aside from that occurrence, there

15 was a time in February 2020, that Muncy was

16 subject to a -- kind of cyber attack, and

17 there was technology that was lost.

18             Due to the amount of efforts it

19 took to get our data back into the system, I

20 was required to provide updates to Mr. Fetter,

21 as well as the other Fetters, as to what

22 progress that the inside sales team has made

23 on trying to have those efforts in regarding

24 getting the data.

1           So prior to that time, I did
2    not have to send e-mail communication on a
3    consistent basis; however, once that computer
4    situation happened, I was required to report
5    based on our progress and what we were doing.
6        Q.    Okay.  Did he ask you to send him a
7    daily or weekly goal list?  Like, things you
8    wanted to accomplish during that day or that
9    week?
10       A.    Not that I recall.
11       Q.    Okay.  Do you know if the
12   calibration technicians and Mr. Szabo had to
13   do that?
14       A.    I have heard of the practice being
15   done for the calibration team, as they had to
16   do both in-house and out-of-house
17   calibrations.  And, obviously, when they were
18   not traveling and they had to be in-house, I
19   had heard that there was a goal list or a task
20   list for a level of accountability, to ensure
21   that tasks were being worked on.
22       Q.    And you said that if something had
23   to do with sales, Mr. Szabo had to get
24   authority, approval for that?

Kimberly DeXiaura Dunning

1    A.    In regards to a level of impact if

2 he was on a job.  So if something had

3 happened.  If it was on the site and it was

4 technical, that he could go ahead and easily,

5 you know, provide another shackle or kind of

6 work technically on that.  He can go ahead and

7 do that.

8              However, if it involved a

9 customer or a level of cost or he missed his

10 flight or he had to -- realized the job was

11 going to take longer and he needed to stay an

12 extra day, then all of those decisions he

13 would reach out to myself as the contact.

14              I would deem that getting ahold

15 of Jason, and Mr. Fetter would be the one who

16 would be making that decision of how to

17 proceed due to the level of cost impact to the

18 company.

19    Q.    As far as you know, were the

20 calibration technicians involved in signing up

21 new clients or contracting with anyone?

22    A.    I do know that with our calibration

23 techs, with their level of experience,

24 Mr. Szabo individually, just because he had

1    worked with Joe Roberts, who was someone very

2    known in the industry, that he was asked to

3    communicate with customers sometimes to gain

4    more knowledge of what Muncy has to offer.  I

5    will say that efforts of that was 100 percent

6    driven by our vice president of sales.

7         Q.    So he did that on Mr. Fetter's

8    authority and direction?

9         A.    Yes.

10         Q.    Okay.  I apologize for not asking

11    this before.

12                    What was his specific job

13    title?

14         A.    Mr. Szabo?

15         Q.    Yes.

16         A.    If I recall correctly, I think he

17    was just a calibration technician.

18         Q.    Do you know if being a calibration

19    technician is something that requires a

20    degree?

21         A.    Not that -- I don't recall.

22         Q.    And as far as you know, did all of

23    the Muncy calibration technicians have the

24    same level of education?

 1      A.     In regards to education, I do not

 2   recall.

 3      Q.     How about training --

 4      A.     I --

 5      Q.     -- on-the-job or before?

 6      A.     I will say from looking at our

 7   calibration technician staff, Ric was someone

 8   that had the most experience and he also aided

 9   with writing -- due to his experience, he

10   helped write procedures for Muncy.

11              He was the first calibration

12   tech.  So he really provided Muncy direction

13   and aided as to the calibration techs that

14   followed after him and added to the team.  He

15   was instrumental and crucial in that

16   development based on his knowledge and

17   experience that he brought.

18      Q.     All right.  And when he had a hand

19   in these procedures, could he implement any

20   procedure without approval from Mr. Fetter or

21   anyone else?

22      A.     No.

23              MS. KRAMER:  Okay.  That's all

24      the questions I have.  Thank you for your

1      time today.  Attorney Stapp may have

2      some.

3   BY MR. STAPP:

4      Q.    Miss Bunting, can you hear me?

5      A.    Yes, I can.

6      Q.    Okay.  I just have a couple of

7   things I want to make sure I understand.

8                  You left Muncy Industries for a

9   job that paid more money; is that correct?

10     A.    That's correct.

11     Q.    And, I think, was part of that

12  decision based on the fact you had obtained

13  your degree in the MBA program?

14     A.    Yes.

15     Q.    With regard to Mr. Szabo, is it

16  correct that when he started at Muncy

17  Industries, there really wasn't a calibration

18  program at Muncy Industries?

19     A.    That is correct.

20     Q.    And, in fact, Mr. Szabo was hired to

21  create the calibration program?

22     A.    I do not recall.

23     Q.    Okay.  Did Mr. Szabo write the

24  procedures for the calibration program at

1    Muncy Industries?

2         A.    Yes, he did; he contributed to

3    writing them.  In regards to if there was any

4    function teams that helped that he was able to

5    collaborate with, I do not recall that.

6         Q.    And Mr. Szabo was the one who

7    actually taught other people at Muncy

8    Industries how to do the calibration program

9    once it was created; is that correct?

10        A.    Correct.

11        Q.    In fact, I think Mr. Szabo helped

12   Jason Fetter understand the calibration

13   program itself; is that right?

14        A.    That is correct.

15        Q.    You were asked about Mr. Szabo and

16   his prior employment at Robert's.

17               Are you aware that there is an

18   e-mail where Mr. Szabo offered to Jason Fetter

19   to reach out to Robert's clients?

20        A.    No, I was not aware.

21        Q.    You weren't privy to that e-mail?

22        A.    No, not that I recall.

23        Q.    Okay.  If I understood your

24   testimony correctly today, is it fair to say

1    that you, as the scheduling person, were

2    trying to schedule calibration trips between

3    Monday to Friday?

4         A.    That was the initial goal, correct.

5         Q.    And you were trying to keep the

6    travel part of that included in that

7    Monday-to-Friday time frame; is that right?

8         A.    When it was possible, yes.

9         Q.    And if I understood your testimony

10   correctly, you left it up to Mr. Szabo, since

11   he had the company credit card, to actually

12   schedule any kind of plane flights or trains

13   or things of that nature; is that correct?

14        A.    That is correct.  Because I did not

15   have a company card.  It was based on the

16   approval of Jason Fetter.  Ric was to go ahead

17   and execute the appropriate flights and hotel

18   arrangements necessary based on that approved

19   plan.

20        Q.    And to your knowledge was Mr. Szabo

21   allowed to travel in the 8:30 to 5 o'clock

22   time frame if he wanted to?

23        A.    Can you restate the question?

24        Q.    Sure.  Was Mr. Szabo allowed by

1   Muncy Industries to travel during the

2   8:30 a.m. to 5:00 p.m. time frame?

3       A.    If there was a calibration that was

4   scheduled during that time, a part of that

5   plan, then, yes, he would be required to

6   travel beforehand.

7       Q.    And, of course, he would have to be

8   able to get a flight that was available during

9   those hours, too, I would assume; is that

10  right?

11      A.    Correct, but I will say that that --

12  it would have to be approved on the plan that

13  was approved by Jason Fetter.

14      Q.    Okay.  And at some point while you

15  were still employed, did Muncy start to hire

16  other calibration technicians?

17      A.    That is correct.

18      Q.    And did those calibration

19  technicians travel with Mr. Szabo?

20      A.    That is correct.

21      Q.    And when Mr. Szabo was on site for a

22  customer of Muncy Industries with another

23  calibration technician, was he in charge of

24  their work?

1    A.    There were times, yes, where there

2    would be another calibration tech on site and

3    Ric would be showing the ropes, so to speak,

4    and making sure that things were following

5    based on these procedures that Ric had a hand

6    in processing; that's correct.

7    Q.    Okay.  So he was basically teaching

8    and supervising those employees; is that

9    correct?

10    A.    When it was on site, when they were

11    actively doing a calibration, that's correct.

12    Q.    Okay.  And my understanding from

13    your testimony is that Ric was salary when he

14    worked for Muncy Industries; is that correct?

15    A.    I was not privy, nor understood what

16    his current standing was.

17    Q.    Okay.  But when you were working for

18    Muncy Industries, you were salary; is that

19    right?

20    A.    That's correct.

21    Q.    And it sounds like from your

22    testimony here today that there were times

23    that you worked after hours; is that right?

24    A.    That is correct.

1    Q.    Did you ever consider filing some

2    type of lawsuit against Muncy Industries

3    trying to ask for overtime?

4    A.    No, I did not.

5    Q.    Why didn't you think to do that?

6    A.    As a salary employee, I took that as

7    in my job responsibility.  Also, I will say

8    that during my time with Muncy, Muncy has --

9    was good to me in regards to bonuses based on

10   performance.  So I did not find it necessary

11   to -- as a salary employee, I just did what I

12   had to do to get the job done.

13   Q.    Are you aware that Mr. Szabo

14   received bonuses when he worked for Muncy

15   Industries?

16   A.    I was not privy to that information.

17   Q.    Okay.  Are you aware of -- and I

18   understand you may have been gone, but are you

19   aware that Mr. Szabo had written an e-mail to

20   other Muncy Industries' customers following

21   his departure --

22         MS. KRAMER:  I am going to

23      object to that.  It's irrelevant.

24         MR. STAPP:  I'm just asking if

1      she was aware of it.  She may not be.

2  BY MR. STAPP:

3      Q.    Are you aware of an e-mail,

4  Miss Bunting, that Mr. Szabo sent to Muncy

5  Industries' customers indicating that he had

6  left?

7      A.    Not that I recall.

8      Q.    Okay.  Are you surprised that

9  Mr. Szabo filed a lawsuit against Muncy

10  Industries?

11      A.    I don't know how to answer that.

12      Q.    Okay.  Well, you indicated earlier

13  you were trying to find out what this case was

14  about.  This is a case about wages and

15  overtime.

16          Are you surprised that

17  Mr. Szabo filed suit against Muncy Industries?

18      A.    I don't know how to answer that.  I

19  am sorry.

20      Q.    That's okay.  With regard to travel

21  arrangements for Mr. Szabo, if I understand

22  your testimony correctly, he handled his own

23  travel arrangements; is that right?

24      A.    He would be responsible for booking

1    the arrangements based on the plan that was

2    approved by Jason Fetter.

3         Q.    Okay.

4         A.    Ric could not go out on his own

5    and -- if we had designated a certain flight

6    at a certain time with a certain airline on a

7    specific day, Ric couldn't go ahead and just

8    book another flight outside of that plan.  It

9    had to be based on the plan.

10              MR. STAPP:  Okay.  I think

11       that's all the questions I have,

12       Miss Bunting.

13              MS. KRAMER:  I just have a few

14       follow-ups on that.

15   BY MS. KRAMER:

16        Q.    Miss Bunting, did you clock in and

17   out in the morning and the afternoon when you

18   got to work and left work?

19        A.    No, I did not, not that I recall.

20        Q.    Okay.  And in your time with Muncy,

21   did you ever miss lunch?

22        A.    I apologize.  It's been a very long

23   time since I have been at that job.  Yes, that

24   is correct.  You had to clock in for the day

1    and clock out for the day.

2        Q.    Okay.  Did you have to clock in and

3    out when you went to lunch?

4        A.    I do not recall.

5        Q.    Okay.  Do you remember if in your

6    time there you ever missed lunch, worked

7    through lunch?

8        A.    Yes.

9        Q.    You did.  Okay.  Were you paid for

10   that time?

11       A.    I was a salary employee.  It was my

12   decision to work past.

13       Q.    Okay.  Then just to confirm, you had

14   your master's already when you started at

15   Muncy?

16       A.    No.  No.  I had -- I was working on

17   my master's degree when I started at Muncy,

18   but I had successfully graduated during my

19   time at Muncy, and then I had left about three

20   years after.

21       Q.    So when you were promoted to inside

22   sales manager, did you have a master's at that

23   point or if you don't remember?

24       A.    I believe that I did have my

1   master's when I was promoted to the inside

2   sales manager position.

3                 MS. KRAMER:  That's all the

4        questions I have.  Thank you.

5                 MR. STAPP:  I don't have any

6        other questions.  Thank you for your

7        time.

8                 (Witness was excused.)

9                 (Deposition concluded at

10       4:00 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Kimberly Lexlaura Bunting

1          C E R T I F I C A T E

2          I HEREBY CERTIFY that prior to the

3   commencement of the examination, KIMBERLY

4   LEXLAURA BUNTING, was remotely sworn by me to

5   testify to the truth and that the proceedings,

6   evidence, and objections are contained fully

7   and accurately in the stenographic notes taken

8   by me upon the deposition taken on June 15,

9   2022, and this is a true and correct

10  transcript of same.

11

12

13          *Jessica M. Gericke*

14   _____

15          Jessica M. Gericke, RPR, CCR-NJ,

            and Notary Public

16

17

18          (The foregoing certification of this

19   transcript does not apply to any reproduction

20   of the same by any means, unless under the

21   direct control and/or supervision of the

22   certifying reporter.)

23

24

1          I have read the foregoing transcript

2   of my deposition given on June 15, 2022, and

3   it is true, correct and complete, to the best

4   of my knowledge, recollection and belief,

5   except for the corrections noted hereon and/or

6   list of corrections, if any, attached on a

7   separate sheet herewith.

8

9          _____

           Kimberly Lexlaura Bunting

10

11

12

13

14   Subscribed and sworn to

15   before me this _____ day

16   of _____, 20___

17

18

19   _____

20   Notary Public

21

22

23

24

Kimberly DexIaura Dunning

1   ERRATA SHEET

2

3   PAGE LINE      CHANGES OR CORRECTION AND REASON

4   _____

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19

20  I have inspected and read my deposition as
    captioned above and have listed all changes

21  and corrections above, along with my reasons
    therefor.

22

23  DATE: _____

24  Signature of Deponent: _____