### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RIC SZABO,

            Plaintiff,

    v.

MUNCY INDUSTRIES, LLC,

            Defendant.

No. 4:21-CV-00468

(Chief Judge Brann)

### MEMORANDUM OPINION

**MARCH 10, 2023**

Plaintiff Ric Szabo sues his former employer, Muncy Industries, LLC (hereinafter, "Muncy"), for violating federal and state labor laws by failing to pay him overtime. Szabo, a salaried calibration technician, alleges that he should have paid overtime.

Muncy disagrees, arguing that Szabo falls into a narrow category of employees exempted from overtime pay requirements because their work necessitates irregular hours. Accordingly, Muncy moves for summary judgment in its favor. For his part, Szabo also moves for summary judgment, arguing that he is not an executive or professional employee, two categories of workers exempted from overtime requirements. For the following reasons, the Court denies Muncy's motion and grants Szabo's motion.

## I.    BACKGROUND

### A.    Underlying Facts[1]

Jason Fetter, one of Muncy's vice presidents, hired Szabo in December 2017.[2] Szabo's title was "calibration technician."[3] He would be Muncy's first calibration technician.[4] Muncy hired him after expanding its operations into the calibration space.[5] He would calibrate load cells sent to Muncy's plant and travel to customers' places of business to calibrate load cells on site.[6]

When Szabo was hired, he was essentially Muncy's entire calibration department.[7] Szabo was already certified to do calibrations by the National Institute

---

[1]    The following facts are undisputed unless noted otherwise. Szabo asks this Court to disregard Muncy's response to his Szabo Statement of Undisputed Material Facts ("SUMF") for failure to comply with the Court's Local Rules. Local Rule 56.1 provides that "[t]he papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried." Muncy's opposition includes a document with separately numbered documents titled: "Defendant's Reply To Statement Of Undisputed Facts Under Local Rule 56.1." Doc. 42-1. However, the document in no way corresponds to Szabo's statement of material facts. Nor does it deny or admit any of Szabo's asserted material facts. Accordingly, Szabo asks the Court to deem all facts in its Statement of Undisputed Facts admitted. *See* Szabo Reply, Doc. 45 at 1-3; Szabo SUMF, Doc. 39. The Court will grant that request. Therefore, consistent with the Local Rules and this Court's prior practice, the Court will deem all facts in Szabo's statement of undisputed material facts admitted to the extent that they are supported by the record. *See Farmer v. Decker*, 353 F. Supp. 3d 342, 347 n.1 (M.D. Pa. 2018) (Kane, J.) (disregarding non-movant's additional statement of facts for non-compliance with Local Rule 56.1); *Barber v. Subway*, 131 F. Supp. 3d 321, 322 n.1 (M.D. Pa. 2015) (Conner, then-C.J.) (declining to consider separate counterstatement of facts that was non-responsive to the movant's statement because it was "neither contemplated nor permitted by the Local Rules").

[2]    Dep. of Jason Fetter, Doc. 39-3 at 16:20-18:8.

[3]    *Id.* at 18:9-14.

[4]    *See id.* at 18:18-19:17.

[5]    *See id.* at 15:17-16:19.

[6]    Dep. of Megan Delahoussaye, Doc. 39-4 at 21:4-23.

[7]    Fetter Dep., Doc. 39-3 at 15:17-16:19; Dep. of Ric Szabo, Doc. 39-5 at 22:18-23.

of Standards and Technology.[8] While working for Muncy, he created a certification program.[9] Through the program, he taught other Muncy employees, including Fetter, how to calibrate load cells, ultimately certifying them to calibrate.[10]

As noted, Szabo's work often required him to visit Muncy's customers at their places of business and service their machines.[11] He estimates that he spent eighty percent of his time on the road calibrating machines.[12] But he was not responsible for hiring, firing, or supervising other Muncy calibration technicians.[13] He considered himself and the other technicians to be on equal footing.[14]

Fetter offered Szabo a starting annual salary of $37,000, with a $2,000 increase for every set of thirty-four calibrations Szabo completed up to a maximum of $50,0000, at which point Muncy would provide Szabo a bonus of $500 for every additional set of twenty calibrations.[15] Szabo also received additional miscellaneous bonuses from time to time.[16] Additionally, Muncy purchased Szabo's car for him,

---

8   *See* Szabo Dep., Doc. 39-5 at 54:20-22; *id.* at 56:9-57:6. The NIST is a federal agency housed in the United States Department of Commerce charged in part with developing and maintaining national standards of measurement in industrial and commercial settings. *See* 15 U.S.C. § 272.
9   Szabo Dep., Doc. 39-5 at 22:24-23:17, 54:23-56:10.
10  *Id.*
11  *See* Fetter Dep., Doc. 39-3 at 15:17-16:19; Delahoussaye Dep., Doc. 39-4 at 14:15-24, 421:4-23.
12  Szabo Dep., Doc. 39-5 at 87:15-20.
13  *Id.* at 24:7-26:22.
14  *Id.* at 28:1-22.
15  Szabo Dep., Doc. 39-5 at 35:11-36:16; Szabo Offer Letter, Doc. 37-1.
16  Szabo Dep., Doc. 39-5 at 38:4-17.

paid some of his moving expenses, and provided him with a company phone and credit card.[17]

Szabo understood his arrangement with Muncy to mean that he would normally work Monday through Friday, 8:00 a.m. to 5:00 p.m., and occasionally on weekends, but he would always be paid for forty hours of work per week, even if he worked more.[18] If needed, he would work through lunch or past 5:00 p.m.[19] Megan Delahoussaye, one of the employees charged with sending Szabo his assignments, claimed that Szabo worked an alternating schedule.[20] He would spend the first week at Muncy's Pennsylvania office and then spend the next week traveling to customer sites.[21] Szabo disputes that he worked a fixed alternating scheduled but acknowledges that he spent time both in the field and at Muncy facilities.[22] As stated earlier, Szabo estimated that he spend "[eighty] percent" of his time "out on the road and calibrating machines."[23]

Delahoussaye and Kimberly Bunting, another Muncy employee, were responsible for sending Szabo his itineraries, which Fetter helped prepare and

---

17  *Id.* at 39:9-44:18.
18  Szabo Dep., Doc. 39-5 at 7:4-8:4. Despite this arrangement, Szabo still clocked in and out of work when he was at Muncy facilities. *Id.* at 31:19-32:14; Szabo Attendance Summary, Doc. 39-6.
19  Szabo Dep., Doc. 39-5 at 19:25-21:22.
20  Delahoussaye Dep., Doc. 39-4 at 31:3-10.
21  *Id.*
22  Szabo Dep., Doc. 39-5 at 63:7-18.
23  *Id.* at 87:15-20.

ultimately approved.[24] But Szabo would be responsible for making his own travel arrangements with his company credit card based on the plan Fetter approved.[25] Bunting suggested that a majority of Szabo's travel weeks involved travelling on weekdays, but also indicated that if the schedule so required, Szabo would travel outside of working hours.[26]

Delahoussaye would send Szabo emails that contained a schedule of his assigned customer visits and travel estimates, as well as which cities he would spend his nights in.[27] She also suggested that Szabo could choose to travel during work hours.[28] Szabo claims that he sometimes travelled between jobs on weekends.[29] At his deposition, Szabo vaguely recalled instances when Fetter rejected his requests to travel on weekdays but also later stated he never requested to travel during work hours because he knew such requests would be futile.[30] He also never requested overtime pay.[31]

Fetter claims that travel arrangements were entirely up to Szabo.[32] But for substantial changes, Szabo would need to communicate with Bunting, who would

---

[24] Delahoussaye Dep., Doc. 39-4 at 21:24-22:4; Dep. of Kimberly Bunting, Doc. 39-10 at 16:7-18:22.
[25] *Id.* at 18:23-19:5.
[26] *See id.* at 19:6-21:7, 30:20-31:13.
[27] *See* May 29, 2020 Email from Delahoussaye to Szabo, Doc. 39-9; Delahoussaye Dep., Doc. 39-4 at 24:16-25:6.
[28] Delahoussaye Dep., Doc. 39-4 at 25:22-26:8.
[29] *See id.* at 8:11-17.
[30] *Id.*; *id.* at 18:25-19:24.
[31] *Id.* at 22:7-17.
[32] *See* Fetter Dep., Doc. 39-3 at 27:18-28:13.

loop in Fetter if necessary.[33] Fetter's authorization would be necessary if, for example, Szabo missed a flight or needed additional time to complete a calibration.[34]

Szabo left his employment with Muncy in July 2020, after working there for two-and-one-half years.[35]

### B.    Procedural History

Szabo alleges that Muncy violated both the Federal Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* (Count I), and the Pennsylvania Minimum Wage Act of 1968, 43 P.S. § 333 *et seq.* (Count II), by failing to compensate him for his overtime.[36] He also claims that Muncy willfully violated the FLSA.[37] He seeks compensatory and punitive damages, as well as attorneys' fees and costs.[38]

Muncy now moves for summary judgment on Szabo's claims, claiming that Szabo is exempt from overtime requirements because his work necessitates irregular hours.[39] Szabo moves for partial summary judgment, seeking a determination that he is not exempt from overtime requirements because he is not an executive or professional employee, which are two categories of exempt workers.[40] Both motions are ripe for disposition.

---

[33]   Bunting Dep., Doc. 39-10 at 21:2-22:9.
[34]   *Id.* at 24:22-25:18.
[35]   Muncy Ans. to Szabo Interrogatories, Doc. 39-2 at 3-4.
[36]   Compl., Doc. 1 ¶¶ 47-58.
[37]   *Id.* ¶ 52.
[38]   *Id.* at 8-9.
[39]   Muncy MSJ, Doc. 36.
[40]   Szabo Partial MSJ, Doc. 35.

## II.    LAW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[41] Material facts are those "that could alter the outcome" of the litigation, "and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[42] A defendant "meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[43] Conversely, to survive summary judgment, a plaintiff must "point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[44]

The party requesting summary judgment bears the initial burden of supporting its motion with evidence from the record.[45] When the movant properly supports its motion, the nonmoving party must then show the need for a trial by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[46] The United States Court of Appeals for the Third Circuit explains that the nonmoving party will not withstand

---

[41]   Fed. R. Civ. P. 56(a).

[42]   *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (quoting *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

[43]   *Clark*, 9 F.3d at 326.

[44]   *Id*.

[45]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[46]   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

summary judgment if all it has are "assertions, conclusory allegations, or mere suspicions."[47] Instead, it must "identify those facts of record which would contradict the facts identified by the movant."[48] Indeed, "the party opposing a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.'"[49] "Rather, that party must point to specific factual evidence showing that there is a genuine dispute on a material issue requiring resolution at trial."[50]

In assessing "whether there is evidence upon which a jury can properly proceed to find a verdict for the [nonmoving] party,"[51] a court "must view the facts and evidence presented on the motion in the light most favorable to the nonmoving party."[52] Moreover, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the court may "consider the fact undisputed for purposes of the motion."[53] Finally, although "the court need consider only the cited materials, . . . it may consider other materials in the record."[54]

---

[47]  *Betts v. New Castle Youth Development Center*, 621 F.3d 249, 252 (3d Cir. 2010).

[48]  *Port Authority of N.Y. and N.J. v. Affiliated FM Insurance Co.*, 311 F.3d 226, 233 (3d Cir. 2002) (quoting *Childers v. Joseph*, 842 F.2d 689, 694-95 (3d Cir. 1988)).

[49]  *Chavarriaga v. New Jersey Dept. of Corrections*, 806 F.3d 210, 218 (3d Cir. 2015) (quoting *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992)).

[50]  *Id.*

[51]  *Liberty Lobby*, 477 U.S. at 252 (quoting *Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (1871)).

[52]  *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

[53]  Fed. R. Civ. P. 56(e)(2); *see also Weitzner v. Sanofi Pasteur Inc.*, 909 F.3d 604, 613-14 (3d Cir. 2018).

[54]  Fed. R. Civ. P. 56(c)(3).

## III.   ANALYSIS

Through their respective motions, both parties essentially ask the Court to determine whether Szabo is exempt from overtime by virtue of three exemptions. Title 29 U.S.C. § 207 sets forth the FLSA's overtime rules.[55] Under section 207, unless an exemption applies, an employer must pay any employee who works more than forty hours during a week at an increased rate. Muncy's motion asserts that there is no factual dispute that an exemption for employment necessitating irregular hours of work (the "*Belo*" exemption[56]) applies to Szabo.[57] Szabo's motion asserts

---

[55]   The Court's analysis applies to both Szabo's FLSA and PMWA claims as both laws are essentially identical. *See Baum v. Astrazeneca LP*, 372 Fed. Appx. 246, 248 n.4 (3d Cir. 2010); *Paul v. UPMC Health System*, 2009 WL 699943, at *8 (W.D. Pa. Mar. 10, 2009) (citing 29 U.S.C. § 213(a)(1); 43 P.S. § 333.105(a)(5)).

[56]   The exception is named for *Walling v. A. H. Belo Corp.*, in which the Supreme Court judicially inferred the exemption. 316 U.S. 624, 634-35 (1942). The exemption was later codified at 29 U.S.C. § 207(f). *See Donovan v. Brown Equip. and Serv. Tools, Inc.*, 666 F.2d 148, 153, 153 n.2 (5th Cir. 1982); *Mitchell v. Brandtjen & Kluge, Inc.*, 228 F.2d 291, 292-96 (1st Cir. 1955)

[57]   Muncy MSJ Br., Doc. 41 at 11-14. Muncy also appears to argue for application of the fluctuating workweek ("FWW") method of calculating for calculating overtime compensation for salaried employees working fluctuating hours, quoting its description of the method at length from the Supreme Court of Pennsylvania's opinion in *Chevalier v. General Nutrition Centers, Inc.*, 220 A.3d 1038, 1040 (Pa. 2019). *See* Muncy MSJ Br., Doc. 41 at 11-14. Whether Muncy intended to argue for the method or not, the *Chevalier* court squarely rejected the FWW method for salaried employees who work fluctuating hours. *See* 220 A.3d at 299 ("[W]e affirm the Superior Court's decision rejecting the use of the FWW Method under the PMWA and the Pennsylvania Regulations"). The *Chevalier* court noted that the FWW method was permissible under federal law. *Id.* Curiously, Muncy does not seek to apply the FWW method to Szabo's FLSA claim, instead arguing that it did not violate the PMWA under a statute that does not exist. *See* Muncy MSJ Br., Doc. 41 at 19 ("Both [Szabo's] starting salary of $37,000.00 and the ending salary of approximately $50,000.00 were payment in excess of the maximum work week applicable under § 231.47 of the Pennsylvania Minimum Wage Act."); 34 Pa. Code §§ 241.41-241.43. Muncy also quotes section 231.43(d) at length in its opening brief, but fails to explain in detail how that section applies to Szabo beyond vague and conclusory arguments. *See* Muncy MSJ Br., Doc. 41 at 19-20. Muncy states without any support that the rate it and Szabo agreed upon "is in excess of the maximum workweek applicable under § 231.41." *Id.* at 20. But Muncy does not explain what that maximum is and does not provide the Court with the necessary information to determine it. Plaintiffs point out some of these deficiencies in

9

that there is no factual dispute that the executive employee and professional employee exemptions do not apply to him.[58] Courts narrowly construe the FLSA's exceptions and exemptions, and as the party invoking the exception, Muncy carries the burden to prove that Szabo is exempt at trial.[59] The Court first addresses Muncy's motion asserting that the *Belo* exception applies, followed by Szabo's motion and the executive and professional employee exemptions.

## A.     The *Belo* Exception Does Not Apply to Szabo's Employment

Muncy seeks summary judgment on the grounds that Szabo falls into the narrow *Belo* exception for employees whose work necessitates irregular hours. As the employer, Muncy carries the burden of showing the exemption applies. And as the movant on this issue, Muncy also carries the burden to establish the absence of any disputed material facts regarding the exemption's applicability. The Court takes all reasonable inferences in favor of Szabo.

### 1.     The *Belo* Exception

Title 29 U.S.C. § 207(f), in relevant part, excepts from overtime requirements employees who are employed "pursuant to a *bona fide* individual contract" to perform duties that "necessitate irregular hours of work." The contract must provide

---

their opposition, but Muncy failed to reply. Therefore, the Court will not consider those arguments.

[58]   Szabo MSJ Br., Doc. 40 at 3-14.

[59]   *See Donovan*, 666 F.2d at 153 (citing *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960)); *Pignataro v. Port Auth. of New York and New Jersey*, 593 F.3d 265, 268 (3d Cir. 2010); *Davis v. Mountaire Farms, Inc.*, 453 F.3d 554, 556 (3d Cir. 2006).

for a regular rate of pay that is not less than the applicable minimum rate and overtime rate that would apply if the employee was not exempted.[60]

For an employment relationship to qualify for the *Belo* exception, it must satisfy four elements:

(1) "[t]he employment must be pursuant to a *bona fide* contract or agreement";

(2) "[t]he duties of the employees must necessitate workweeks which fluctuate both above and below forty hours per week";

(3) "[t]he contract or agreement must specify the regular rate of pay, which is not less than the minimum wage, and compensation at not less than time and one-half that regular rate for all hours worked over the maximum workweek"; and

(4) "[t]he contract or agreement must also provide a weekly guaranty of pay for not more than sixty hours per week."[61]

The United States Department of Labor's regulations further explain the requirements for the *Belo* exception.[62] The Court now turns to elements of the exception, all of which Muncy must satisfy to invoke the exception.

### 2. There Are Genuine Issues of Material Fact as to Whether Szabo's Job Necessitated Irregular Hours

The second element in the *Belo* exception is by far the most important: the employee's job must necessitate "irregular" hours. "[W]hether the particular

---

[60] 29 U.S.C. § 207(f).

[61] *Donovan v. Richland Shoe Co.*, 623 F. Supp. 667, 669 (E.D. Pa. 1985), *aff'd in part, vacated on other grounds sub nom. by Brock v. Richland Shoe Co.*, 799 F.2d 80 (3d Cir. 1986), *aff'd sub nom. McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988).

[62] 29 C.F.R. §§ 778.402-778.414.

employee's duties do or do not necessitate irregular hours" is "always a question of fact."[63]

The *Belo* exception "is not designed to apply in a situation where the hours of work vary from week to week at the discretion of the employer or the employee, nor to a situation where the employee works an irregular number of hours according to a predetermined schedule."[64] Instead, "[t]he nature of the employee's duties must be such that neither he nor his employer can either control or anticipate with any degree of certainty the number of hours he must work from week to week."[65] The employee's "duties must necessitate significant variations in weekly hours of work both below and above the statutory weekly limit on non-overtime hours."[66] That means that the *Belo* exception does not apply to an employee who regularly works forty hours a week but then works an irregular and varying number of overtime hours.[67]

It is clear that Szabo's duties sometimes required him to work more than forty hours.[68] Muncy disputes its obligation to compensate Szabo for time worked over

---

[63]   § 778.405.
[64]   § 778.405.
[65]   *Id.*
[66]   *Id.* The Department provides as examples employees such as "on-call servicemen," "insurance adjusters," "newspaper reporters, and photographers." *Id.*
[67]   *Id.*
[68]   Szabo filed a document listing his work history evidence by his clock-ins and clock-outs in support of his motion. Doc. 39-6. Muncy referred to such a document in its answers to Szabo's interrogatories but did not file the same document in support of its motion, in which it seeks the protection of the *Belo* exception. The document Szabo filed provides that Szabo worked 4,208.15 hours over 261 days, which is about 52 workweeks. However, the Court is unsure as to the accuracy of that document because it states that Szabo worked 23.97 hours on May 27,

forty hours, not the fact that Szabo worked more than forty hours. Fetter described being a calibration technician as "not a [forty]-hour week kind of job."[69] But nothing in the record indicates that Muncy ever needed Szabo to work *less* than forty hours in a week. The *Belo* exception requires an arrangement where an employee's hourly workload varies above and below the forty-hour mark.[70]

Additionally, there is insufficient evidence for the Court to conclude as a matter of law that neither Szabo nor Muncy could control the hours worked. The evidence before the Court shows that Szabo received detailed itineraries explaining which customer sites he would visit and how long he had to travel.[71] That shows that Muncy had the ability to control Szabo's schedule. The record does contain some suggestion that jobs might take longer than initially anticipated, but not enough for the Court to conclude that Muncy could not control Szabo's schedule without any degree of certainty.[72]

---

2019, 23.9 hours on December 31, 2019, and 1,656 hours on January 1, 2020. The full-day workdays may be plausible, and the January 1 number may be an annual total for 2019. But without additional information, the Court is left to divine the document's import, which it will refrain from doing.

[69]   Fetter Dep., Doc. 39-3 at 16:4-19.

[70]   29 C.F.R. § 778.405 ("Consequently, where the fluctuations in an employee's hours of work resulting from his duties involve only overtime hours worked in excess of the statutory maximum hours, the hours are not "irregular" within the purport of section 7(f) and a payment plan lacking this factor does not qualify for the exemption." (citing *Foremost Dairies, Inc. v. Wirtz*, 381 F.2d 653, 657 (5th Cir. 1967))).

[71]   *See* May 29, 2020 Email from Delahoussaye to Szabo, Doc. 39-9; Delahoussaye Dep., Doc. 39-4 at 24:16-25:6.

[72]   *See* Szabo Dep., Doc. 39-5 at 19:25-21:22.

The case might be different if Szabo was an *emergency* calibration technician who responded to issues as they arose.[73] In such a situation, an employee would likely experience significant variations in hours depending on whether emergencies occurred and how many occurred.[74] The facts in the record do not indicate such a situation. Therefore, the Court cannot apply the *Belo* exception to Szabo's employment as a matter of law and accordingly denies Muncy's motion.

## B.  Szabo Is Not an Executive Employee

Szabo's motion for summary judgment first seeks a determination that he is not exempt from overtime requirements by virtue of the executive employee exemption. As the movant, Szabo carries the burden to establish the absence of any disputed facts and Muncy is entitled to all reasonable inferences.

That said, as it did with the *Belo* exception, Muncy carries the burden of proof to show the executive employee exemption applies.[75] "At the summary judgment stage, the absence of evidence on an issue redounds to the detriment of the party who bears the burden of proof on that issue."[76] When the nonmoving party bears the burden of persuasion at trial—as is the case here—"the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is

---

73 *See* 29 C.F.R. § 778.405.
74 *See id.*
75 *Pignataro*, 593 F.3d at 268.
76 *Perez v. Lorraine Enterprises, Inc.*, 769 F.3d 23, 30 (1st Cir. 2014) (citing *McCarthy v. N.W. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

insufficient to carry its burden of persuasion at trial."[77] In other words, "to defeat summary judgment on this issue, [Muncy] had to do more than point to a dearth of evidence."[78] It must "adduce definite, competent evidence showing that" the exemption applies.[79]

Muncy first argues that the FLSA executive employee exemption applies to Szabo. That exemption applies to an employee (1) who is compensated on a salary basis at a rate of not less than $684 per week; (2) whose "primary duty is management of the enterprise in which the employee is employed"; (3) who customarily and regularly directs the work of two or more other employees"; and (4) who "as the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."[80] The parties appear to agree that Szabo was paid in accordance with the first element based on the lack of any arguments about Szabo's rate of pay. But the test is conjunctive; failure to satisfy any of the other elements of the exemption is fatal to the employer's claim to the defense.[81] As the Court finds that there is no material dispute of fact as

---

[77] *Lawrence v. Natl. Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir. 1996) (citing *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 329 (3d Cir.1995)).
[78] *Perez*, 769 F.3d at 30.
[79] *Id.* (citing *Vineberg v. Bissonnette*, 548 F.3d 50, 56 (1st Cir. 2008)).
[80] 29 C.F.R. § 541.100.
[81] *Davis*, 453 F.3d at 557.

to the third element—whether Szabo regularly and customarily directed the work of two or more employees—the Court will address only that element.

### 1. Regular and Customary Direction of Other Employee's Work

The third element of the executive employee exemption is that the employee must "customarily and regularly direct the work of two or more other employees."[82] The Department of Labor's regulations do not define what it means to "direct" someone, so the Court uses the word's plain meaning.[83] "Direct" means "to control or be in charge of an activity [or] organization."[84]

The Department's regulations do define "customarily and regularly." That phrase means a "frequency that must be greater than occasional but . . . less than constant."[85] "Tasks or work performed 'customarily and regularly' include work normally and recurrently performed every workweek; it does not include isolated or one-time tasks."[86] Beyond that, "[c]ourts have declined to set bright-line rules regarding what constitutes 'customarily and regularly.'"[87] Yet, they "have typically

---

[82]   § 541.100(a)(3).

[83]   *See Lawrence v. City of Philadelphia, Pa.*, 527 F.3d 299, 317 (3d Cir. 2008).

[84]   DIRECT, Cambridge Dictionary (online ed., 2023). The Court is unable to find cases that analyze whether an employee directed the work of others. That is likely because most of that analysis is more germane to the primary-duty element of the executive employee exemption. *See* § 541.102 (listing the activities that can show that an employee's primary duty is management).

[85]   § 541.701.

[86]   *Id.*

[87]   *McKinney v. United Stor-All Centers LLC*, 656 F. Supp. 2d 114, 131 (D.D.C. 2009) (citing *Morgan v. Fam. Dollar Stores, Inc.*, 551 F.3d 1233, 1276 (11th Cir. 2008)).

construed the regulation to require an individual to supervise two or more full-time employees at least seventy-five to eighty percent of the time."[88]

Lastly, the third element requires that the executive employee regularly and customarily direct "two or more employees," which "means two full-time employees or their equivalent."[89] Directing four half-time employees or one full-time and two half-time employees would satisfy that regulation. But "[h]ours worked by an employee cannot be credited more than once for different executives."[90] "Thus, a shared responsibility for the supervision of the same two employees in the same department does not satisfy this requirement."[91]

Therefore, the Court discerns three components within the regular-and-customary-direction element. The first is a qualitative component. An executive employee's duties must include "directing" others, which means having some independent authority to control subordinate employees. Second is a quantitative component with respect to the employee's direction of others. The executive employee's direction must be regular and customary, as the Department of Labor

---

[88]  *Id.* (citing *Morgan*, 551 F.3d at 1275 (holding that the trial court did not err in requiring an eighty percent threshold for the "customarily and regularly" requirement)); *accord Perez v. Radioshack Corp.*, 552 F. Supp. 2d 731, 741-42 (N.D. Ill. 2005); *see Sec'y of Labor v. Daylight Dairy Products, Inc.*, 779 F.2d 784, 788 (1st Cir. 1985) (seventy-six percent does not meet threshold); *Murray v. Stuckey's, Inc.*, 50 F.3d 564, 568 (8th Cir. 1995) (rejecting the seventy-six percent threshold in *Daylight Dairy* and concluding 98.2% satisfies the standard "by any definition"); *Jackson v. Go–Tane Servs., Inc.*, 56 F. App'x 267, 272 n. 8 (7th Cir. 2003) (sixty-seven percent insufficient).

[89]  § 541.104(a).

[90]  § 541.103(d).

[91]  *Id.*

defines those terms. The third element is also quantitative, but concerns the number of employees that the executive employee directs. He or she must have exclusive supervisory authority over at least two full-time employees or their equivalent in part-time employees.

### 2. Szabo Did Not Regularly and Customarily Direct Two or More Employees

The Court first discusses what Szabo's job duties were to determine whether any of them constitute regular and customary direction of two or more employees. Then the Court will apply the regular-and-customary-direction element to those tasks by proceeding through three components: (1) whether Szabo's actions constituted directing others' work, (2) whether Szabo's direction of others was regular and customary, and (3) whether Szabo regularly and customarily directed the work of two or more full-time employees or their equivalents.

#### a. Szabo's Duties at Muncy

Responding to Szabo's interrogatories, Muncy states that Szabo had the following duties:

- Create and lead the calibration program's technical aspects.

- Write Work Instruction of calibration procedures, even more specific than the manufacturer's procedures.

- Calibrate customers' loadcells, transducers, dynamometers and measuring devices.

- Support other calibration technicians.

- Help [m]aintain calibration equipment.

- Help source equipment and supplies for calibration equipment.
- Other duties when at the shop to help the shop's operations.[92]

Despite the interrogatory requesting that Muncy identify Szabo's duties and responsibilities "in full and complete detail," Fetter—who apparently assisted in responding to Szabo's interrogatories—stated at his deposition that there's "a lot missing" from the above list and that Szabo did "a lot of other things."[93] He then added that Szabo trained the new calibration technicians and created and led the calibration program's technical aspects and had some involvement in sales.[94]

When Muncy began its calibration subdivision, Szabo was its only employee. Accordingly, at that point, he could not have directed any other employee because there were no additional employees in the calibration subdivision for him to direct. It therefore appears that the only opportunities Szabo had to possibly direct another employee's work were when he trained them and when he travelled to customers' places of business with them to calibrate customer machines. Therefore, the Court must determine whether Szabo's training of other employees constitutes regular and customary direction and/or whether Szabo regularly and customarily directed other technicians' work when he went on jobs with them.

---

[92]   Muncy Ans. to Szabo Interrogatories, Doc. 39-2 at 1-2
[93]   Fetter Dep., Doc. 39-3 at 23:5-23.
[94]   *Id.*

### b.   Szabo Trained Other Employees, But He Did Not Direct Their Work

The Court begins by assessing whether Szabo "directed" other employees when he trained them or on work trips with other employees. Courts typically find that an employee directed other employees when they are responsible for directly managerial tasks, such as giving out assignments to other employees, monitoring their work, training them, approving hours and timesheets, excusing absences, and approving or rejecting vacation requests.[95]

---

[95]  *See, e.g.*, *Goff v. Bayada Nurses, Inc.*, 424 F. Supp. 2d 816, 822 (E.D. Pa. 2006) (concluding that the plaintiff regularly and customarily directed others' work as she was responsible for "assisting in recruitment and retention of nursing staff, supervising and evaluating the staff, and making performance evaluations," ensuring compliance with human resources and service delivery policies, scheduling employees, and assisting in hiring decisions); *Giallanzo v. City of New York*, ___ F. Supp. 3d ___, 2022 WL 4386591, at *12 (S.D.N.Y. Sept. 22, 2022) (concluding that the plaintiff directed other employees because he was responsible "for assigning, inspecting, and supervising crews a duty which necessarily entailed directing several employees to take specific actions" and "approved timesheets, monitored the work of subordinates, approved vacation requests, and determined whether a subordinate's absence was excused or not"); *Martinez v. Hilton Hotels Corp.*, 930 F. Supp. 2d 508, 527 (S.D.N.Y. 2013) (concluding that a reasonable jury could find that the plaintiffs had "little meaningful supervisory authority" over other employees based on their lack of discretion "in determining how or when work was to be performed, and little opportunity, as a practical matter, to improve the performance or productivity of the cleaning staff, given their limited disciplinary authority over such employees"); *Bradley v. S.C. Boys, Inc.*, 2022 WL 3021140, at *10 (M.D. Pa. July 29, 2022) (concluding that plaintiff directed multiple employee's work when he "designate[d] work" to others and prepared other employees' schedules); *Farnsworth v. Terra-Petro Dev., Inc.*, 2007 WL 4613036, at *3 (S.D.W. Va. Dec. 31, 2007), *vacated on other grounds* (Feb. 29, 2008) (concluding that employee directed the work of other employees because she "was responsible for scheduling employee shifts, assuring the keeping and accuracy of time records, assuring compliance by employees of company policies and procedures and conducting period employee evaluations"); *Gilchrist v. Schlumberger Tech. Corp.*, 575 F. Supp. 3d 761, 767 (W.D. Tex. 2021) (concluding, after trial, that "occasional direction" was insufficient to show the plaintiff directed the work of others); *Williamson v. BOPCO, L.P.*, 2017 WL 5071336, at *5 (W.D. Tex. Sept. 27, 2017) (concluding that the plaintiff directed other employees by training them, handling personnel issues, gave them assignments, directing them to stay late); *Rock v. Sunbelt Cranes, Constr. & Hauling, Inc.*, 678 F. Supp. 2d 1264, 1269 (M.D. Fla. 2009) (concluding that an employee regularly directed others' work where he was responsible for ensuring customers' satisfaction with other employees, assigning other employees to jobs, and

It is undisputed that Szabo could not hire and fire employees, delegate tasks to them, or discipline them.[96] When asked whether Szabo "supervise[d] any other Muncy employees" or "direct[ed] their work, such as giving them assignments or saying where they would be traveling," Delahoussaye responded in the negative.[97] Bunting stated she could not recall whether Szabo "supervise[d] any other Muncy employees and direct[ed] their work" but later agreed that Szabo was "teaching and supervising" employees when "actively doing a calibration."[98] These statements certainly establish the fact that Szabo trained other employees, but whether that training translates to regular and customary direction of other employees' work is a question of law that the Court must determine.

The Court finds the following testimony from Szabo's deposition instructive:

Q: When you would have Shandi Crappell or William Croy with you, would you supervise them while they were on the customer site?

A: No, sir. I was not given any authority to supervise.

Q: Did you help them perform the calibrations when you were there with them?

A: Yeah, I would, it was a team effort for sure.

---

hiring and disciplining employees); *Slusser v. Vantage Builders, Inc.*, 576 F. Supp. 2d 1207, 1221 (D.N.M. 2008) (concluding that employee directed the work of others where she "assigned work to these employees, directed the work of the employees, apportioned work among the employees, set deadlines for the employees, answered questions of the employees, disciplined the employees, supervised the employees' arrival and departure times, evaluated the employees' job performance, made recommendations concerning salary increases, and created procedures for the employees").

[96]  Fetter Dep., Doc. 39-3 at 35:19-38:1; *see* Szabo Dep., Doc. 39-5 at 26:11-27:19; *see also* Szabo SUMF, Doc. 39 ¶¶ 16, 21.

[97]  Delahoussaye Dep., Doc. 39-4 at 27:12-15.

[98]  Bunting Dep., Doc. 39-10 at 23:7-11.

21

Q: And if they were doing something wrong, would you tell them how to fix that so they weren't doing it incorrectly?

A: Yeah, that's, I mean that goes with training someone, yes, sir, you want to make sure they do the job and learn it correctly.

Q: Were there times with either Ms. Crappell or Mr. Croy where they would ask for your assistance with a calibration technique or something they were doing to perform the work?

A: Yes. Sure. There were always questions about doing things.

Q: Okay. And when they, those questions, they were directed to you?

A: Well, yes, sir, I was the only one there.

Q: And did you then help them perform the—

A: Well, yes, sir.

Q: Okay. So and it's correct to say that when people, William Croy and Shandi Crappell would a job assignment with you, you were trying to make sure they were doing the work correctly; is that right?

A: Well, yes, sir, you don't want to teach them to do it wrong.

Q: So in essence, I mean isn't that what supervision is, is everything you just described: answering questions, giving them directions, helping them do the job correctly, wouldn't you agree that's what supervision is?

A: No, sir. I was a trainer. I was not supervisor. Let's be clear.

Q: And, well, help me understand the difference in your perspective between what you did and what supervision is?

A: Okay. Well, for example, my brother-in-law works for the government, he is a trainer. He's clearly someone that trains people to do a certain job, but he's not a supervisor. He doesn't have any supervisory capabilities hiring people, firing people, do this, do that, do what I say or, you know, that's what a supervisor is. But to train someone, you're just training someone. You're teaching them

22

how to do a job and that's all I did was teach people how to do a job.

Q: Okay. So, again, let's try to make sure I understand, it sounds to me like your definition . . . of someone who supervises means that they have to have the ability to hire or fire that employee; is that correct?

A: Let's not twist that around. I'm not saying that. I'm just saying that I didn't have any delegation authorities. I was just there to make sure someone did the job correctly, to understand the process and how Muncy does things. I was not any type of supervisor.

Q: Okay. Well, let's talk about an individual site where you would have gone with somebody like William Croy, right, so you arrive at the customer's location. Who was the person who decides who is going to do what part of the job that day when you would arrive?

A: I don't know. we just did it. We just tackled it and did things, I mean it wasn't—

Q: Okay. well, was it you that told Mr. Croy, I'm going to go do this—

A: I didn't delegate.

Q: —and you're going to go do that?

A: No, I didn't delegate. No, I didn't do that.

Q: How did you decide with Mr. Croy and Ms. Crappell who was going to do what part of the job?

A: We just would open up the stuff and just start tackling. Sometimes they would say, okay, I'll do this or do that and you do this and do that, okay, that's fine. You know, however you all want to do it, let's do it, you know.[99]

It appears that the extent of Szabo's training responsibilities was showing other Muncy employees how to calibrate, ensure the work was done correctly, and answer questions if there were any. But he had no authority to delegate them tasks,

---

[99]   Szabo Dep., Doc. 39-5 at 24:7-27:19

much less control their work. Once Szabo finished training other technicians, he and the other technicians were essentially on equal footing.[100] Even assuming he directed Croy or Crappell's work while training them, he did not direct their work after their training was complete.[101]

The many decisions cited above bear out the conclusion that training other employees without having any other managerial authority over them is not directing the work of others. No case cited in this opinion involved an executive employee who *only* instructed other employees. Every single employee in those cases had some additional power that was consistent with directing others' work.

A useful comparison is *Bellone v. Kraft Power Corporation*, in which the Eastern District of New York considered whether an employee "in the business of designing and manufacturing engine-generator systems" who was hired as the defendant's "technical manager" was exempted from the FLSA.[102] The court

---

[100] *See* Szabo Dep., Doc. 39-5 at 22:24-28:4 ("Q: So were you training [Croy and Crappell] the entire time that they worked with you? A: No, once they learned the job, we would just be teammates at that point."), 54:23-56:10.

[101] *See id.* at 28:5-14 ("Q: Okay. So after they were trained, didn't you have the authority to supervise them on the job site at that point to tell them what they could do and you would do something different, correct? A: Oh, absolutely not. I did not have the authority to say you do this or I'll do that or whatever. we were just equals at that point. I was not a team leader or a— you know, once they were calibration technicians, they were just a technician like me."). *Cf. Selwood v. Ocean Divers, Inc.*, at *3 (S.D. Fla. Sept. 29, 2006), *report and recommendation adopted*, 2006 WL 8433889 (S.D. Fla. Oct. 4, 2006) (finding a genuine issue of material fact where the plaintiff's subordinates testified that the plaintiff supervised them).

[102] 2016 WL 2992126, at *1 (E.D.N.Y. May 23, 2016).

concluded that he directed others' work because he trained other employees, drafted documents detailing tasks for them, and received progress reports from them.[103]

Unlike the employee in *Bellone*, Szabo had no authority over other Muncy employees. Aside from instructing them on calibration, he did not delegate them tasks or assess their progress. Those additional responsibilities beyond just training show that the employee in *Bellone* directed other employees, and evidence some form of hierarchy between him and other employees whose work he directed. Here, the undisputed facts presented here show that all Szabo did was instruct employees for a limited period of time, after which the employees became his peers. The Court therefore concludes that Szabo's training is not direction under section 541.100(a)(3). Nor did he meaningfully supervise other technicians when calibrating with them. No reasonable factfinder would find them to be directing others' work.

### c.   Szabo's Training Was Not Customary and Regular

Even assuming that Szabo's training of other employees is tantamount to directing their work, the record indicates that his training was not a customary and regular activity. As discussed above, courts generally agree that an employee regularly and customarily directs others' work when he or she does so upwards of seventy-five percent of the time.[104]

---

[103]  *Id.* at *4-5.
[104]  *See McKinney*, 656 F. Supp. 2d at 131 (citing *Morgan.*, 551 F.3d at 1276).

It is unclear how much time Szabo devoted to training employees. He estimates—and the Court accepts as true—that he was out on the road visiting customers or traveling eighty percent of his time spent working.[105] However, it appears that Szabo at least occasionally trained other employees while doing on-site calibrations as customer locations.[106] Fetter estimates that Szabo trained five or six employees throughout his two-and-one-half years with Muncy.[107] Szabo does not appear to dispute that he trained five or six employees, but he only recalls two of them becoming technicians for Muncy.[108] He recalls a few assignments with one technician he trained and one assignment with the other.[109] Muncy does not dispute those facts. It is unclear whether any of these assignments involved training, but even if they all did, a reasonable factfinder could not find these isolated instances to take up seventy-five percent of the time Szabo spent working over a two-and-one-half-year period.

Although the record is not completely clear, Szabo's training responsibilities seem intermittent rather than regular or customary. But Muncy fails to identify any facts regarding how much time Szabo spent training employees—the main in which Szabo could have directed others' work.[110] Although Szabo carries the burden on his

---

[105]  Szabo Dep., Doc. 39-5 at 87:15-16; Szabo SUMF, Doc. 39 ¶ 7.

[106]  *See* Szabo Dep., Doc. 39-5 at 22:24-24:21.

[107]  Fetter Dep., Doc. 39-3 at 24:16-25:12.

[108]  Szabo Dep., Doc. 39-5 at 22:24-24:6.

[109]  *Id.*

[110]  *Cf. Howe v. Gov't Leasing Co.*, 2017 U.S. Dist. LEXIS 216565, at *18 (D. Colo. Sep. 26, 2017) (denying summary judgment in favor of employer where employer "failed to offer

motion, Muncy must at least identify some evidence on which it could meet its burden to show the executive employee exemption applies to Szabo.[111] And it has failed to do so. There are no facts from which the Court could even infer that Szabo spent anywhere near seventy-five percent of his time working on training others. Therefore, the Court concludes that there is no dispute that Szabo did not regularly and customarily direct others' work.

### d.    Szabo Did Not Direct the Work of Two or More Employees

Additionally, the Court concludes that even if Szabo's activities could be considered regular and customary, Muncy has not identified a single instance in which Szabo trained or supervised more than one employee. Although the record is not completely clear on that point, it appears that, at most, Szabo was accompanied by one other technician on trips.[112] That is insufficient to satisfy section 541.100(a)(3)'s test.[113]

Additionally, Szabo and the other technicians received their assignments from Delahoussaye, who was in a position of authority over Szabo and the other

---

evidence detailing the amount of time Plaintiff spent supervising other employees as compared to time spent on other activities").

[111]    *See Perez*, 769 F.3d at 30; *Lawrence*, 98 F.3d at 65.

[112]    *See* May 29, 2020 Email from Delahoussaye to Szabo and Shandi Crappell, Doc. 39-9 (informing Szabo and another technician of their work schedule).

[113]    *McPherson v. LEAM Drilling Sys., LLC*, 2015 WL 1470554, at *8-9 (S.D. Tex. Mar. 30, 2015) (concluding that where employees consistently performed tasks in two-man teams, the senior employee could not have directed two or more employees).

technicians.[114] Fetter also had supervisory authority.[115] Therefore, even if the Court were to find a triable issue of fact on Szabo's regular and customary direction, he shared that responsibility with Delahoussaye and Fetter, which further indicates that he did not regularly and customarily direct the work of two or more employees.[116]

Therefore, the Court concludes that no reasonable jury could find that Szabo regularly and customarily directed the work of other employees. At best, Muncy has convinced the Court that the undisputed facts show that Szabo was an instructor, not a supervisor. Without facts establishing some form of regular and customary authority over two employees, the Court concludes that summary judgment in Szabo's favor is appropriate.

### C.     The Professional Employee Exemption

Muncy next seeks to characterize Szabo as an employee working in a "professional capacity," which would exempt him from the FLSA's overtime requirements.[117] Szabo disputes Muncy's characterization, arguing that his work does not meet the Department's regulatory test for the professional exemption.[118]

---

[114]  Szabo SUMF, Doc. 39 ¶¶ 17-20 (citing Delahoussaye Dep., Doc. 39-4 at 22:3-4; July 7, 2020 Email from Delahoussaye to Szabo, Doc. 39-8; May 29, 2020 Email from Delahoussaye to Szabo and Shandi Crappell, Doc. 39-9).

[115]  Szabo SUMF, Doc. 39 ¶¶ 22-24.

[116]  *See* § 541.104(d) ("[A] shared responsibility for the supervision of the same two employees in the same department does not satisfy this requirement.").

[117]  Muncy Opp. Br. to Partial MSJ, Doc. 42 at 17-18; 29 U.S.C. § 213(a)(1).

[118]  Muncy Opp. Br. to Partial MSJ, Doc. 42 at 17-20.

As was the case with the executive exemption, although Szabo carries the burden on his motion, Muncy is responsible for putting forward "definite, competent evidence showing that" the exemption applies and cannot survive summary judgment by just "point[ing] to a dearth of evidence."[119]

The parties agree that the exemption is governed by 29 U.S.C. § 213(a) and 29 C.F.R. § 541.300 and § 541.301. Under section 541.300(a), a professional employee under section 213(a) is one who is: (1) compensated on a salary basis at a rate not less than $684 a week; and (2) "[w]hose primary duty is the performance of work" that either requires "knowledge of advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction" or requires "invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." Again, the parties do not appear to dispute the salary factor, and there is no indication that Muncy intends to argue that Szabo's work requires artistic or creative ability. As with the executive exemption, the test for the learned professional exemption is also conjunctive.[120]

### 1.    Prolonged Courses of Intellectual Instruction

Under section 541.301(a), to qualify for the professional exemption, an employees' "primary duty" must be the performance of work that requires "advanced knowledge . . . in a field of science or learning," which "must be

---

[119] *Perez*, 769 F.3d at 30; *see Lawrence*, 98 F.3d at 65.
[120] *See* § 541.301(a)(1)-(a)(3).

customarily acquired by a prolonged course of specialized course of specialized instruction." "The phrase 'customarily acquired by a prolonged course of specialized intellectual instruction' restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession."[121] "The best *prima facie* evidence that an employee meets this requirement is possession of the appropriate academic degree."[122] "However, the word 'customarily' means that the exemption is also available to employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction."[123]

Therefore, for an employee to be an exempt learned professional, "some type of *academic* degree is required, as opposed to skill acquired through experience."[124] In *Pignataro v. Port Authority of New York and New Jersey*, our Court of Appeals explained that academic means "[o]f, relating to, or characteristic of a school [or] [p]ertaining to liberal or classical rather than technical or vocational education."[125]

---

[121]  § 541.301(d).

[122]  *Id.*

[123]  *Id.*

[124]  *Pignataro*, 593 F.3d at 269 (emphasis in original).

[125]  *Id.* at 269 n.5 (citing WEBSTER'S II NEW RIVERSIDE DICTIONARY 69 (1988)). The *Pignataro* court defined intellectual as relating to "the capacity for understanding and knowledge [or] [t]he ability to think abstractly or profoundly." *Id.* at 270 n.8 (quoting Webster's II New Riverside Dictionary 634-35 (1988)).

Other Courts of Appeals have reached similar conclusions that some level of academic degree is required.[126]

The *Pignataro* court concluded that a helicopter pilot's flight license and related certifications were not academic degrees in the meaning of the regulation. The court noted that the pilots received their instruction in the air rather than in a classroom, and thus were not engaged in intellectual instruction and study, despite the fact that they had "specialized knowledge" and "unique skills."[127] It was of no moment that the pilots had to complete post-high school training to work for the defendant-employer.[128] The court ultimately agreed with the district court that the pilots were "merely highly trained technicians."[129]

---

[126] *See, e.g.*, *Reich v. Wyoming*, 993 F.2d 739, 741 (10th Cir. 1993) (educational prong satisfied where game wardens "required to have a baccalaureate degree in wildlife management, wildlife biology, or a closely related field"); *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737, 742 (6th Cir. 2000) (two years of college including related scientific training, year of mortuary science school, and passage of state examination deemed sufficient); *Owsley v. San Antonio Indep. Sch. Dist.*, 187 F.3d 521, 524 (5th Cir. 1999) (bachelor's degree in any field, five three-hour credit courses specifically directed towards athletic training, 1800 hours of apprenticeship training, and C.P.R. test deemed sufficient); *Vela v. City of Houston*, 276 F.3d 659, 675 (5th Cir. 2001) (concluding that the lack of educational requirement combined with over one thousand hours of combined field work and didactic training was insufficient for the exemption); *Fife v. Harmon*, 171 F.3d 1173, 1177 (8th Cir. 1999) ( "combination of experience and education" from "general academic education and from an apprenticeship" insufficient to satisfy education prong).

[127] *Pignataro*, 593 F.3d at 270.

[128] *See id.*

[129] *Id.*

### 2. Szabo Did Not Undergo a Prolong Course of Intellectual Instruction

Here, it is undisputed that Szabo does not have any type of academic degree and that being a calibration technician does not require an academic degree.[130] Szabo's resume, which was attached to his job application, indicates that he has knowledge in several technical areas.[131] His application shows that he attended high school, completed a six-month program in information technology, and spent some years serving in the United States Air Force, where he maintained fighter jets.[132] Fetter explained that he believed Szabo spent a significant amount of time in the classroom through "his training in the military, his training on engines and learning about engines in a training setting in the military."[133]

But based on Szabo's resume and job application, the Court concludes that any training he received was either vocational or on-the-job. It is clear that Szabo is highly trained, but without a degree; he is not highly trained in an academic or intellectual sense. The fact that Muncy does not require a degree is further evidence that Szabo did not undergo a prolonged course of academic instruction. Although job titles are of little evidentiary value in this context,[134] the Court notes that Szabo's job title is technician, he professes to be a technician, and Muncy does not dispute

---

[130] Szabo SUMF, Doc. 39 ¶¶ 25 (citing Szabo Job Application, Doc. 39-12), 26 (citing Delahoussaye Dep., Doc. 39-4 at 30:7-17).
[131] *See* Szabo Job Application, Doc. 39-12.
[132] *See id.*
[133] Fetter Dep., Doc. 39-3 at 47:20-48:12.
[134] *See* 29 C.F.R. § 541.2.

that he is a technician. As *Pignataro* indicates, technicians are generally not learned professionals.[135] Therefore, there is no dispute of material fact that said training is not a prolonged course of intellectual instruction. Summary judgment on the learned professional exemption is accordingly appropriate.

## IV.   CONCLUSION

As evident throughout this opinion, the FLSA's overtime requirements require an incredibly detailed assessment of the facts. And as the cases cited in this opinion indicate, that detailed assessment often prevents summary judgment. That is the case with Muncy's motion. But not so with Szabo's. Despite the limited record, there is no dispute of fact that training someone without having any authority over them is not directing their work and there is no dispute of fact that a technician without a degree did not undertake a prolonged course of academic instruction. Therefore, summary judgment in Szabo's favor is appropriate.

Accordingly, the Court denies Muncy's motion for summary judgment and grants Szabo's partial motion for summary judgment.

An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[135]   *See Pignataro*, 593 F.3d at 270.